# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| THOMAS J. HOLMES, OTHA KEITH FAIR, JOSE MALDONADO, MARIA E. MALDONADO, CERAFIN DAVALOS, WILBUR JONES, PYTHAPHONE KHAMPANE, and OMJAI NUEAKEAW, | Case No. 14-CV-208-JPS |
| Plaintiffs, | |
| v. | |
| CITY OF RACINE, GARY BECKER, JOHN DICKERT, DOWNTOWN RACINE CORPORATION, TAVERN LEAGUE OF RACINE CITY, KURT S. WAHLEN, JEFFREY A. COE, JAMES KAPLAN, GREGORY T. HELDING, DAVID L. MAACK, ARON WISNESKI, ROBERT MOZOL, DEVIN P. SUTHERLAND, MARK L. LEVINE, JOSEPH G. LEGATH, DOUGLAS E. NICHOLSON, MONTE G. OSTERMAN, MARY OSTERMAN, and GREGORY S. BACH, | ORDER |
| Defendants. | |

The plaintiffs—black, Hispanic, and Thai former owners of bars in downtown Racine, Wisconsin—filed their complaint in this action on February 25, 2014. (Docket #1 ("Compl."), ¶¶ 9–15). In it, they allege that the defendants—the City of Racine, local politicians, a political group, and a non-profit—engaged in various activities designed to eliminate minority-owned bars, specifically those owned by the plaintiffs, from operating in downtown Racine. (*E.g.*, Compl., ¶ 4). This, the plaintiffs assert, violated their civil rights and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and thus they brought suit against the defendants under the Civil Rights Act ("CRA"), 42 U.S.C. §§ 1983, 1985(3), and RICO, 18 U.S.C. §§ 1962(b)–(d). (*E.g.*, Compl., ¶ 5).

The defendants, in four separate groups (which the Court will discuss in further detail later in this opinion, but essentially deriving from the identity of the attorneys representing them), moved to dismiss the complaint. (Docket #25, #28, #31, #36). The plaintiffs responded to the defendants' four separate motions, largely opposing them. (Docket #45, #46, #47, #48). However, the plaintiffs did agree to dismiss certain aspects of their claims (which, again, the Court will discuss more fully, as follows). (*See* Docket #45 at 41, 43, 48–50). The plaintiffs also entered a stipulation to dismiss one of the individual defendants (Docket #49), which the Court adopted (Docket #50). Thereafter, the separate groups of defendants filed their respective reply briefs, (Docket # 52, #55, #57, #58), meaning that the motions to dismiss are now fully briefed and ready for a decision.

Needless to say, this matter is very complex. If the four separate motions to dismiss were not enough, several of the briefs in support of those motions exceed the typical page limits. (*See* Docket #20, #43, #51). But that is not to say that the motions were unnecessary; indeed, they raise legitimate shortcomings with the plaintiffs' complaint. Due to the vast number of plaintiffs and named defendants, the complaint suffers from its breadth, creating significant confusion as to who, precisely, is claiming what against whom.

Thus, given the complexity, the Court believes that it is best to use this order to try to clear up the confusion. This requires that the Court take pains to be very specific, starting by describing the general nature of the plaintiffs' allegations, then specifically detailing the plaintiffs' claims and which aspects of those claims the plaintiffs have agreed to dismiss. After providing that background, the Court will address the remaining substance of the outstanding motions to dismiss.

In the end, the Court finds that it has no choice but to dismiss the complaint. As already noted and as will be described in further detail, the complaint is much too vague to provide any meaningful notice to the defendants of the respective plaintiffs' claims. This is not to say that the plaintiffs' claims are necessarily without merit—in fact, their general allegations suggest a case with serious potential that should proceed to discovery. For that reason, the Court will allow the plaintiffs an opportunity to amend their complaint in a way that comports with the following discussion.

1.     PLAINTIFFS' ALLEGATIONS

The Court begins with a general discussion of the plaintiffs' factual allegations. At this stage of the proceedings, the Court must accept all of the plaintiffs' well-pleaded factual allegations as true. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (complaint must "contain sufficient factual matter, *accepted as true*, to 'state a claim to relief that is plausible on its face.'") (emphasis added; quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Thus, in describing the plaintiffs' allegations, the Court does not mean to imply that they are necessarily true. Rather, the Court recounts them only for the purpose of providing the relevant record upon which it must assess the defendants' motions to dismiss.

1.1     The Parties

There are eight plaintiffs in this case. They are all either black, Hispanic, or Thai, and owned several bars located in downtown Racine:

(1)     Thomas Holmes is black and owned and operated the Park 6 Bar from 2008 to 2012 (Compl., ¶ 9);

(2)     Otha Keith Fair is black and owned and operated The Place on 6th, LLC, from 2009 to 2012 (Compl., ¶ 10);

(3-4)   Pythaphone Khampane and Omjai Nueakeaw are Thai-American and Thai, respectively, and together owned and operated Ginger's Lounge from 2008 to 2011 (Compl. ¶¶ 11–12);

(5)   Wilbur Jones is black and owned and operated Viper's Lounge from 1998 to 2008 (Compl. ¶ 13);

(6)   Cerafin Davalos is Hispanic and owned and operated Cera's Tequila Bar from 2006 to 2008 (Compl. ¶ 14);

(7–8)   Jose Maldonado and Maria Maldonado are Hispanic and together owned and operated The Cruise Inn from 2001 to 2006 (Compl. ¶ 15).

They brought suit against a number of defendants, including the City of Racine and various individuals and groups involved in Racine's local politics. (*See* Compl. ¶¶ 16–35). Those defendants have since split into several separate groups, as follows:

(1)   the Municipal Defendants, which includes:

(a)   the City of Racine (hereinafter "Racine" or "the City") (Compl. ¶ 16);

(b)   John Dickert, Racine's current mayor, who has held that position since May of 2009 (Compl. ¶ 17);

(c)   Gary Becker, Racine's former mayor, who served in that position from May of 2003 until May of 2009 (Compl. ¶ 18);

(d)   Kurt Wahlen, who served as Racine's police chief from 2007 until April of 2012 (Compl. ¶ 21);

(e)   Jeffrey Coe, an alderman sitting on Racine's Common Council from April of 2001 through April of 2005, April of 2007 through April of 2011, and April of 2013 through present (Compl. ¶ 22);

(f)   James Kaplan, an alderman sitting on Racine's Common Council from April of 2006 through present, during which time he has served on the City's Board of Health and Licensing Committee (Compl. ¶ 23);

(g)     Raymond DeHahn, an alderman sitting on Racine's Common Council from April of 2005 through April of 2011, during which time he served on the City's Licensing Committee (Compl. ¶ 24);

(h)     Gregory Helding, an alderman sitting on Racine's Common Council from April of 2005 through present, during which time he served on the City's Licensing Committee (Compl. ¶ 25);

(i)     David Maack, an alderman sitting on Racine's Common Council from April of 2000 through April of 2010, during which time he served on the City's Licensing Committee (Compl. ¶ 26);

(j)     Aron Wisneski, an alderman sitting on Racine's Common Council from April of 2006 through April of 2012, during which time he served on the City's Licensing Committee (Compl. ¶ 27);

(k)     Robert Mozol, an alderman sitting on Racine's Common Council from April of 2007 through April of 2013, during which time he served on the City's Licensing Committee (Compl. ¶ 28);

(l)     Devin Sutherland, who serves as manager of Racine's Downtown Business Improvement District ("BID #1") and executive director of the Downtown Racine Corporation (the Court will discuss both BID #1 and the Downtown Racine Corporation in further detail, below) (Compl. ¶ 29);

(m)     Mark Levine, who serves as the chairman of BID #1 and also owns property within BID #1 (Compl. ¶ 30);

(n)     Joseph LeGath, a member of the BID #1 board, who also owns several bars in Racine and serves as the director of the Racine City Tavern League (which the Court will discuss further, below) (Compl. ¶ 31); and

(o)     Gregory Bach, Mayor Dickert's assistant (Compl. ¶ 35);

(2)     the Political Staff Defendants, a term the Court has created to describe the group that include:

   (a)   Doug Nicholson, a member of the Racine City Tavern League, who owns several bars withing BID #1 and also serves on the City's Board of Ethics (Compl. ¶ 32);

   (b)   Monte Osterman, who assisted Mayor Dickert with his 2009 and 2011 mayoral campaigns (Compl. ¶ 33); and

   (c)   Mary Jerger Osterman, who served as Mayor Dickert's treasurer for his 2009 and 2011 mayoral campaigns (Compl. ¶ 34);

(3)     the Downtown Racine Corporation, a private, non-profit corporation that works to enhance Downtown Racine's image and functionality and contracts with the City to manage BID #1, the Downtown Racine Corporation is managed by an Executive Director (Devin Sutherland, one of the Municipal Defendants) and governed by a Board of Directors (some of whom are named Municipal Defendants) (Compl. ¶ 19); and

(4)     the Racine City Tavern League (the "Tavern League"), a non-profit corporation that, essentially, serves as a lobbying group for alcohol retailers in Racine, Wisconsin (Compl. ¶ 20), and currently has approximately 83 members, the vast majority of whom are white (Compl. ¶ 20).

1.2     The Plaintiffs' Factual Allegations

Current-Mayor Dickert was elected in May of 2009.[1] (Compl. ¶ 17, 39). He replaced former-Mayor Becker, who was found to have engaged in criminal conduct and resigned in January of 2009. (Compl. ¶ 39).

From the start of his campaign, current-Mayor Dickert made clear his intent to "revitalize" and "clean up" downtown Racine, getting rid of "undesirable" or "problem" patrons. (Compl. ¶ 40). This was obviously a

---

[1]The plaintiffs claim, however, that the illegal activities engaged in by the defendants extend back into the term of former-Mayor Becker. (*See, e.g.*, Compl. ¶¶ 140, 153).

view he shared with some members of the Tavern League—including Municipal Defendant LeGath and Political Staff Defendant Nicholson—who contributed large amounts of money to current-Mayor Dickert's campaign. (Compl. ¶ 41). Those contributions were allegedly in excess of statutory limits, and the campaign allegedly fraudulently reported them when depositing them into the campaign account. (Compl. ¶ 41).

There were allegedly some other financial shenanigans going on, both during and after current-Mayor Dickert's election. First, he allegedly received sizeable personal loans from family members and staff members, which he deposited into his personal account; he then wrote checks to his campaign from those funds, all to avoid contribution limits. (Compl. ¶ 42). Further, after becoming mayor, Dickert allegedly continued to accept money from Tavern League members and other business owners in Racine. (Compl. ¶ 43). He deposited that money into his campaign accounts for use in his 2011 re-election campaign, and allegedly has continued to receive such contributions. (Compl. ¶ 43).

So, why did the donors make these allegedly illegal contributions to current-Mayor Dickert? According to the plaintiffs, it was to both sway Dickert's agenda and to, essentially, buy positions in Racine's municipal government from which they could control the agenda further. (Compl. ¶¶ 41, 44).

The plaintiffs allege that "Dickert conspired with Alderpersons, Police Department officials, the Downtown Racine Corporation, BID #1 Board members, and business and property owners to prevent minority bar owners from obtaining and/or maintaining their liquor licenses and to ensure white Tavern League members kept their respective liquor licenses." (Compl. ¶ 44). According to this theory, the Police Department (presumably at current-

Mayor Dickert's direction) would target minority-owned bars and report crimes and other disturbances that occurred there at a higher rate. Citizens (presumably at the control of either the Dickert campaign, the Tavern League, or conspiring business owners) would do the same. Those reports resulted in the minority-owned bars being called before the Common Council for a hearing. There, the Common Council often required that the minority-owned bars take expensive steps to combat the problems, such as installing cameras or hiring off-duty police officers to provide security. If the owners could afford to take such steps—and not all could, instead choosing to voluntarily relinquish their licenses—they then had to walk a very tight rope, because the slightest slip-up would result in additional hearings and, eventually, the loss of their liquor licenses.[2] Those lost liquor licenses were, in turn, acquired by white individuals. (Compl. ¶¶ 44, 46–67, 90–138). White-owned bars, meanwhile, were reported far less often—occasionally even receiving the benefit of having police officers list the location of a disturbance as having occurred in a general area or separate address, so as to disguise the fact that the disturbance had occurred in their bar. Then, even when the white owners were called before the Common Council, they escaped with

---

[2] This is a simplification of the hearing process, which was largely conducted before the Licensing Committee (a sub-committee of the Common Council), but is sufficient for the purposes deciding the motions to dismiss.

less or no additional safety requirements and did not face the same license-loss prospects that the minority owners did. (Compl. ¶ 68–89).[3]

And, if this course of conduct was intended to rid downtown Racine of all minority-owned bars, it succeeded: there currently are not any minority-owned bars in downtown Racine. (Compl. ¶ 65). The plaintiffs all lost or relinquished their licenses, some after spending large amounts of money on complying with Common Council safety requirements.

2.      PLAINTIFFS' CLAIMS AND AGREEMENTS TO DISMISS

On the basis of those alleged facts, the plaintiffs filed suit against the defendants. Their complaint alleges five separate claims.

(1)      The CRA conspiracy claim, pursuant to 42 U.S.C. § 1985(3). In this claim, the plaintiffs claim that the defendants conspired to deprive the plaintiffs of their civil rights, specifically the equal protection of the law and equal privileges and immunities under the law, on the basis of their race (Compl. ¶¶ 139–45).

(2)      The general CRA claim, pursuant to 42 U.S.C. § 1983. In this claim, the plaintiffs allege that each of the defendants, acting under color of state law, deprived the plaintiffs of their civil rights, specifically the equal protection of the law and equal privileges and immunities under the law, on the basis of their race (Compl. ¶¶ 146–50).

---

[3]In an effort to keep this order as short as possible, the Court has not included all of the facts described by the plaintiffs. But those facts are enlightening. The plaintiffs have provided a long recitation of the municipal actions taken against them, which—when compared to those taken against white-owned bars with very similar problems—are (on their face) clearly harsher than those directed at their white counterparts. Of course, we are at an early stage of the proceedings and discovery may ultimately reveal reasons for that treatment. Nonetheless, on its face, the course of conduct is concerning.

(3)    The RICO acquisition claim, pursuant to 18 U.S.C. § 1962(b). In this claim, the plaintiffs allege that the defendants targeted the plaintiffs and obtained power or control over their businesses through a scheme of corrupt and illegal activities (Compl. ¶¶ 151–66).[4]

(4)    The RICO conduct claim, pursuant to 18 U.S.C. § 1962(c). In this claim, the plaintiffs allege that the defendants conducted corrupt and illegal activities through their businesses or the Racine municipal government (Compl. ¶¶ 167–74).

(5)    The RICO conspiracy claim. In this claim, the plaintiffs allege that the defendants conspired in carrying out the corrupt and illegal activities. (Compl. ¶¶ 175–84).

One of the first giveaways that the plaintiffs' complaint may have problems is the fact that it totally fails to clarify who is making which of these claims against whom and in what capacity. Rather than work with a rifle, the plaintiffs unholstered their bazooka: without any clarifying language in the complaint, it seems clear that *each* plaintiff intends to allege *each* claim against *each* defendant (and in the case of the individual defendants, those claims are against them in *each* of their capacities—official *and* individual).

They have attempted to walk that back a bit by agreeing to narrow their claims slightly in the following ways:

(1)    dismissing all claims against Raymond DeHahn (Docket #49, #50);

(2)    dismissing their RICO claims against Racine (Docket #45 at 41);

---

[4] Or, at least, that is what they must be claiming, because 18 U.S.C. § 1962(b) is directed at preventing unlawful acquisition of power or control of a business. However, as the Court will discuss in further detail, the plaintiffs do not seem to flesh out the power/control aspect of their claim.

(3)    dismissing their RICO claims against individual Municipal Defendants (Dickert, Becker, Wahlen, Coe, Kaplan, DeHahn, Helding, Maack, Wisneski, Mozol, Sutherland, Levine, LeGath and Bach), to the extent that such claims were made against them in their "official capacity" (Docket #45 at 41);

(4)    dismissing their CRA claims against the individual Municipal Defendants (Dickert, Becker, Wahlen, Coe, Kaplan, DeHahn, Helding, Maack, Wisneski, Mozol, Sutherland, Levine, LeGath and Bach) in their "official capacity" (Docket #45 at 43);

(5)    dismissing their RICO acquisition claim, pursuant to 18 U.S.C. § 1962(b), against Downtown Racine Corporation (Docket #57 at 9); and

(6)    dismissing their RICO acquisition claim, pursuant to 18 U.S.C. § 1962(b), against the Political Staff Defendants (Osterman, Jerger, and Nicholson) (Docket #52 at 7).

To some further unspecified extent, the plaintiffs have also acknowledged or not disputed that portions of their claims cannot lie in the following manner:

(1)    that plaintiffs Davalos, Jones, and Fair cannot sustain their claims against the Municipal Defendants on the Common Council to the extent those claims are based upon the Common Council's decision to revoke or to not renew their liquor licenses (though they assert that they can maintain their claims relating to "side agreements") (Docket #45 at 48);

(2)    that plaintiffs Khampane, Nueakeaw, and Holmes cannot sustain their claims against Municipal Defendant Maack to the extent those claims are based upon the Common Council's decision to revoke or to not renew their liquor licenses (though they assert that they can maintain their claims relating to "side agreements") (Docket #45 at 49–50); and

(3)    that plaintiffs Fair and Holmes cannot sustain their claims against Municipal Defendant Wisneski to the extent those claims are based upon the Common Council's decision to revoke or to not renew their liquor licenses (though they assert that they can maintain their claims relating to "side agreements") (Docket #45 at 49–50).

On this basis alone, the Court would find it appropriate to dismiss the plaintiffs' complaint in order to have them file an amended version. Frankly, given the breadth of the complaint and the plaintiffs' vague and haphazard attempts to pare it back, the Court is seriously confused about what claims are viable and against whom. Without a doubt, the parties, including the plaintiffs, must be too. Therefore, it would be appropriate to require an amended complaint if only so that the plaintiffs could clarify what claims they are actually continuing to assert in this case.

3.    DISCUSSION

There are, however, other problems with the complaint. Rather than dismiss it on that basis alone to allow a clarifying amendment, only to have the same disputes bubble up to the surface again, the Court will address the merits of the defendants' motions to dismiss.

In doing so, the Court must accept all of the plaintiffs' well-pleaded factual allegations as true to determine whether the complaint states "'a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 663 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This plausibility requirement helps "to protect defendants from having to undergo costly discovery unless a substantial case is brought against them." *United States v. Vaughn*, 722 F.3d 918, 926 (7th Cir. 2013).

With that standard in mind, the Court turns to addressing the substance of the defendants' motions to dismiss. Because of the vast number of allegations and the fact that those allegations affect different groups of

defendants in different ways, the Court will address each group's motion to dismiss separately.

### 3.1    Municipal Defendants

The Municipal Defendants' motion to dismiss is the most substantial. In it, they point out serious problems with the plaintiffs' CRA and RICO claims against them.

#### 3.1.1   CRA Claims

The Municipal Defendants have several valid concerns with the plaintiffs' CRA claims.

##### 3.1.1.1 No Third Party Standing

First, the Municipal Defendants are right to clarify that the plaintiffs cannot bring claims on one another's behalf. It may not have been the plaintiffs' intent, but because their complaint does not specify individual claims, it seems that each individual plaintiff may be trying to allege claims on behalf of other plaintiffs or unnamed parties. To the extent they are attempting to do so, that is impermissible. *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 17–18 (2004) (litigant cannot sue in federal court to enforce the rights of third parties); *Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 757 (7th Cir. 2008). There is no doubt that each plaintiff has standing to bring his or her own CRA claims, and allegations with respect to other plaintiffs may be pertinent to each individual plaintiff's claims. (Docket #45 at 42). The confusion creeps in because the plaintiffs lumped every single one of their individual claims into single claim sections for 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3), respectively. (Compl. ¶¶ 139–50). That joining of the multiple individual claims only serves to confuse matters. Therefore, in filing an amended complaint, the plaintiffs should be sure to specify the extent of their individual claims.

### 3.1.1.2 Statute of Limitations on Maldonado Claims

Second,[5] there appear to be statute of limitations issues with the Maldonado plaintiffs' CRA claims. Under the applicable statute of limitations supplied by Wisconsin law, the Maldonados had to bring their CRA claims within six years of the date when they knew or should have known that their constitutional rights were violated. *See, e.g., Reget v. City of La Crosse*, 595 F.3d 691, 694 (7th Cir. 2010) (six year limitations period on 42 U.S.C. § 1983 actions brought in Wisconsin, pursuant to Wis. Stat. § 895.53); *Gray v. Lacke*, 885 F.2d 399, 409 (7th Cir. 1989) (same); *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011) (limitations period accrues when plaintiff knew or should have known of violation); *Hileman v. Maze*, 367 F.3d 694, 696 (7th Cir. 2004) (same); *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993) (same). The Seventh Circuit uses a two-step test to determine the accrual date: first, identifying the injury, and, second, determining when the plaintiff could have sued for that injury. *Draper*, 664 F.3d at 1113 (citing *Hileman*, 367 F.3d at 696).

So, what was the Maldonados' injury? Presumably when they were the victims of harmful actions—being subject to a due process hearing and "fines, threats, calls, and visits"—that forced them to sell their property, all of which allegedly occurred on the basis of their race.

Next, when could the Maldonados have sued for that injury? This question is up for debate. The Municipal Defendants argue that it accrued no later than January 9, 2007, the date on which the Maldonados sold their establishment. This would be the case if the Court were to adopt the

---

[5]The Municipal Defendants have made other arguments against the plaintiffs' complaint, some of which the plaintiffs agreed with. (*See* Docket #45, at 43). The Court has already addressed the plaintiffs' concessions in that regard in Section 2, *supra.* Therefore, the Court does not repeat them in this section.

Municipal Defendants' arguments and find that the Maldonados should have been aware that they were treated disparately from white owners, because those white owners' liquor license renewals were a matter of public record. (*See, e.g.,* Docket #58 at 25–26). That argument gives every appearance of a stretch: it assumes that the Maldonados should have been aware of the issues at other establishments and aware that the owners were white, then utilized that information in conjunction with the public knowledge that the white owners' liquor licenses had been renewed. Thus, while the Municipal Defendants cite persuasive authority for the proposition that the Court should not extend the CRA accrual date when the Maldonados could have discovered their injury on the basis of public records (Docket #58 at 26) (citing *Wise v. Hubbard*, 769 F.2d 1, 2–3 (1st Cir. 1985); *Perry H. Bacon Trust v. Transition Partners, Ltd.*, 298 F. Supp. 2d 1182, 1191–92 (D. Kan. 2004); *Vieyra v. Harris County*, No. 10-CV-1412, 2010 WL 4791518, at *5 (S.D. Tex. Nov. 17, 2010); *Hanson v. Johnson*, No. Civ. 02-3709, 2003 WL 21639194, at * 3, *5 n.2 (D. Minn. June 30, 2003); *Soliman v. Philip Morris Inc.*, 311 F.3d 966, 975 (9th Cir. 2002)), the Maldonados would have needed much more detailed knowledge to have known they could sue for their injury.

Thus, in the end, the Court determines that the Maldonados may maintain their claims in the amended complaint. In other words, in dismissing the complaint, the Court does not do so with prejudice against the Maldonados.

However, the Maldonados should be aware that their claims remain on thin ice. The Court has not definitively determined that their claims escape the statute of limitations. Rather, it has found only that—on the basis of the record before it—the claims escape dismissal at this early stage. If there is reason to believe that the Maldonados should have known that their claims

had accrued (or if the defendants can provide controlling or better-applicable law), then their claims may still be subject to dismissal.

### 3.1.1.3 Failure to Allege Personal Involvement

Third, one of the symptoms of the plaintiffs' overly-broad complaint is the fact that they fail to adequately allege that certain of the Municipal Defendants had any personal involvement in the alleged deprivations of the plaintiffs' civil rights. Of course, to be held liable under 42 U.S.C. § 1983, an individual defendant "must be 'personally responsible for the deprivation of a constitutional right.'" *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001)). Unfortunately, in painting with a broad brush, the plaintiffs fail to explain how a number of the Municipal Defendants—specifically Becker, Wahlen, Sutherland, Levine, LeGath, and Bach—had any personal responsibility for depriving the plaintiffs of their civil rights. By and large, the allegations are too bare-bones to find even the spectre of personal responsibility; meanwhile, the plaintiffs do not explain how some defendants—Bach, for example, who did not begin working for Dickert until 2009—should be liable to *each* of the plaintiffs, even those who suffered alleged deprivations when those defendants could not have participated in a deprivation.[6]

Again, this is a problem that stems from the plaintiffs' overly-broad complaint. In failing to connect the dots between each individual plaintiff's claims against each individual defendant, the plaintiffs have failed to plead 42 U.S.C. § 1983 claims against many of the named Municipal Defendants.

---

[6]The same discussion applies to the plaintiffs' claims against Maack and Wisneski, which it seems that the plaintiffs have conceded they cannot maintain, though that is not absolutely clear. (*See* Section 2, *supra*). If the plaintiffs elect to amend their complaint, they should keep these facts in mind.

This is not a basis to dismiss those claims with prejudice, though. The plaintiffs may amend their complaint to clearly specify the defendants' personal involvement.

### 3.1.2    RICO Claims

Each plaintiff apparently alleges three separate RICO claims against each defendant, pursuant to 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d), respectively. There are multiple problems with each claim.

#### 3.1.2.1    Failure to Adequately Allege Predicate Acts Dooms All Three RICO Claims

While 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d) each have distinct elements, they all require the existence of a "pattern of racketeering activity." *See* 18 U.S.C. §§ 1962(b–d) (the terms of subsection (d) may not specifically mention a pattern requirement, but in requiring a violation of subsection (a), (b), or (c), it effectively imports those sections' pattern requirement). A pattern of racketeering activity requires at least two "predicate acts" of racketeering activity. 18 U.S.C. § 1961(5). This means that the plaintiffs have to have pleaded at least two "act[s] or threat[s] involving…bribery [or] extortion…," in order to state a claim under 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d). *See, e.g.*, 18 U.S.C. §§ 1961(1, 5), 1962(b–d).

The Court begins by again highlighting the lack of clarity in the plaintiffs' complaint. Despite providing a fairly detailed factual recitation at the beginning of their complaint, the plaintiffs never circle back to those facts in their RICO claims section to provide a specific detail of what they believe the predicate acts to be.

However, reading the complaint as broadly as possible, the Court agrees with the Municipal Defendants that there may be two groups of acts that may constitute predicate acts: (1) the alleged interference with the

plaintiffs' liquor licenses ("the Liquor License Acts"); and (2) the alleged bribes and improper contributions to current-Mayor Dickert during his campaign, which are now allegedly ongoing ("the Campaign Acts"). (Docket #26 at 12).

### 3.1.2.1.1 Liquor License Acts

The Liquor License Acts, at least on the state of the pleadings, cannot be treated as predicate acts. To begin, to the extent that the plaintiffs may be arguing that the Liquor License Acts constituted civil rights violations, which, in turn, constitute predicate acts, they are incorrect as a matter of law. *See, e.g.*, *Jennings v. Emry*, 910 F.2d 1434, 1438 (7th Cir. 1990) (violations of civil rights are not RICO predicate acts); *Giuliano v. Fulton*, 399 F.3d 381, 388 (1st Cir. 2005) (same). The plaintiffs do not seem to push that argument, though.

Instead, they try to convince the Court that the Liquor License Acts constitute extortion, under both federal law (18 U.S.C. § 1951) and state law (Wis. Stat. § 943.30). (Docket #45 at 11–17). Extortion would, of course, qualify as a predicate act. 18 U.S.C. § 1961(5). The problem is that the factual allegations are not sufficient to escape Rule 12(b)(6) dismissal.

Under federal law, there is no extortion where the sole beneficiary is a governmental entity. *Wilkie v. Robbins*, 551 U.S. 537, 564–66 (2007). On the state of the pleadings, it seems as if Racine was the sole beneficiary of the Liquor License Acts.

Of course, the plaintiffs disagree. They argue that their allegations "clearly support the reasonable inference that Defendants stood to gain financially, and otherwise, from their extortionate acts." (Docket #45 at 18). But the plaintiffs do not explain *how* their allegations support those assertions. Perhaps they mean that, in taking action against the plaintiffs, the

defendants received financial rewards or secured liquor licenses for themselves or others. But there are no specific allegations in the complaint stating so.

The plaintiffs also argue that the Municipal Defendants benefitted politically from their acts. It is a regular occurrence that an elected official—such as an elected sheriff—takes a tough-on-crime stance, which results in (typically lawful) deprivations of others' liberties, and for which the official is eventually rewarded politically by the electorate. The Court hesitates to classify such activity as extortion, as it would seem to open up a world of lawsuits against elected officials who are zealous in carrying out their otherwise lawful functions.[7]

As to the whether the Liquor License Acts satisfy Wisconsin's extortion statute, an argument first raised in the plaintiffs' response briefs, the Court finds similar problems. To begin, there is a similar government-as-beneficiary problem. There is no Wisconsin case law on the topic, but the Court struggles to see how the outcome should differ under Wisconsin law as compared to federal law (although, if this issue comes up again, the Court will welcome argument from the plaintiffs on the topic). Additionally, the allegations simply do not raise the specter of an extortionate scheme: it is unclear what the plaintiffs were threatened with to coerce them to act.

Finally, as with just about every other aspect of the plaintiffs' complaint, the plaintiffs simply never specify *who* actually did *what* that would satisfy the elements of either 18 U.S.C. § 1951 and state law Wis. Stat. § 943.30.

---

[7]The Court is not entirely foreclosing this issue. If it comes up again later in the case, the plaintiffs are free to brief it further, but the Court will not side with them absent citation to solid authority.

### 3.1.2.1.2   Campaign Acts

Likewise, the Campaign Acts cannot be treated as predicate acts on the state of the pleadings. Any potential violations of Wisconsin's campaign finance laws, as found in Wisconsin Statutes Chapter 11, would not necessarily constitute predicate acts. The terms of 18 U.S.C. § 1961(5) do not clearly include campaign finance violations. Furthermore, as the Municipal Defendants correctly point out, there is some question as to whether Wisconsin's campaign finance laws are even valid in light of recent Supreme Court and Seventh Circuit decisions. (Docket #26 at 20 n. 9 (citing *McCutcheon v. Federal Election Comm'n*, --- U.S. ----, 134 S.Ct. 1434 (2014); *Wis. Right to Life, Inc. v. Barland*, No. 12-2915, --- F.3d ---- (7th Cir. May 14, 2014))). Finally, even if Chapter 11 violations were predicate acts, the plaintiffs have done nothing more than provide conclusory allegations that such violations occurred. The Court is not applying a heightened pleading standard when it finds so: simply put, the plaintiffs have not alleged any *factual* matter to support a finding of a Chapter 11 violation, instead providing only conclusions that such violations occurred. (*See, e.g.*, Compl. ¶¶ 41–43 (stating that excess contributions were made and falsely reported, but providing no factual detail in support)).

The plaintiffs' argument that the Campaign Acts constituted bribery also fails for lack of specificity. The plaintiffs have not alleged any communication between the multiple defendants to indicate an agreed *quid pro quo* transaction, as would be necessary to establish bribery. *See Kaye v. D'Amato*, 357 Fed. App'x 706, 714 (7th Cir. 2009). There are no allegations regarding who paid what to whom and in exchange for what; thus, all of the hallmarks of a bribery claim—be it under federal law (18 U.S.C. §§ 201(b), 201(c)) or state law (Wis. Stat. § 11.25(1))—are entirely missing, except for the

bald conclusory statements that excess donations or improper loans were made for the purpose of a *quid pro quo* transaction.

Likewise, the plaintiffs' argument that money laundering occurred is not adequately supported. Again, there are no factual allegations to support a finding of money laundering—only a bald conclusion that there was money laundering. This is not enough.

Finally, to the extent that the plaintiffs argue that the Campaign Acts (or for that matter, the Liquor License Acts) fall under the definition of "predicate acts" as defined by Wisconsin's state RICO act, that fact would be irrelevant. The Court cannot find a federal RICO violation without a federal RICO predicate act. There may be some substantial overlap between the two statutes, but Wisconsin RICO predicate acts do not *per se* constitute federal RICO predicate acts.

In the end, given the myriad other issues with the complaint, the Court was going to dismiss this complaint anyway and this predicate acts analysis is of little impact. Perhaps, if that were not the case, the Court would have given the plaintiffs' claims a more charitable reading. But, given that the plaintiffs must amend their complaint anyway, the Court raises these concerns with the hope that the plaintiffs will consider them and draft their complaint taking them into account.[8]

---

[8]The plaintiffs' failure to plead any RICO predicate acts effectively prevents the Court from determining whether they sufficiently alleged a "pattern of racketeering activity." *See DeGuelle c. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011) (citing *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989)). The Municipal Defendants argue that the plaintiffs have failed to make allegations in that regard but, without any predicate acts to analyze for a pattern, the Court finds that it is wiser not to reach that question.

### 3.1.2.2   Plaintiffs' RICO Standing

The Municipal Defendants also argue that the plaintiffs lack standing to pursue their RICO claim because they failed to allege that each Municipal Defendant engaged in at least two predicate acts and that such predicate acts harmed the plaintiffs. This is an important point for the plaintiffs to consider in drafting their amended complaint.

Though the Seventh Circuit has never specifically stated so, the Second Circuit has made clear that, to succeed on a RICO claim against any given defendant, the plaintiff must prove the elements of the claim against that defendant. *DeFalco v. Bernas*, 244 F.3d 286, 315 n.19 (2d Cir. 2000). In other words, if a plaintiff sues twenty defendants, she must prove every element of her claim against each defendant if she wishes to recover from each of them. This is a wise rule: why should defendants who did not engage, for example, in at least two predicate acts be held liable on a RICO claim simply because they were named with other defendants who did commit the two predicate acts?

The Municipal Defendants also point out that the plaintiffs' RICO claims do not make clear which defendants' actions harmed which plaintiffs. As a simple matter of standing, the individual plaintiffs cannot maintain claims against defendants who did not harm them. *E.g. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (requiring a causal connection between plaintiff's alleged injury and challenged action of defendant). Thus, where the plaintiffs do not make clear how they were harmed by specific defendants' actions, it is not clear that they have standing to sue those specific defendants.

These rules are important and should be considered but do not necessarily mean that each plaintiff must absolutely plead two specific

predicate acts separately against every defendant he or she is suing. That may be the wiser course of action, but given that the Court is looking for "plausibility," that does not seem that it is an absolute requirement.

This is not an invitation to engage in the same sort of vague drafting that the Court has seen so far, though. Here is what is clear: each plaintiff must allege *facts* that, taken as true, would show a *claim to relief* that is plausible on its face. *Iqbal*, 556 U.S. at 663. In other words, the Court will not allow them to escape dismissal simply by pleading a host of facts which they then incorporate into claims against all or groups of the defendants. Rather, the Court expects to see each plaintiff who wishes to assert a RICO claim to plead factual allegations, as specifically as possible, against the specific defendant(s) they allege that claim against so as to show a claim to relief that is plausible on its face. The Court cannot tell the plaintiffs how to do this—that is a matter of judgment. Suffice it to say that, absent factual allegations that would establish facial plausibility of RICO claims against specific defendants by specific plaintiffs, the Court will be obliged to dismiss the RICO portions of the plaintiffs' amended complaint.

### 3.1.2.3 § 1962(d) Claims

Finally, the Court points out that it agrees with the Municipal Defendants that, to the extent that the plaintiffs fail to plead an agreement that would violate either 28 U.S.C. §§ 1962(b) or 1962(c), they also fail to state a claim under 28 U.S.C. § 1962(d). For the reasons described above, the plaintiffs have not adequately stated facts that would show either a scheme that would violate 28 U.S.C. §§ 1962(b) or 1962(c) or an agreement to engage in such a scheme. In drafting their amended complaint, the plaintiffs should keep this in mind, so as to ensure that they adequately plead those elements.

### 3.2 Political Staff Defendants

Next, the Court turns to the motion to dismiss filed by the Political Staff Defendants—Osterman, Jerger, and Nicholson. They raise some of the same arguments as the Municipal Defendants and some additional arguments specific to their own circumstances. The Court addresses all of those arguments, as follows.

#### 3.2.1 CRA Claims

The Court finds that the plaintiffs' CRA claims against the Political Staff Defendants are troubled for the same reasons described in Sections 3.1.1.1, 3.1.1.2, and 3.1.1.3, *supra*, in addition to the fact that the plaintiffs have not pleaded factual allegations in sufficient detail as against the Political Staff Defendants. Thus, as the Court has repeated several times, the plaintiffs should ensure that their amended complaint adequately addresses these issues.

The Court also points out that it is unclear whether the Political Staff defendants engaged in state action so as to allow them to be liable under 42 U.S.C. § 1983. In any event, to the extent that the plaintiffs wish to proceed against the Political Staff Defendants under 42 U.S.C. § 1985(3), they must bear in mind the need to allege concerted action between the Political Staff Defendants and the government actors.

#### 3.2.2 RICO Claims

The Political Staff Defendants also object to the RICO claims against them on several grounds.

##### 3.2.2.1 Lack of Mayoral Power over Liquor Licenses

The Political Staff Defendants argue that they cannot possibly be liable for RICO claims because, to the extent that they engaged in any bribery or extortion, they did so in relation to the mayor, who lacks power to issue or

revoke liquor licenses. (*See, e.g.*, Docket #52 at 2–4). The plaintiffs certainly should have made their points on these allegations more clearly in their complaint. But, the Court has already decided to allow the plaintiffs to amend their complaint. It seems as though the plaintiffs are alleging that the mayor engaged in other, non-legislative activities as part of the alleged scheme (for instance, directing the police officers to focus more heavily on minority-owned businesses). This may play into a RICO scheme. Though tenuous, the Court will not foreclose the plaintiffs from trying to connect these dots in their amended complaint.

### 3.2.2.2 Bribery and 18 U.S.C. §§ 201(b), 201(c) Violations Not Sufficiently Pleaded

The Political Staff Defendants also argue that—to the extent that the plaintiffs allege bribery or a violation of 18 U.S.C. §§ 201(b) or 201(c) as a predicate act—such allegations are not sufficiently pleaded. The Court agrees. If the plaintiffs wish to sustain those claims in their amended complaint, they should be sure to pay close attention to the elements of those claims and be sure to include facts that would establish the facial plausibility of the claims.

### 3.2.2.3 Lack of Enterprise Allegations

The plaintiffs' complaint is also devoid of any allegations that would show that the Political Staff Defendants played a significant role in the operation or management of an enterprise. *See, e.g.*, *United States v. Cummings*, 395 F.3d 392, 397–400 (7th Cir. 2005). This does not necessarily mean that the Court is finding that the plaintiffs cannot adequately plead such allegations—only that, in amending their complaint, the plaintiffs must allege sufficient facts that would do so.

### 3.2.2.4   Actions Prior to Dickert's Election

The Political Staff Defendants have been brought into this case primarily because of their association with current-Mayor Dickert's campaign. To the extent that the plaintiffs argue that the Political Staff Defendants should be liable to any of the plaintiffs for activities that occurred before that campaign, they need to reexamine their contentions. Perhaps the plaintiffs have some basis to believe that the Political Staff defendants were involved in some of the pre-campaign activities, but that is not at all clear from the complaint. If the plaintiffs maintain their complaint against the Political Staff defendants on this basis, they had better provide clear allegations to establish how the political staff defendants could possibly be liable for pre-campaign activities.

### 3.3     Downtown Racine Corporation[9]

Downtown Racine Corporation (and its executive director, Devin Sutherland) by and large reiterate the Municipal Defendants' arguments as to the CRA and RICO claims. Accordingly, for the same reasons described in Sections 3.1.1 and 3.1.2, *supra*, the Court finds that the plaintiffs cannot sustain their claims against Downtown Racine Corporation and Sutherland. (The Court's analysis of the Political Staff Defendants in Sections 3.2.1 and 3.2.2, *supra*, is also relevant to the plaintiffs' claims against Downtown Racine Corporation and Sutherland.) Again, the plaintiffs will be permitted to

---

[9]Downtown Racine Corporation's brief also addresses the plaintiffs' claims against Devin Sutherland, who seems to be separately represented as one of the Municipal Defendants. (*See* Docket #58, purporting to have been made on behalf of Sutherland). It is not entirely clear which group Sutherland falls into—a determination that is made all the more difficult by the fact that Sutherland is mentioned *only once* in the plaintiffs' complaint and his role in the alleged activities is otherwise left entirely unclear. (Compl. ¶ 29).

amend their complaint as more fully described in those sections to ensure that they adequately state claims against Downtown Racine Corporation and Sutherland.

### 3.4    Tavern League

The Tavern League reiterates many of the arguments raised by the Municipal Defendants and the Political Staff Defendants. Accordingly, for the same reasons described in Sections 3.1.1, 3.1.2, 3.2.1, and 3.2.2, *supra*, the court finds that the plaintiffs cannot sustain their claims against the Tavern League. The plaintiffs will also be permitted to amend their complaint as more fully described in those sections to ensure that they adequately state claims against the Tavern League.

Finally, to address the Tavern League's one argument that is not addressed elsewhere, the Court advises the plaintiffs that, if they wish to sustain their action against the Tavern League, they should make clear how the Tavern League—itself, as opposed to its individual members—is liable for any claim they levy against it.

### 4.    CONCLUSION

In sum, the Court will grant the defendants' motions and dismiss the plaintiffs' complaint in its entirety. The complaint is so broad and vague as to be virtually functionless. The Court will, however, allow the plaintiffs to amend their complaint. In doing so, the plaintiffs should give careful consideration to the Court's discussion, above. Perhaps most importantly, the plaintiffs need to ensure that each of their separate claims is clearly delineated and supported by factual allegations.

By filing such a broad and vague complaint, the plaintiffs imposed significant burdens on a broad swath of defendants. Many of those defendants seem to have had little involvement in the activities that the

plaintiffs complain of. Thus, the Court admonishes the plaintiffs to carefully consider what claims they are bringing and against whom and avoid bringing meritless claims against blameless defendants. The plaintiffs' shotgun approach in their initial complaint is likely one of the reasons that the plaintiffs felt the need to make their individual claims so vague. Working with a scalpel rather than a butcher knife requires more time, but leads to a more precise result. And that precision will pay dividends in the long run, allowing the Court and parties to avoid worthless discovery (and attendant disputes), motions, jury instructions, and the other trappings of litigation that only grow more complex with additional superfluous parties.

The Court requests that the parties be sure to engage in meaningful discussions with each other at every stage of the litigation. For instance, to the extent that, in future briefing, the multiple groups of defendants find that their arguments overlap, they may wish to file a joint motion. This would reduce the number of duplicative arguments being made before the Court. Likewise, it would be wise for the parties to discuss the plaintiffs' amended complaint as it is being drafted. In doing so, the parties may realize that they can reach some common ground as to what claims and defendants should remain in the case.

Finally, the Court addresses the Municipal Defendants' request that the Court require a RICO case statement in the plaintiffs' amended complaint, as is standard practice in the Eastern District of Louisiana. (Docket #58 at 30). To be sure, a RICO case statement may be a very useful item to include in a RICO complaint. The plaintiffs should certainly consider including it. The Court will not, however, require such a statement. The pleading standards are those described in *Iqbal, Twombly*, and Rule 8 of the Federal Rules of Civil Procedure. If the plaintiffs satisfy those standards in

their amended complaint—with or without a RICO case statement—only then the Court will allow the case to proceed.

Accordingly,

IT IS ORDERED that the plaintiffs' complaint be and the same is hereby DISMISSED without prejudice; the plaintiffs shall file an amended complaint within 21 days of the entry of this order; the defendants shall have 21 days after the plaintiffs have filed an amended complaint to file their respective answers or appropriate motions.

Dated at Milwaukee, Wisconsin, this 30th day of July, 2014.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge