**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

THOMAS J. HOLMES, Individually and d/b/a Park 6 Bar, LLC, OTHA KEITH FAIR, Individually and d/b/a The Place on 6th, LLC, PYTHAPHONE KHAMPANE, Individually and d/b/a Ginger's Lounge, OMJAI NUEAKEAW, Individually and d/b/a Ginger's Lounge, WILBUR JONES, Individually and d/b/a Viper's Lounge, JOSE MALDONADO, Individually and d/b/a The Cruise Inn, and MARIA MALDONADO, Individually and d/b/a The Cruise Inn,

*Plaintiffs*,

v.

JOHN DICKERT, Individually, CITY OF RACINE, a municipal corporation, GARY BECKER, Individually, RACINE CITY TAVERN LEAGUE, INC., a nonstock corporation, KURT WAHLEN, Individually, JAMES KAPLAN, Individually, GREGORY T. HELDING, Individually, DAVID L. MAACK, Individually, ARON WISNESKI, Individually, ROBERT MOZOL, Individually, DEVIN SUTHERLAND, Individually, MARK LEVINE, Individually, JOEY LEGATH, Individually, DOUGLAS NICHOLSON, Individually, MONTE OSTERMAN, Individually, MARY OSTERMAN, Individually, ,

*Defendants*.

**Case No.: 14-CV-208-JPS**

---

**CORRECTED AMENDED COMPLAINT**

---

NOW COME the Plaintiffs, Thomas J. Holmes, Individually and d/b/a Park 6 Bar, LLC ("Holmes"), Otha Keith Fair ("Fair"), Individually and d/b/a The Place on 6th, LLC, Pythaphone Khampane ("Khampane"), Individually and d/b/a Ginger's Lounge, Omjai Nueakeaw ("Nueakeaw"), Individually and d/b/a Ginger's Lounge, Wilbur Jones ("Jones"), Individually

and d/b/a Viper's Lounge, Jose and Maria Maldonado, Individually and d/b/a The Cruise Inn, ,
by their attorneys, Kohler and Hart, S.C. and Segal McCambridge Singer & Mahoney, Ltd, and
allege the following:

## I.    INTRODUCTION

1.    Until recently, the central business district within the City of Racine, Wisconsin,
exemplified the city's diverse, multicultural population.  Minority-owned establishments catering
to minority and non-minority patrons were commonplace in downtown Racine until a pervasive
policy designed to eradicate these businesses resulted in a dramatic change.

2.    Several powerful individuals, both within and outside of the municipal
government of Racine, have conspired to gain control of the government through of a pattern of
racketeering activity and use the government for their own personal benefit.  They have used this
power to drive local minority-owned establishments—specifically, bars and taverns—out of
downtown Racine.  To that end and at the behest of these individuals, the City, its elected
officials and departments, instituted, implemented and followed a policy of discrimination which
has forced minority-owned bars to close their doors.  Similarly situated white-owned
establishments frequented by white patrons were not subjected to the same scrutiny during the
same time period.

3.    The Defendants' discriminatory actions are driven by multiple factors.  First, the
Defendants' scheme to eliminate minority-owned bars within Racine promotes white-owned
establishments, which, in turn, financially support the figures within the conspiracy.  Second, the
Defendants' scheme to eliminate minority-owned bars is also motivated by simple racism—
specifically, a desire to "rehabilitate" and "clean up" the downtown area which, in the

Defendants' minds, requires fewer or no minority-owned establishments and their minority patrons.

4.      The Defendants' targeting of minority-owned establishments and their minority patrons through a pattern and practice of discriminatory treatment on the basis of race has deprived the Plaintiffs of their right to equal protection under the law and their right to equal privileges and immunities under the law.  Furthermore, the Defendants' scheme to eliminate minority-owned bars and their minority patrons from Racine and/or their deliberate indifference toward these discriminatory policies violated the substantive due process protections of the Fourteenth Amendment and resulted in an unconstitutional deprivation of the Plaintiffs' liberty and property interests.

5.      The Plaintiffs bring this action to recover for injuries caused by the Defendants' conduct and seek injunctive relief, treble damages, costs of suit and reasonable attorneys' fees arising from the Defendants' violation of the Civil Rights Act (42 U.S.C. §§ 1983, 1985(3)) and the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(b)–(d)).

## II.      JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to Title 28, United States Code, Sections 1331 and 1343(3).

7.      Venue is proper in this District pursuant to Title 28, United States Code, Section 1391 because all of the acts committed by the Defendants for which the Plaintiffs claim relief occurred within the Eastern District of Wisconsin.

8.      This Court has personal jurisdiction over each Defendant because each Defendant: (a) is a citizen of this District; (b) transacted business in this District; (c) had substantial contacts with this District; and/or (d) engaged in a conspiracy that was directed at and

had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing or doing business in this District.

## III.    PARTIES

### A.  PLAINTIFFS

9.      Plaintiff Thomas J. Holmes ("Holmes"), Individually and d/b/a Park 6 Bar, LLC, resides in the County of Milwaukee, Wisconsin.  Holmes owned and operated the Park 6 Bar in Racine, Wisconsin, from 2008 to 2011.  Holmes is black.

10.     Plaintiff Otha Keith Fair ("Fair"), Individually and d/b/a The Place On 6th, LLC, resides in Jacksonville, Florida.  Fair owned and operated The Place On 6th in Racine, Wisconsin, from 2009 to 2012.  Fair is black.

11.     Plaintiff Pythaphone Khampane ("Khampane"), Individually and d/b/a Ginger's Lounge, resides in the County of Milwaukee, Wisconsin.  Khampane owned and operated Ginger's Lounge in Racine, Wisconsin, from 2008 to 2011.  Khampane is a Thai-American.

12.     Plaintiff Omjai Nueakeaw ("Nueakeaw"), Individually and d/b/a Ginger's Lounge, resides in Racine, Wisconsin.  Nueakeaw owned and operated Ginger's Lounge in Racine, Wisconsin, with Khampane from 2008 to 2011.  Nueakeaw is a Thai citizen.

13.     Plaintiff Wilbur Jones ("Jones"), Individually and d/b/a Viper's Lounge, resides in Racine, Wisconsin.  Jones owned and operated Viper's Lounge in Racine, Wisconsin, from 1998 to 2008.  Jones is black.

14.     Plaintiffs Jose and Maria Maldonado ("the Maldonados"), Individually and d/b/a The Cruise Inn, reside in Racine, Wisconsin.  Plaintiffs Maldonados owned and operated The Cruise Inn in Racine, Wisconsin, from 2001 to 2006.  The Maldonados are Hispanic.

4

**B. DEFENDANTS**

15.     Defendant City of Racine (the "City") is a municipality duly organized and existing under and pursuant to the laws of the State of Wisconsin.  The government of the City of Racine is divided into executive and legislative branches.  The following persons and entities have been instrumental in targeting minority-owned establishments and their minority patrons through a pattern and practice of discriminatory treatment on the basis of race:

  a.  The Mayor appoints commissioners and other officials who oversee various departments, committees, and commissions, and he serves as an *ex-officio* member.  Each April or May, the Mayor appoints five alderpersons to the Public Safety and Licensing Committee ("Licensing Committee") for a one-year term. After each one-year term, the Mayor can re-appoint or remove an alderperson from the committee.

  b.  The Common Council, the City's legislative branch, is comprised of fifteen alderpersons who represent the City's fifteen districts.  The Common Council enacts local ordinances and approves the City's budget.

  c.  The Licensing Committee hears all alcohol licensing matters for the Common Council, including applications, renewals, suspensions, and revocation proceedings.

  d.  The Downtown Business Improvement District #1 ("BID #1") was created and approved by the Common Council on October 16, 2001.  The stated objective of BID #1 is to preserve and improve the social and economic conditions within the district by bringing together appropriate partnerships of people, organizations, and funds to evaluate, facilitate or implement downtown development projects.  BID

#1 expenditures are funded through special assessments levied against each tax parcel of property within BID #1, as well as additional funds received by BID #1 through gifts, grants, government programs, and other sources. BID #1 is governed by a Board of Directors made up of eight members, including a Chairman, Treasurer, and Secretary. The members are the 1st District Alderperson and property and business owners within BID #1. The Mayor appoints members to the BID #1 Board. The appointments made by the Mayor must be confirmed by the Common Council.

    e.    The Racine Police Department ("Police Department") enforces municipal and state laws in the City of Racine.

16. Defendant Gary Becker ("Becker") was the Mayor of the City of Racine from April 2003 until his resignation on January 20, 2009, and at all times herein was acting under the color of state law and title.

17. Defendant Racine City Tavern League, Inc. ("Tavern League") is a non-profit corporation established to serve alcoholic retailers in Racine, Wisconsin. The Tavern League has approximately eighty-three active members and is governed by a Board of Directors that includes a President, Vice President, Membership Chair, Treasurer, and Secretary. The Tavern League notifies its members of upcoming license renewals, Common Council committee meetings, fundraisers, and monthly Tavern League membership meetings. During the relevant time period, the Tavern League was made up of dozens of members, nearly all of whom are white.

18. Defendant John Dickert ("Dickert") has been the Mayor of the City of Racine from May 2009 to present, and, at all times herein was acting under the color of state law and

title.  Dickert was a close personal friend of Becker and worked on Becker's mayoral campaigns in 2003 and 2007.  Dickert's 2009 Mayoral campaign platform was largely based on his promise to "revitalize" and "clean up" downtown Racine.

19.     Defendant Kurt Wahlen ("Wahlen") was the Police Chief of the Racine Police Department from September 2006 to his retirement in April 2011.  In July 2011, he was recalled and served as interim chief until July 2012, and at all times herein was acting under the color of state law and title.

20.     Defendant James Kaplan ("Kaplan") is a member of the Common Council, a policymaking body, and at all times herein was acting under the color of state law and title.  Kaplan was elected as the Alderman for the 4th District in April 2006, a position he still holds.  Kaplan campaigned on a promise to remove minority-owned bars from his district.  Kaplan also sits on the City's Board of Health.  Kaplan was appointed to serve on the Licensing Committee from April 2006 by Becker and he continued to serve the Committee through April 2012 after having been appointed by Dickert in April 2010 and 2011.

21.     Defendant Gregory T. Helding ("Helding") is a member of the Common Council, a policymaking body, and at all times herein was acting under the color of state law and title.  Helding was elected as Alderman for the 11th District in April 2005 and currently serves as such.  Helding was appointed to the Licensing Committee by Becker in April 2005 and served on that committee until April 2008.  He was reappointed to the Licensing Committee by Dickert in April 2011 and has served on that committee continuously since that time, including the past three years as chair.

22.     Defendant David L. Maack ("Maack") is a former member of the Common Council, a policymaking body, and at all times herein was acting under the color of state law and

7

title.  Maack was elected as an Alderman in April 2000 and served as such until April 2010. Maack was appointed to serve as the chair of the Licensing Committee by Becker in April 2005 and he continued to serve on the committee until April 2008.  He was reappointed to the Licensing Committee in April 2009 and was again appointed to the committee by Dickert in April 2010.

23.    Defendant Aron Wisneski ("Wisneski") is a former member of the Common Council, a policymaking body, and at all times herein was acting under the color of state law and title. Wisneski was elected as an Alderman in April 2006 and served as such until July 9, 2012. Wisneski was first appointed to the Licensing Committee in April 2008 and he served as its chairperson from April 2009 to April 2012.  Although he was no longer the chairperson, he served on the committee upon Dickert's appointment from April 2012 to July 2012.

24.    Defendant Robert Mozol ("Mozol") is a former member of the Common Council, a policymaking body, and at all times herein was acting in his individual and official capacity under the color of state law and title. Mozol was elected as an Alderman in April 2007 and served as such until April 2013.  Mozol was first appointed to the Licensing Committee in April 2007 and served on it until April 2013.

25.    Defendant Devin Sutherland ("Sutherland") is the Executive Director of the Downtown Racine Corporation, which is a private, non-profit corporation dedicated to enhancing the image and functionality of downtown Racine by attracting new businesses, residents, and visitors.  The Downtown Racine Corporation contracts with the City to manage the BID #1. Sutherland is also the Manager of the BID #1.  Sutherland was hired as the Executive Director in September of 2003.

8

26.     Defendant Mark Levine ("Levine") owns property within the BID #1 and was appointed the Chairman of the BID #1 by Dickert.

27.     Defendant Joey LeGath ("LeGath") is a member of the Tavern League. He was the former President and currently serves as a Director of the Tavern League. He was also appointed to be a member of the BID #1 Board by Dickert. He is also the owner and operator of various taverns in Racine, including Joey's On Lathrop, Joey's On Taylor, and Joey's On 6th. LeGath is also on the City's Board of Parks, Recreation and Cultural Services.

28.     Defendant Douglas Nicholson ("Nicholson") is a member of the Tavern League and the owner and operator of Ivanhoe's Pub & Eatery, Envi, and Hiram's Place, all of which are bars located within the BID #1. Nicholson was appointed to the City's Board of Ethics by Dickert. In addition, Nicholson served as a campaign worker for Dickert. He also owns Carriage House Liquor Company, which was granted a Class B liquor license by the Licensing Committee in June 2014.

29.     Defendant Monte Osterman ("Osterman") is the owner and operator of Osterman Granite and Marble, a business located within the BID #1. Osterman is currently the District #3 Racine County Supervisor. Osterman assisted Dickert during his 2009 and 2011 Mayoral campaigns.

30.     Defendant Mary (née Jerger) Osterman ("Jerger") is the wife of Monte Osterman and the owner and operator of Copacetic, a business located within the BID #1. Jerger served as Dickert's campaign treasurer for his 2009 and 2011 Mayoral campaigns. She was appointed to the Ethics Board and Cable Commission by Dickert.

# IV. CLAIMS

## A. CIVIL RIGHTS VIOLATIONS

### *Overview*

31.     Since at least 2006, the City of Racine, its Mayor, alderpersons and municipal departments have waged war on minority-owned taverns in downtown Racine sthat cater to minority clientele.  At the same time, they have turned a blind eye to the infractions committed by white-owned tavern owners and their mostly white patrons, actively supporting and protecting them instead of policing them in the manner they do minority-owned taverns.

32.     The City of Racine, its Mayors, members of the Licensing Committee and the Common Council systematically imposed heightened burdens on minority-owned bars through administrative agencies, the Police Department, and by other means, making it difficult for them to obtain or maintain a liquor license.

33.     Since 2006, minority bar owners' applications for liquor licenses have been disproportionately denied by the Licensing Committee, when compared with white bar owners' applications, because the minority owners' liquor licenses were, ostensibly, contrary to the health, safety, or welfare of the public or any regulation, law, or ordinance applicable to the liquor licenses.  In denying minority bar owners' applications, the Licensing Committee also often cited to the "fragility" of the neighborhood or the "oversaturation" of liquor licenses in the area.

34.     Despite the fact that similar, if not more, police calls and violent acts took place at white-owned establishments, white bar owners have rarely been denied a requested liquor license since 2006.

35. The City, its Mayors and alderpersons' scheme of (1) imposing barriers on minority-owned bars to obtaining or maintaining liquor licenses; and (2) targeting minority-owned bars utilizing the Police Department was successful.

36. Today, there are no minority-owned bars that cater to minority clientele in the downtown area. In their place, numerous bars owned by members of the Tavern League, such as Nicholson's Envi, hold events like "hip-hop nights" that specifically cater to minority patrons and for which minority-owned establishments were previously targeted by the Mayor, the Licensing Committee and the City.

37. As of December 2013, there were 128 Class B liquor licenses in Racine. The overwhelming majority of these licenses for bars and taverns are currently held by Tavern League members, nearly all of whom are white.

38. The conspiracy to rid downtown Racine of minority-owned bars is ongoing.

*The Due Process Procedure*

39. In the event minority bar owners received liquor licenses, they were regularly ordered to appear before the Licensing Committee as the result of so-called "direct referrals" from citizens, the Police Department, or even an Alderperson sitting on the Licensing Committee to discuss or answer for incidents allegedly occurring at, or even near, their establishments.

40. At an initial Licensing Committee hearing related to a direct referral, a bar owner is expected to explain the conduct in question to the Licensing Committee and offer voluntary steps he or she will take to address the issue(s). If satisfied with the explanation and proffered solution, the Licensing Committee may "receive and file" the matter with no further action.

41. This "receive and file" procedure was rarely implemented when minority-owned bars were the subject of a complaint. Even on the rare occasions that it was, the Licensing

Committee threatened the minority bar owner that it would use any and all of the previously-alleged conduct against them at any subsequent hearing.

42.     On the other hand, "receive and file" was the usual procedure when white-owned bars were called before the Licensing Committee.  And unlike how it treated minority bar owners, the Licensing Committee never threatened to use reports that were deemed "received and filed" against white bar owners in the event that they were requested to appear before the Licensing Committee on a subsequent, unrelated incident.

43.     In fact, when a minority-owned bar was called before the Licensing Committee, many times the Licensing Committee would "defer" the matter to another date to determine if the minority bar owner followed through with the proffered solution and/or to determine if additional incidents at the bar occurred.

44.     In fear of non-renewal, suspension and/or revocation, and the economic harm that accompanies these action, many minority bar owners entered into side agreements with the City—requiring them to endure hardship and incur significant costs—rather than participate in a formal due process hearing.

45.     Side agreements forced upon minority bar owners to obtain and/or maintain a license included, but were not limited to, the following additional requirements: hiring off-duty Police Department officers or private security; installing and/or updating security video systems inside and outside the bar; instituting dress codes, age restrictions (e.g., no patrons under the age of 25 years old), capacity restrictions, noise restrictions, music restrictions along racial lines (e.g., no hip-hop); limiting the hours of operation; purchasing ID scanners; sound proofing; installing metal detectors; limiting the types of alcohol offered based on racial stereotypes (e.g.,

not allowing a business to sell Hennessy or malt liquor); re-surfacing parking lots; installing outdoor lights; and even donating to local charitable groups.

46.     White-owned bars were rarely forced into due process hearings or costly side agreements with the City, even when they experienced incidents of nearly identical severity and at a similar frequency to minority-owned taverns.

47.     In fact, only those white-owned bars cater to minority clientele have ever gone through a due process hearing.

48.     On the rare occasions when the Licensing Committee confronted white bar owners with a potential side agreement, those owners advised that they could not afford the additional requirements and no further action would be taken.

49.     If the Licensing Committee was not satisfied with a minority owner's proffer solution to issues raised, or if the minority bar owner did not comply with a "side agreement" entered into with the City, the Licensing Committee recommended to the Common Council that the bar owner proceed to a due process hearing.

50.     The Common Council must approve the recommendation of the Licensing Committee to begin a due process hearing before a hearing is scheduled by the Licensing Committee.

51.      In almost all instances involving a minority-owned or frequented tavern, the Common Council approved the Licensing Committee's recommendation to hold a due process hearing.

52.     The due process hearing was then formally initiated by the filing of a sworn complaint alleging a specific violation of municipal ordinances and/or state statutes.  Written

13

notice of the alleged causes for suspension or revocation was to be provided to the licensee at least ten days before the hearing was held before the Licensing Committee.

53.     At the due process hearing, the licensee may be represented by counsel and produce witnesses. Testimony at the Licensing Committee due process hearing was under oath, subject to the right of cross-examination, and recorded.

54.     After the due process hearing, the Licensing Committee submitted a report to the Common Council that included findings of fact, conclusions of law, and a recommendation as to what action, if any, the Common Council should take with respect to the license.

55.     The Licensing Committee provided the complainant and licensee with a copy of the report.

56.     The complainant and licensee may file an objection to the report and have the opportunity to present arguments supporting the objection to the Common Council.

57.     If an objection was presented, the Common Council determined whether the arguments would be presented orally or in writing.

58.     If the Common Council, after considering the report and any arguments presented, found the complaint to be true, or if there was no objection to the report recommending suspension or revocation, the license would be suspended or revoked.

59.     Few minority-owned bars have undergone a due process hearing before the Licensing Committee without having their license recommended for suspension and/or revocation. Likewise, the Common Council almost always followed the Licensing Committee's recommendation for suspension and/or revocation of a minority bar owner's license.

60.     Between 2006 and the present, minority bar owners and/or white bar owners with minority patrons were almost exclusively the bar owners who were forced to sign side

agreements with the City in order to avoid a due process hearing, retain their licenses, and stay in business.

61.    Between 2006 and the present, minority bar owners and/or white bar owners with minority patrons were almost exclusively the owners taken to due process hearings, forced to surrender their licenses, or have their licenses suspended, not renewed, and/or revoked by the City.

62.    Between 2006 and the present, no white bar owners with white patrons surrendered their licenses or had their licenses suspended, revoked, and/or not renewed by the City.

### Targeting of Minority-Owned Bars

63.    Between 2006 and the present, Police Department calls for service to minority-owned bars were markedly lower for fights, assaults, ordinance complaints, civil trouble, weapons, and narcotics when compared to white-owned bars.

64.    Despite fewer calls for service, minority bars owners were called before the Licensing Committee almost twice as many times as white bar owners during that same time period.

65.    In almost every instance where a white bar owner was called before the Licensing Committee, the matter was received and filed with no further action taken.

66.    On only a few occasions, for egregious and frequent violations were white bar owners forced to enter side agreements with the City Attorney and the Licensing Committee.

67.    A white-owned bar with white patrons never lost its license as a result of any action taken by the Licensing Committee.

68. Conversely, in almost every instance a minority bar owner was called before the Licensing Committee, the ultimate result was either an extorted/forced surrender or revocation of the license.

69. Similarly, the minority-owned bars were forced to enter into many side agreements and many of their licenses were suspended, revoked, or surrendered as a result of the Licensing Committee's actions.

70. Unlike the normal procedure for white-owned bars, few complaints regarding minority-owned bars were received and filed with no further action by the Licensing Committee.

71. Many of the calls to the Police Department reporting incidents in or around minority-owned bars were made by "anonymous" callers and/or by tenants, business owners, and property owners in the areas around the minority-owned bars. When these anonymous calls were used as evidence by the Licensing Committee against minority bar owners at due process hearings, none of the individuals who reported these calls—including the Racine Police Department, Sutherland, and the Aldermen—were able to provide any identifying information about these alleged callers. Many of the complaints regarding minority-owned bars called in by anonymous callers were reported as "unfounded" when investigated by the Police Department.

72. Upon information and belief, many of these callers, if they even existed, were motivated by rent reductions, financial gain, and/or racism. Many of these callers were working directly with the Downtown Racine Corporation, BID #1 Board members, Aldermen, and City officials to flood the Police Department with calls concerning the minority-owned bars and their minority patrons. These often "bogus" calls provided a convenient excuse for the Police Department to respond to the minority-owned bars and to provide a paper trail for subsequent referrals, complaints, and proceedings before the Licensing Committee. The Police Department

16

often used the "bogus" calls to inflate and exaggerate reports of its calls for service to minority-owned bars. These reports were routinely provided to the Licensing Committee for its use in proceedings against the minority-owned bars. Conversely, in many instances the Police Department calls for service to white-owned bars for the same or similar complaints were downplayed, never reported, or never referred to the Licensing Committee.

73. The Downtown Racine Corporation through Sutherland would also provide reports to the Licensing Committee concerning incidents in the downtown area. Many of the reports came through Metro Security, a company under contract with the Downtown Racine Corporation to supplement security for businesses in the downtown area.

74. Further, the Downtown Racine Corporation and the Police Department purchased surveillance cameras to be installed downtown in what the Downtown Racine Corporation, Police Department, Licensing Committee, and City officials considered to be "problem" areas. These fixed cameras were installed in the 500 Block of 6th Street so as to point directly at the areas in front of and adjacent to minority-owned bars. After installation, the cameras were linked directly to City Hall for easy access and viewing by City officials and the Licensing Committee. Following the closure of Park 6 and Place on 6th, which were located on that block, these cameras were removed from 6th Street and were placed outside of Gerald's Smokehouse, a restaurant and bar owned by a black man.

75. No cameras were installed to view the white-owned bars on 6th Street.

76. One of the many reasons often given by the Licensing Committee when justifying the revocation of a minority bar owner's license was the excessive use of City resources. Upon information and belief, that number, when reported to the Licensing Committee, was inflated with respect to minority-owned bars. For example, police officers routinely waited outside

minority-owned bars around closing time to videotape patrons coming and going from the bars. The hours allocated to the surveillance of minority-owned bars by police officers were reported to the Licensing Committee and were used in proceedings against minority bar owners. Upon information and belief, the Police Department never conducted such extensive surveillance on white-owned bars. In addition, the Police Department rarely provided detailed information regarding the hours allocated "keeping the peace" at white-owned bars. It comes as no surprise, then, that the Police Department's portrayal of these minority-owned bars as so-called "problem areas" was often contradicted by the more objective Metro Security reports and testimony at Licensing Committee proceedings.

77.     Off-duty police officers who worked security at white-owned bars routinely deflected the Police Department from responding to incidents at the white-owned bars. However, off-duty police officers working security at minority-owned bars (as required by side agreements between the City and the minority-owned bars) routinely called the Police Department for assistance or advised their superiors about incidents at minority-owned bars that occurred while they were off-duty. These "extra" calls for service and/or incidents were reported to the Licensing Committee when they involved minority-owned bars.

78.     On May 19, 2006, a shooting occurred in the bathroom of 262 Lounge located at 1843 Mead Street. The bar owner was black and the bar was predominantly frequented by minority patrons. The suspect was caught and prosecuted. On October 9, 2006, the Licensing Committee passed a motion to take 262 Lounge to a due process hearing. On December 14, 2006, the Class B liquor license for 262 Lounge was revoked by the Common Council upon the recommendation of the Licensing Committee. In comparison, shootings have occurred at white-owned bars that are still in operation.

79.     On February 25, 2007, several patrons were ejected after a fight broke out in Mr. Kool's Bar located at 1330 Washington Avenue. The owner of Mr. Kool's was black and the bar was predominantly frequented by minority patrons. A suspect came back to the bar and shot the front door twice. There were no injuries reported. At the Licensing Committee meeting on May 7, 2007, a motion was made to take Mr. Kool's to a due process hearing and a potential side agreement was discussed. On June 6, 2007, the Licensing Committee held the license for non-renewal. On July 9, 2007, Mr. Kool's entered into a side agreement in order to maintain its Class B liquor license. There have been a number of fights at white-owned bars that cater to white clientele where no action has been taken by the Licensing Committee against the bar owner.

80.     On June 4, 2007, a suspect shot the owner of Rosie's in the hand and the owner's son in the stomach while they were removing bar patrons at closing time. The son returned fire and shot the suspect. The suspect was caught and prosecuted. The owner of Rosie's Bar was black and the bar was predominantly frequented by minority patrons. On June 11, 2007, Rosie's was called before the Licensing Committee for non-renewal of its Class B liquor license for the June 4th shooting. On July 23, 2007, the Licensing Committee granted a license extension. The Licensing Committee demanded that Rosie's install a security camera and hire off-duty Police Department officers, but Rosie's could not afford the associated costs. On December 1, 2008, the Licensing Committee began a due process hearing on Rosie's. On July 15, 2008, Rosie's Class B liquor license was revoked by the Common Council upon the recommendation of the Licensing Committee.

81.     On September 24, 2007, the Licensing Committee deferred a second request from Tina Elmergreen to open a salsa-themed dance club at 500 6th Street called Tinita's, which was intended to cater to minority clientele. The Licensing Committee requested that Tinita's provide

a more detailed business plan prior to the Licensing Committee considering the issuance of a Class B liquor license. Alderman Maack proposed that the plan should include a dress code, security, video surveillance, monitoring of noise levels outside the building, and a promise to clean around the building at closing. Maack said such conditions are not typical, but have been required in some cases. A letter was submitted by the President of the Hispanic Chamber of Commerce that criticized the Licensing Committee's heightened requirements imposed on Tinita's and suggested that the Licensing Committee's denial of Tinita's license would confirm that the Licensing Committee had a perception that Latinos come to downtown Racine "to be rowdy and fight." Alderman Kaplan, who sat on the Licensing Committee at the time, openly took offense at the letter. On June 4, 2008, a side agreement was entered into between Tinita's and the City for a Class B liquor license. This agreement imposed heightened costs and burdens on Tinita's, including the requirement that it hire at least one off-duty law enforcement officer from the City or County of Racine to work security between 10:00 p.m. and closing.

82.    In December 2006, after receiving a Class B liquor license, Cerafin Davalos, who is Hispanic, opened Cera's Tequila Bar at 607 6th Street. Cera's Tequila Bar was predominantly frequented by minority patrons. On September 27, 2007, Davalos called the police at 2:25 a.m. to report that he feared that an employee's boyfriend was waiting outside his bar with a gun to attack the employee when she got off work at 2:30 a.m. The Police Department arrested the boyfriend on a probation hold as a result. At 2:59 a.m. the Police Department was called back to Cera's due to the employee, who was intoxicated, trying to get back into Cera's when it was locked. She screamed at the police officers and yanked on the locked bar door in an attempt to get back inside. From approximately November to December 2007, a number of minor incidents occurring at Cera's were reported to the Police Department. Indeed, Cera's itself notified the

Police Department about many of these minor incidents. On December 8, 2007, Cera's was reported as the site of a homicide by the Police Department, when, in reality, the incident occurred about a half block away from Cera's. In response to these incidents, Cera's was called before the Licensing Committee for a due process hearing. On April 16, 2008, the Licensing Committee recommended to the Common Council that Cera's license be revoked. On May 6, 2008, Davalos and his attorney appeared before the Common Council and objected to the Licensing Committee recommendation based on same or similar conduct occurring at white bars. The Common Council nonetheless accepted the Licensing Committee's recommendation and revoked Cera's liquor license.

83.     On September 13, 2010, the white owner of the Blue Rock Lounge & Eatery ("Blue Rock") located at 306 6th Street, was called before the Licensing Committee and forced to enter into a side agreement due to inadequate security cameras. At the time, Blue Rock served minority customers when it first opened. The owner was later told by alderman to join the Tavern League and attract "different" patrons to eliminate problems or complaints from the Licensing Committee.

84.     In September 2012, Ray Bueno and Brenda Torres applied for a Class B liquor license to open a bar for minority patrons at 1600 Douglas Avenue. In response, the Licensing Committee—and specifically Alderman Kaplan—created a number of obstacles in order to deter Bueno's and Torres' attempts to obtain a liquor license. Bueno requested membership in the Tavern League to gain assistance in obtaining a license, but was told by the Tavern League leadership, "[I]t would not be a good idea to join because we have a reputation to keep up." Nonetheless, Bueno and Torres were diligent and eventually obtained a liquor license around February or March of 2013. In April 2013, Bueno's brother, Oscar Bueno, filed for the recall of

Kaplan, citing abuse of power and discriminatory practices. When Bueno opened the bar–R&B Latin Club in May 2013—the Police Department immediately came to the bar and advised Bueno that the bar was not permitted to open. When Bueno inquired as to why the Police Department called on the bar immediately after its opening, the officer advised that Kaplan and Dickert sent the Police Department to "shut down the bar." When Bueno called the City to question the officer's assertion, he was advised that his permit was conditional and that he and Torres must report to the Licensing Committee. Bueno was told through intermediaries that if his brother backed down from his recall efforts, the bar could open. Bueno's brother thereafter dropped the recall effort. Only then, after 10 months of opposition to the R&B Latin Club opening, the Common Council subsequently approved its permit by a unanimous vote.

85.     Approximately two weeks after a license was finally awarded to the R&B Latin Club, The Double D Bar, located four blocks from the R&B Latin Club, requested a Class B license from the Licensing Committee under new, white ownership. LeGath, in his capacity as Director of the Tavern League, as well as other Tavern League members, appeared before the Licensing Committee in support of the request and told the Licensing Committee that no one has their liquor license revoked when they are a member of the Tavern League. One month later, the Double D Bar was opened with a Class B license.

*Preferential Treatment of white-Owned Bars*

86.     On August 12, 2005, a fight broke out in Ricky's Place located at 236 Main Street in the City of Racine. The fight eventually spilled outside to the front of the bar. A suspect shot the white bar owner and a bartender. The white bar owner is the brother of a then-Police Department Deputy Chief. The suspect was caught and prosecuted. The white bar owner is a member of the Tavern League. The bar was, and still is, predominantly frequented by white

patrons. Although the due process procedure had not yet been implemented, the bar was never called before the Common Council for violations of any municipal ordinances and/or state statutes and its license was renewed in mid-2006 by the Common Council without reference to the August 2005 shooting incident.

87. On October 5, 2006, the Police Department responded to a complaint at the City Hall Lounge, located at 835 Washington Avenue. Twenty-one people were arrested for underage drinking. Three guns were confiscated and seven other criminal arrests were made. The owner of the bar is white and his patrons were predominately white. The owner was subsequently called before the Licensing Committee. He blamed the incident on security guards who let the minors into the tavern. When asked for their names, the owner could not provide the information. The matter was not sent to a due process hearing. Instead, negotiations with the City Attorney ensued. The matter was received and filed by the Licensing Committee and no further action was taken.

88. On February 18, 2007, the Police Department responded to a fight at Ricky's Place. Six police squads responded. There is no record the matter was ever brought before the Licensing Committee. On June 30, 2007, and again in July 2008, Ricky's Class B liquor license was renewed.

89. On August 31, 2007—approximately six weeks after obtaining a Class B liquor license—a fight broke out inside Kenny's, a bar located at 1300 N. Main Street. The owner is white and a member of the Tavern League. The bar was, and still is, predominantly frequented by white patrons. After being thrown out because of the fight, a patron came back to the bar with a gun and shot two persons inside the bar and one person outside the bar. Kenny's was called before the Licensing Committee on October 22, 2007 regarding the incident. The owner

told the Licensing Committee he fired three bartenders, hired a manager and promised to be more observant. The report was received and filed by the Licensing Committee and no further action was taken.

90.     Also on August 31, 2007, one person was shot multiple times in the parking lot of George's Tavern located at 1201 N. Main Street. The owner is white and member of the Tavern League. The bar was, and still is, predominantly frequented by white patrons. On October 22, 2007, the owner was called before the Licensing Committee. He told the Licensing Committee that he would institute a "no cap and no white t-shirt" dress code, require two types of identification and hire additional security. The owner also commented that the shooting could have happened anywhere due to bad blood between patrons. The report was received and filed by the Licensing Committee and no further action was taken.

91.     On February 5, 2009, a person was shot four times while entering TBG's Bar & Grill located at 1814 Taylor Avenue. The owner of TBG's is white and a member of the Tavern League. TBG's was, and still is, predominantly frequented by white patrons. The Police Department found the victim inside of the bar. The exterior and interior door of the bar was shattered due to gunfire. The bar was never called before the Licensing Committee for the incident.

92.     On January 9, 2010, a fight inside Joey's On Lathrop located at 2054 Lathrop Avenue spilled outside. The owner of Joey's, LeGath, is white and member of the Tavern League. The bar was, and still is, predominantly frequented by white patrons. Multiple gun shots were fired. A nearby McDonald's Restaurant, an office building, and Family Video were hit with bullets. The bar was never called before the Licensing Committee for the incident.

24

93.     On July 10, 2010, as a patron left Pepi's Bar located at 618 6th Street, two gun shots were fired in the front of the bar. A patron of Pepi's was hit by the gun shots in an arm and stomach. The Police Department called the shooting an accident and the incident was not reflected on the bar's history report. The owner of Pepi's is white and a member of the Tavern League. The patrons of the bar were, and still are, predominantly white. Pepi's was not called to appear before the Licensing Committee.

94.     On February 25, 2011, Metro Security responded to crowd incidents and an assault at Ivanhoe's Pub & Eatery. Nicholson, the owner of Ivanhoe's, is white and a member of the Tavern League. The bar was, and still is, predominantly frequented by white patrons. Ivanhoe's was never brought to the Licensing Committee for the incident.

95.     On May 5, 2011, a fight that began inside Peg & Lou's Bar located at 3113 Douglas Avenue spilled outside and resulted in a homicide. The victim's body was found at closing time. The suspects returned to the bar and confessed to a bartender. The owners of Peg & Lou's are white and members of the Tavern League. The patrons of the bar were, and still are, predominantly white. Peg & Lou's was called before the Licensing Committee on September 26, 2011. The owners said they would be more diligent watching customers. The owners also said the bar has an old camera system and cannot afford to replace the system. The matter was received and filed and no further action was taken by the Licensing Committee.

96.     On August 6, 2011, at 2:12 a.m., the Police Department responded to a fight inside and outside of Kenny's. Upon arrival, officers saw that the front window of the bar was broken. Several people in the street began throwing punches. Several people ignored commands by officers to stop fighting and were taken into custody at Taser point. In all, four people were arrested and eight officers were required to manage the incident. The incident tied up officers

for over three hours. The matter was received and filed by the Licensing Committee and no further action was taken.

97. On April 19, 2012, at 1:05 a.m., Metro Security reported that the Police Department was called to Envi at 316 Main St. for a fight involving five to six people. Nicholson is the owner of Envi. The bar was, and still is, predominantly frequented by white patrons. Five police squads reported to the area to look for a suspect. After ten to fifteen minutes, the police left the area. Metro Security officers heard a police officer advise dispatch that the location of the call should be referred to generically as the "300 block of Main Street" as to avoid having it linked directly to Envi. The matter was never brought before the Licensing Committee.

98. On August 11, 2012, at approximately 12:30 a.m., multiple gun shots were fired in the direction of Kenny's. Multiple cars were hit by gunfire and one person was shot in the arm. Witnesses in the bar said they saw and heard "shots flying." The shooting does not appear on police reports or on the bar's history report. The incident was never referred to the Licensing Committee.

99. On May 11, 2013, at 1:00 a.m., the Police Department responded to another shooting at Kenny's. Upon arrival, officers spoke to bar security and learned that a fight had occurred inside Kenny's between several patrons. As the bar was emptying, two people fired numerous shots. The Police Department noted that the investigation was ongoing. The Licensing Committee took no action on this incident.

100. On June 9, 2013 at 1:34 a.m., the Police Department responded to Ricky's Place due to a large fight reported outside the bar. When officers arrived on scene, they observed a large crowd, but no fighting. The officers did, however, observe an intoxicated patron with a

head injury. Officers warned the bartender about dispersing such large crowds at closing time. The matter was never brought before the Licensing Committee. On June 30, 2013, the Class B liquor license of Ricky's Place was renewed.

101. On June 23, 2013, at 1:05 a.m., the Police Department responded to another shooting incident at Kenny's and found that the suspects fired several rounds at the rear smoking patio area. A patron was struck in the left buttock by a bullet. Despite several shootings in just a few years, on June 30, 2013, Kenny's Class B liquor license was renewed.

102. On July 13, 2013, as a crowd left Pepi's Bar at 618 6th Street, fights broke out on the sidewalk. People were milling about the sidewalk and in the middle of street, impeding traffic and being loud. No police officers arrived on the scene. The matter was never referred to the Licensing Committee.

103. On July 15, 2013, at 12:40 a.m., the Police Department responded to a call for a fight in front of Kenny's. Upon arrival, officers saw a large group of individuals separating. Two intoxicated people were identified as being involved in a fight and one of them was visibly injured. Officers also saw a large number of beer bottles located outside of the bar. The matter was never referred to the Licensing Committee.

104. After a string of incidents involving Kenny's, the Licensing Committee asked its white owner to appear before it for an informal meeting on July 22, 2013. One of the committee members said that the conference was intended for information gathering only. The white owner told the Licensing Committee that the bar would voluntarily close at midnight on the weekends in light of recent events. The owner told the Licensing Committee that he and his staff also met with the Police Department on June 28 to discuss crime prevention strategies. Police Department Chief Howell requested the Licensing Committee treat the recent shooting at

Case 2:14-cv-00208-JPS   Filed 08/21/14   Page 27 of 119   Document 62

Kenny's as a homicide. The Licensing Committee asked for a side agreement and ordered Kenny's to return to the Licensing Committee on August 12, 2013.

105.     On August 12, 2013, Kenny's was not required to sign a side agreement before the Licensing Committee. In fact, Kenny's was not even on the Licensing Committee's agenda. Chief Howell reported to the Licensing Committee that Kenny's was closing early until things quieted down. Apparently to alleviate any of the Licensing Committee's apprehension concerning Kenny's, Chief Howell assured the Licensing Committee that he had spoken to Joey LeGath of the Tavern League.

106.     The last minority-owned bar catering to minority clientele in downtown Racine closed in October 2012. Soon thereafter, minority patrons began frequenting Bar 525 and Blue Rock, two white-owned bars in the downtown area that played hip-hop music and whose owners were not members of the Tavern League at the time. The City began targeting those bars. On several occasions, Nicholson, a prominent member of the Tavern League, went into Bar 525 to tell the owner how to discourage minorities from coming to the bar. Bar 525 and Blue Rock are both within a block from the newly announced multi-million dollar Porter's of Racine development project.

107.     On September 9, 2013, Police Department Sergeant Rivers informed the Licensing Committee that there are concerns with Bar 525 and that the Police Department will be paying extra attention to the area during the third shift to monitor overcrowding issues that have occurred during the prior weeks. Upon information and belief, Bar 525's owner met with prominent Tavern League members after drawing the attention of the City and requested their assistance in appeasing the Licensing Committee. As a result, John McAuliffe, Vice President of the Tavern League, told the Licensing Committee he is acquainted with the owner and has

Case 2:14-cv-00208-JPS   Filed 08/21/14   Page 28 of 119   Document 62

spoken with the owner on ways to resolve these issues. Nonetheless, the Licensing Committee voted to call Bar 525 for a subsequent hearing. At the September 23, 2013 Licensing Committee meeting, the owner of Bar 525 told the committee that the bar had changed its entertainment style to include more "Top 40" music, which had changed the racial makeup of the patrons. The matter was then received and filed by the Licensing Committee. Before the meeting came to an end, Bar 525's owner was urged by Helding to join the Tavern League.

108.　As of January 28, 2014, the Downtown Racine Corporation stopped sending Metro Security reports to the Licensing Committee because of a perceived a slowdown in violent crime in the downtown Racine area. Upon information and belief, the Downtown Racine Corporation ceased forwarding these reports in order to conceal the preferential treatment of white-bar owners in anticipation of this lawsuit.

109.　However, despite the perceived threat associated with minority-owned bars that catered to minority clientele having been removed, violent crime still exists at white-owned bars.

110.　As recently as March 29, 2014, in the early morning hours, a patron re-entering Envi, Nicholson's bar, was shot and killed. Once again, the police report of the incident hid any connection between Nicholson's bar as it characterized the location as the "300 Block of Main Street." Nicholson, as owner of Envi, has never been disciplined for the incident nor was the incident called to the attention of the Licensing Committee despite a history of prior violence at Envi.

111.　The preferential treatment of white-owned bars by the City continues to this day.

112.　By way of example, a comparison from January of 2006 to June of 2013 of documented police calls for service at twelve white owned bars with white patrons and twelve

minority-owned bars (including each of Plaintiffs' bars) with minority patrons reveals the following:

a. With respect to the white owned bars with white patrons, there were 588 calls to the police for service with only forty-two referrals to the Licensing Committee. Based on those calls, **zero** bars were required to enter into side-agreements and **zero** licenses were revoked or surrendered;

b. In contrast, with respect to the minority-owned bars with minority patrons, there were 276 calls to the police for service with eighty-four referrals to the Licensing Committee. Based on those calls, five of the twelve bars were forced to enter into side-agreements (some on multiple occasions) and seven of the twelve licenses were revoked or surrendered;

c. Or more simply, white-owned bars generated twice the number of calls but were referred to the Licensing Committee half the number of times as minority owners.

113. Further evidence that Racine's pattern and practice of discrimination continues is that on June 6, 2014, Nicholson the owner of multiple bars with a history of violent actions and repeated police calls was granted another Class B liquor license which he used to open Carriage House Liquor Co. in a neighborhood in which minority applicants for liquor licenses had previously been denied "due to the fragility of the neighborhood" and "concentration of liquor licenses." These concerns were not substantively addressed when Nicholson was called before the Licensing Committee or Common Council.

### Maldonados/The Cruise Inn v. Becker, Maack, Helding
### Pursuant to 42 U.S.C. 1983

114. The Maldonados incorporate the allegations of paragraphs 31 to 113 as if fully restated here.

115.    The Maldonados, both of whom are Hispanic, opened The Cruise Inn in 2001. The property was located at 1423 State Street in Racine, which had previously housed Racine's first post office, and was predominantly frequented by minority patrons.

116.    The Maldonados also owned 1402 Liberty Street, which sat directly behind their bar property. Racine's Historic Train Station building and platform was partially situated on this property.

117.    In 2006, the area around the Maldonados' property was being developed with a new Walgreen's to the west of their property, a new shopping center across the street, and a new transit center directly to their East. During this time there was much anticipation for a commuter rail to connect Milwaukee to Chicago with a stop at the State Street Station in Racine. The value of the Maldonados' land quickly increased.

118.    Contemporaneously with this development by outside investors, the City grew interested in purchasing the Maldonados' property.

119.    At the direction of Becker, City of Racine departments began to target the Cruise Inn to force the Maldonados off the property in an effort to obtain the property at a lower price and to benefit developers.

120.    On August 7, 2006, the Licensing Committee, including Maack and Helding, recommended that the Common Council should take The Cruise Inn to a due process hearing for revocation of its liquor license based solely on a single incident.

121.    Specifically, the Common Council's pretext was a July 3, 2006 incident in which the Police Department responded to a call by an employee of The Cruise Inn concerning a non-life threatening altercation between an ex-wife and ex-husband. The victim of the altercation

Case 2:14-cv-00208-JPS   Filed 08/21/14   Page 31 of 119   Document 62

had even walked outside of the bar but the Cruise Inn employee still called police to report the situation.

122.  Prior to July 2006, The Cruise Inn had never been called before the Licensing Committee and had only one incident reported against it—a citation for underage drinking and smoking which was dismissed because the Maldonados were able to prove that their bar was closed at the time the alleged incident occurred.

123.  Despite the relative lack of activity at The Cruise Inn and the fact the July 2006 incident was reported by the bar itself, the Common Council voted unanimously to adopt the recommendation of the Licensing Committee and the due process hearing was set for December 2006.

124.  From August 2006 to December 2006, Becker and other City officials, including Jim Luellof and Rick Jones, frequently visited the property.

125.  On one such occasion, Becker threatened the Maldonados and told Jose Maldonado that both he and his wife were "in trouble." Becker said, "It would be smart for you to work with the City because right now you are set up for trouble."

126.  Becker, through a real estate agent, threatened Jose Maldonado that the City would revoke his liquor license and the property would soon be worthless and to avoid that Jose Maldonado should sell his property.

127.  After the decision by Becker to target the Maldonados and the Cruise Inn, the Cruise Inn began to see an increase in alleged incidents and fines.

128.  At the direction of Becker, City departments began fining the Maldonados for so-called "offenses" like the presence of weeds and chipped paint.

129.    No matter what the Maldonados did to appease the City, they continued receiving fines.

130.    When these fines did not drive the Maldonados to sell, the pressure from Becker and the City increased.

131.    Spanish-speaking City employees named Lopez and Rodriguez and an unknown Racine police officer would come to the Cruise Inn and threaten Maria Maldonado, telling her that she was in "deep trouble."

132.    The fines, threats, calls, and visits took a toll on the family and the business.

133.    Maria Maldonado was afraid to leave her house because of the constant harassment by City employees.

134.    Eventually, the Maldonados were forced to accede to the City's demands due to the continued harassment by the City and the looming due process hearing.

135.    On December 5, 2006, Jose and Maria Maldonado, not having an attorney for the upcoming due process hearing, listed The Cruise Inn for sale at $225,000.

136.    On December 6, 2006, having succeeded in forcing the Maldonados off their land with the continued and unwarranted scrutiny and the repeated threats of a due process hearing, the City postponed the due process hearing.

137.    Later that month, the City announced its intentions to purchase both pieces of property owned by the Maldonados for a combined purchase price of $260,000.

138.    The city completed its purchase in January 2007.

139.    No use has been made of the Cruise Inn building and the bar and restaurant equipment has remained within the building.

140.     Becker, and Maack and Helding at Becker's direction, acting under color of state law, deprived the Maldonados of their right to equal protection under the laws and equal privileges and immunities under the laws in that they were discriminated against solely because of their race and the race of their tavern's patrons.

141.     Becker, Maack, and Helding knowingly and deliberately utilized municipal authority and administrative tribunals to invoke customs and policies to unfairly target, harass, and discriminate against the Maldonados in several ways, including but not limited to:

a.  Becker targeting the Maldonados and the Cruise Inn with increased monitoring and scrutiny solely because of their race and the race of their patrons while similarly situated white-owned bars frequented by whites were exempted from the same scrutiny from summer 2006 until January 2007;

b.  Becker encouraging discriminatory activities such as routinely focusing excessive police resources on the Maldonados and the Cruise Inn while failing to similarly use police resources against white-owned bars with similar reports of incidents;

c.  Becker encouraging the exaggeration of the July 3, 2006 incident while encouraging the downplaying, deflecting and neglecting of similar reports of violence in white-owned bars;

d.  Becker disparately disciplining minority-owned bar owners for claims of underage alcohol consumption while failing to impose discipline against white-owned bars for similar offenses;

e.  Becker ordering the disparate and unjust issuing of citations for violations of minor City ordinances against the Maldonados and not against white-owned bars guilty of violating similar ordinances;

f.  Becker threatening and intimidating the Maldonados to force them to sell their property and abandon their business; and

g.  Maack and Helding voting to revoke the liquor license of The Cruise Inn on a scant history of punishable behavior and not doing so against white-owned bars with similar or greater histories of punishable behavior;

h.  As detailed above, the actions and/or by the City, its Mayor, alderpersons and employees constituted a pattern, practice, policy or custom of the City and deliberate indifference toward the Maldonados' rights.

142.  Becker, Maack, and Helding's discriminatory actions were callously indifferent to the federally protected rights of the Maldonados and were designed to bring about the closure of The Cruise Inn, thereby depriving the Maldonados of their constitutional right to equal protection under the law and equal privileges and immunities under the law.

143.  As a result of Becker, Maack and Helding's discriminatory actions, the Plaintiffs are entitled to compensation, in law and in equity, as victims of official misconduct and discrimination.

144.  Becker, Maack and Helding conspired to deprive the Maldonados of their right to equal protection of the laws by discriminatorily targeting them and their business as discussed above.

145.  Each of those defendants acted in furtherance of the conspiracy in that:

a.  Becker instructed and/or pressured his subordinates to threaten and harass the Maldonados with "offenses" regardless of the Maldonados' efforts to appease the City;

35

b. Becker used real estate agents to threaten and scare the Maldonados into selling their property by leading them to believe their property would soon be worthless;

c. Becker used City employees to visit the Maldonados' at their place of business to threaten them with claims that they were in "deep trouble;"

d. Becker conspired with Maack and Helding to use the "due process" procedure against the Maldonados to revoke their license for a single exaggerated incident; and

e. Maack, and Helding voted to revoke the Maldonados' license in furtherance of the racially motivated agenda.

146. If not for the overtly discriminatory conduct, the Maldonados would still own the the Cruise Inn and its property today and would have continually operated it from December 2006 to the present.

147. Specifically, the clearly discriminatory and unconstitutional conduct of Becker, Maack, and Helding violated the Maldonados constitutional rights and proximately caused the Maldonados the following injuries:

a. The Maldonados were forced to close their business;

b. The Maldonados were forced to sell their property at a steep discount;

c. The Maldonados lost profits; and

d. Other damages

**Wilber Jones and Viper's Lounge v. Becker, Maack, Helding, Kaplan, Mozol, Wisneski Wahlen
Pursuant to 42 U.S.C. 1983 and 42 U.S.C. 1985**

148. Jones incorporate the allegations of paragraphs 31 to 113 as if fully restated here.

149.     Jones, who is black, was the owner of Viper's Lounge located at 501 High Street. Viper's had been in business for approximately 10 years, opening in 1998.

150.     The vast majority of incidents at Viper's Lounge during its years of operation involved nuisances, such as noise complaints, traffic, and crowd control.  Additionally, most of these incidents occurred outside the bar itself.  Indeed, Viper's Lounge never had any shootings or violent crimes associated with the business.  Nevertheless, during his time in business, Jones was required by the City to hire off-duty Police Department officers as a condition to obtaining and maintaining his liquor license.  This requirement was enforced despite the fact that Jones took it upon himself to hire his own private security for the bar.

151.     Throughout its operation, Viper's Lounge was the victim of several racially-motivated incidents, damage to property, harassment of minority patrons, and racial slurs being painted on the building.  Jones reported these incidents to the Police Department, which made no effort to take action against the perpetrators.  In particular, when one Racine resident was caught spraying a racial slur on the side of the Viper's Lounge building, the Police Department informed Jones that the perpetrator's husband, who was identified, would clean the slur off the building and closed the case.  The husband never complied and Jones was forced to have the slur cleaned off the building himself.

152.     Viper's Lounge, as Jones reported to the Racine Journal Times on August 3, 2006, catered to a predominantly minority clientele in a neighborhood that had changed from predominantly white to mixed race over a relatively short period of time.  Indeed, neighborhood residents glued the locks on the doors of Viper's shut on a number of occasions, costing Jones $4,000 to fix the locks each time.  The combination of that racially charged environment and the

Police Department's unwillingness to assist with the incidents related to it contributed to Viper's Lounge being singled out as a "problem" bar.

153.    Starting in 2006 and continuing throughout its years of operation, Viper's was called before the Licensing Committee on at least 10 occasions to answer for incidents that allegedly occurred on-site. Jones made every effort to appease the Licensing Committee and repeatedly insisted that he hired security to maintain the interior of the bar as well as the immediate outside area.

154.    Jones took several steps to ensure the safety of both Viper's clientele and the neighborhood residents, including but not limited to searching all clientele who entered the bar for weapons and contraband, encouraging off-duty officers to issue citations to clientele who misbehaved, and even placing restrictions on reentry to the bar by clientele who went outside in an effort to curb bringing any outside altercations into the bar.

155.    Despite the uncommon efforts taken by Jones to operate Viper's Lounge in as safe a fashion as possible, on July 21, 2008, Jones was called before the Licensing Committee and was given a list of incidents purportedly having occurred at Viper's. Jones disputed the list, pointing out that the list presented by the Police Department was inconsistent with the one presented by the Licensing Committee. The Licensing Committee was forced to defer the matter to August 11, 2008 as well as defer the decision on Jones' renewal application until August 25, 2008.

156.    On August 11, 2008, Viper's appeared before the Licensing Committee as planned. Wisneski stated that he had concerns about incidents at the bar using too many police resources. The Police Department reported that there were many incidents at the bar as of late. Kaplan had personally called in complaints to the Police Department regarding noise and chaos

occurring around the bar at closing time. Jones stated he hired off-duty officers to handle security in the bar and immediate outside area, and the matter was only received and filed. But Jones' application for renewal of his liquor license was up before the Licensing Committee just two weeks later.

157. Indeed, on August 25, 2008, the Licensing Committee recommended to the Common Council that Viper's Class B license not be renewed.

158. At the time of non-renewal, Kaplan—the alderman of the district in which Viper's Lounge was located—sat on the Licensing Committee. Kaplan campaigned on a promise to remove Viper's and other minority-owned bars from his district in the spring of 2006. Jones objected to Kaplan's involvement with the renewal decision, to no avail. Following the hearing, the Common Council accepted the Licensing Committee's recommendation and voted to not renew the license for Viper's Lounge in November 2008.

159. Mayor Becker, and members of the Licensing Committee—Maack, Kaplan, Helding, Wisneski and Mozol—and the Police Chief Wahlen acting under the Mayor's direction, acting under the color of state law, deprived Jones of his right to equal protection under the laws and equal privileges and immunities under the laws in that he was discriminated against solely because of his race and the race of his tavern's patrons.

160. Those Defendants knowingly and deliberately utilized municipal authority and administrative tribunals to invoke customs and policies to unfairly target, harass, and discriminate against Jones, including but not limited to the following ways:

      a. Targeted Jones and Viper's Lounge's by increased monitoring and scrutiny solely because of his race and the race of Viper's patrons while similarly situated white

bar owners with bars frequented by whites were exempted from the same scrutiny from 2006 until December 2008;

b. Wahlen, at Becker's direction, refused to investigate racially motivated crimes committed against Jones and his property but investigated crimes purportedly implicating Jones and Viper's as the wrongdoers;

c. Licensing Committee members –Maack, Kaplan, Helding, Wisneski and Mozol – at Becker's direction, disparately disciplined Jones for the occurrence of minor incidents at Viper's, by forcing him to hire off-duty police officers at Viper's and ultimately Kaplan, Wisneski and Mozol voted to recommend the revocation of Viper's liquor license, while failing to impose discipline against white-owned bars experiencing similar incidents at the same or even a higher rate;

d. As detailed above, the actions by the City, its Mayor, alderpersons, and employees constituted a pattern, practice, policy or custom of the City and deliberate indifference toward Jones' rights.

161.    Specifically, the clearly discriminatory and unconstitutional conduct of Becker and other City employees violated Jones' constitutional rights and proximately caused him the loss of his liquor license for Viper's Lounge.

162.    If not for the overtly discriminatory conduct, Jones would still own Viper's Lounge and its property today and would have continually operated it from November 2008 to the present.

163.    Becker, Wahlen, and the members of the Licensing Committee conspired to deprive Jones of his right to equal protection of the laws by discriminatorily targeting him and his tavern as discussed above.

40

164. Each of those defendants acted in furtherance of the conspiracy in that:

a. Becker instructed and/or pressured Wahlen to discriminatorily investigate crimes that could be attributed to Viper's for purposes of Licensing Committee scrutiny and not racially motivated crimes committed against Viper's;

b. Wahlen discriminatorily investigated crimes regarding Viper's based on Wahlen's instruction;

c. Becker instructed and/or pressured members of the Licensing Committee, including Maack, Kaplan, Helding, Wisneski and Mozol, to disparately discipline Jones and his business and eventually to not renew Jones' license; and

d. Kaplan, Wisneski, and Mozol voted to not renew Jones' license.

165. The aforementioned discriminatory and unconstitutional conduct and the conspiracy to violate Jones' constitutional rights and proximately caused him injuries, including but not limited to:

a. the loss of his liquor license for Viper's;

b. the loss of his business;

c. his lost profits from November 2008 to the present; and

d. other damages.

**Pythanphone Khampane and Omjai Nueakeaw v. Wisneski, Kaplan, Mozol, Maack, Helding, Dickert**
**Pursuant to 42 U.S.C. 1983 and 42 U.S.C. 1985.**

166. Khampane and Nueakeaw incorporate the allegations of paragraphs 31 to 113 as if fully restated here.

167.     Pythanphone Khampane, Thai-American, and Omjai Nueakeaw, a Thai citizen, were the owners of Ginger's Lounge located at 337 Main Street.  Ginger's patrons were predominantly minorities.

168.     Before Ginger's opened in 2008, Nicholson and Alderman Coe visited Ginger's and told Khampane and Nueakeaw that they did not want "certain people" downtown and encouraged the owners to take alcohol such as "Hennessy" off the shelf and to charge those "certain people" $20 a drink in order to discourage their presence at the bar.

169.     During its years of operation from 2008 to 2011, the number of police calls and incidents attributed to Ginger's were fewer than other bars in and around the area.  Allegedly as a result of the volume of these incidents—the majority of which were minor and non-violent— Ginger's was called before the Licensing Committee.

170.     Nonetheless, on May 11, 2009, Ginger's was called before the Licensing Committee on Coe's request and Khampane appeared on its behalf.  The reason was ostensibly that neighbors in the area had been complaining about Ginger's.  During this same timeframe, however, LeGath's bar nearby (on Taylor Avenue) had a neighbor complaining about the chronic loud noise coming from the bar.  In the Licensing Committee meeting minutes regarding the neighbor's complaint, the Committee noted that the complaint was false and that it would send a citation to the neighbor if he/she kept making false claims.

171.     In order to keep its liquor license under threat of revocation by the Licensing Committee, Ginger's entered into a side agreement with the City in September 2009.   This agreement required Ginger's to expend enormous costs by requiring, for instance, that Ginger's employ additional security guards, limit capacity, purchase surveillance cameras, maintain

surveillance tapes, procure identification scanners, limit operation times, and post notices concerning "gang clothing."

172.    In 2010, Ginger's was called to appear before the Licensing Committee regarding an extension of the side agreement.  At this meeting, Khampane represented that he had spent over $10,000 to comply with the side agreement.  The Licensing Committee referred Ginger's to a due process hearing to determine whether its license should be revoked or suspended.

173.    Ginger's due process hearing before the Licensing Committee was held on March 30, 2011.  Prior to the hearing, the owners and their attorney were told in a private meeting with Wisneski and the City's attorneys that if it would quit playing "hip-hop" music and change the patrons, it could maintain its Class B license.  At the due process hearing, Khampane addressed the Licensing Committee and stated that Ginger's has zero tolerance for violent and disruptive behavior.  He went on to discuss the policies and procedures Ginger's had implemented to remain in business and the large amount of money Ginger's was spending to appease the Licensing Committee.  Nonetheless, at the conclusion of the hearing, the Licensing Committee made a recommendation to the Common Council to revoke the Class B license for Ginger's.

174.    Rather than have its license inevitably revoked by the Common Council, Ginger's surrendered its liquor license following the Licensing Committee hearing.

175.    Mayor Dickert, and members of the Licensing Committee—Wisneski, Kaplan, Helding, and Mozol—acting under the Mayor's direction, acting under the color of state law, deprived Khampane and Nueakeaw of their right to equal protection under the laws and equal privileges and immunities under the laws in that they were discriminated against solely because of their race and the race of their tavern's patrons.

176. Those Defendants knowingly and deliberately utilized municipal authority and administrative tribunals to invoke customs and policies to unfairly target, harass, and discriminate against Khampane and Nueakeaw, including but not limited to the following ways:

a. Targeted Khampane and Nueakeaw and Ginger's by increased monitoring and scrutiny solely because of their race and the race of Ginger's patrons while similarly situated white bar owners with bars frequented by whites were exempted from the same scrutiny from 2008 to March 2011;

b. Licensing Committee members—Wisneski, Maack, Kaplan, Helding, and Mozol—at Dickert's direction, disparately disciplined Khampane and Nueakeaw for the occurrence of minor incidents at Ginger's, by forcing them to expend money and enter side agreements in order to keep their license and ultimately recommending the revocation of Ginger's liquor license, while failing to impose discipline against white-owned bars experiencing similar incidents at the same or even a higher rate;

c. As detailed above, the actions by the City, its Mayors, alderpersons, and employees constituted a pattern, practice, policy or custom of the City and deliberate indifference toward Khampane and Nueakeaw's rights.

177. Specifically, the clearly discriminatory and unconstitutional conduct of Dickert and other City employees violated Khampane and Nueakeaw's constitutional rights and proximately caused them the loss of their liquor license for Ginger's Lounge.

178. If not for the overtly discriminatory conduct, Khampane and Nueakeaw would still own Ginger's Lounge and its property today and would have continually operated it from March 2011 to the present.

44

179. Dickert and the members of the Licensing Committee conspired to deprive Khampane and Nueakeaw of their right to equal protection of the laws by discriminatorily targeting them and their tavern as discussed above.

180. Each of those defendants acted in furtherance of the conspiracy in that:

    a. Dickert instructed and/or pressured members of the Licensing Committee to extort side agreements from Khampane and Nueakeaw and ultimately to vote to revoke their license; and

    b. Wisneski, Kaplan, Helding, and Mozol voted to revoke Khampane and Nueakeaw's license.

181. Khampane and Nueakeaw lost their license as a result.

182. The aforementioned discriminatory and unconstitutional conduct proximately caused Khampane and Nueakeaw's injuries, including but not limited to:

    a. the loss of Khampane and Nueakeaw's liquor license for Ginger's in March 2011;

    b. the loss of Khampane and Nueakeaw's tavern business;

    c. the loss of any and all potential profits from Ginger's from March 2011 to the present; and

    d. other damages.

**Fair v. Dickert, Wisneski, Kaplan, Helding, Mozol, and Maack**
**Pursuant to 42 U.S.C. 1983 and 42 U.S.C. 1985**

183. Fair incorporates the allegations of paragraphs 31 to 113 as if fully restated here.

184. Plaintiff Keith Fair, a black man, served a term as the 1st District Alderman from April 2005 to April 2007 and then again from April 2011 to 2013. In August 2009, Fair took over a bar located at 509 6th Street, and inherited the Class B liquor license for the location. In September 2009, Fair opened The Place On 6th.

185. Throughout its operation, Fair and The Place on 6th were repeatedly—on a total of 19 occasions—called before the Licensing Committee for largely minor incidents, almost none of which involved violence of any kind. Many of these so-called incidents were falsely reported to the Police Department by neighbors under the influence of the City.

186. For instance, in 2011, Mark Levine posted a Craigslist advertisement for an apartment for rent at 507 6th Street, next door to The Place On 6th and across the street from Park 6. The ad stated "special discount available – discuss after showing." In August 2011, Georgia Davis and Linda Davis met with Levine to discuss renting his advertised apartment. The as stated "SPECIAL DISCOUNT AVAILABLE – Discuss after showing." Levine told the Davises that the discount was contingent on the Davises agreeing to complain about Park 6 and The Place On 6th.

187. On the numerous occasions Fair was called before the Licensing Committee, he attempted to address the Licensing Committee's concerns installing security cameras and hiring extra staff to work the door. On July 12, 2010, in particular, the Licensing Committee tried to force Fair to enter into a side agreement with the City whereby he would be required to hire off-duty Racine police officers, change the type of music he played, and monitor the dress of code of his patrons. The Licensing Committee disregarded Fair's complaint—that he was being asked to do more than other white-owned bars similarly situated. Fair refused to enter the agreement. As a result, Fair's subsequent request to revise the scope of his liquor license was denied. Maack told him that the request would be approved if Fair entered into the side agreement.

188. On April 11, 2011, Fair was called before the Licensing Committee on reports of fighting at the bar. The Police Department reported that the fights had occurred outside the bar. After Alderman Marcus indicated that arrests should have been made by the Police Department

Case 2:14-cv-00208-JPS    Filed 08/21/14    Page 46 of 119    Document 62

if such fighting had actually occurred (and no such arrests were made), the matter was received and filed with no further action at that time.

189.     On July 11, 2011, the Licensing Committee voted to begin a due process hearing to suspend or revoke The Place On 6th's liquor license. To avoid the due process hearing, The Place On 6th entered into a side agreement requiring it to double the number of security cameras, allow no one under the age of 25 into the bar, maintain a list of "trouble" patrons, and suspend its operations for fifteen days.

190.     On March 26, 2012, Fair again was called before the Licensing Committee regarding a fight that had occurred at The Place On 6th.  In fact, following the incident, Fair provided the Police Department with the names of those involved in the fight, but the Police Department made no arrests.  The Licensing Committee recommended that The Place On 6th be referred to a due process hearing based on the continuous police calls, fights, and large crowds.

191.     On October 15, 2012, Fair appeared before the Licensing Committee for the due process hearing.  The Licensing Committee, of which Helding, Wisneski and Mozol were members, voted to recommend to the Common Council that the license for The Place On 6th be revoked, which the Common Council adopted.

192.     Mayor Dickert, and members of the Licensing Committee –Maack, Kaplan, Helding, Wisneski and Mozol acting under the Mayor's direction, acting under the color of state law, deprived Fair of his right to equal protection under the laws and equal privileges and immunities under the laws in that he was discriminated against solely because of his race and the race of his tavern's patrons.

193.    Those Defendants knowingly and deliberately utilized municipal authority and administrative tribunals to invoke customs and policies to unfairly target, harass, and discriminate against Fair, including but not limited to the following ways:

   a.  Targeted Fair and The Place on 6th by increased monitoring and scrutiny solely because of his race and the race of the tavern's patrons while similarly situated white bar owners with bars frequented by whites were exempted from the same scrutiny from September 2009 to October 2012;

   b.  Licensing Committee members –Maack, Kaplan, Helding, Wisneski and Mozol – at Dickert's direction, disparately disciplined Fair for the occurrence of minor incidents at Ginger's, by forcing him to expend money and enter side agreements in order to keep his license and ultimately recommending the revocation of The Place on 6th's liquor license, while failing to impose discipline against white-owned bars experiencing similar incidents at the same or even a higher rate;

   c.  As detailed above, the actions by the City, its Mayors, alderpersons, and employees constituted a pattern, practice, policy or custom of the City and deliberate indifference toward Fair's rights.

194.    Specifically, the clearly discriminatory and unconstitutional conduct of Dickert and other City employees violated Fair's constitutional rights and proximately caused him the loss of his liquor license for The Place on 6th.

195.    If not for the overtly discriminatory conduct, Fair would still own The Place on 6th and its property today and would have continually operated it from October 2012 to the present.

196.     Dickert and the members of the Licensing Committee conspired to deprive Fair of his right to equal protection of the laws by discriminatorily targeting him and his tavern as discussed above.

197.     Each of those defendants acted in furtherance of the conspiracy in that:

a.  Dickert instructed and/or pressured members of the Licensing Committee to extort side agreements from Fair and ultimately to vote to revoke his license; and

b.  Maack, Wisneski, Kaplan, Helding, and Mozol extorted side agreements from Fair, and

c.  Helding, Wisneski, and Mozol voted to revoke Fair's license.

198.     Fair lost his license as a result.

199.     The aforementioned discriminatory and unconstitutional conduct proximately caused Fair's injuries, including but not limited to:

e.  the loss of Fair's liquor license in October 2012;

f.  the loss of Fair's tavern business;

g.  the loss of any and all potential profits from Place on 6th from October 2012 to the present; and

h.  other damages.

**Holmes v. Dickert, Wisneski, Kaplan, Helding, Mozol, Maack, Wahlen
Pursuant to 42 U.S.C. 1983 and 42 U.S.C. 1985**

200.     Holmes incorporates the allegations of paragraphs 31 to 113 as if fully restated here.

201.    Holmes, a black man, owned and operated Park 6, previously located at 500 6th Street, from July 2008 to its closing on December 15, 2011.  During this time, Defendants unfairly and arbitrarily targeted Holmes because he and his patrons are black.

202.    Ostensibly in response to incidents at Park 6, Holmes and Park 6 were repeatedly called before the Licensing Committee and Common Council, were forced to enter into numerous side agreements, and were subject to three due process hearings.  Yet, none of the "incidents" that occurred at Park 6 during the two and a half years it was open were unusual, distinguishable, or more frequent from incidents at white-owned bars.

203.    One side agreement, entered into on August 10, 2009, required Park 6 to implement a number of unprecedented requirements to keep its license.  Specifically, Park 6 was required to (1) update, install, and maintain video surveillance and retain the videos for two weeks; (2) close Park 6 at 1:30 a.m. on Thursdays, Fridays, and Saturdays until the end of September 2009; (3) monitor the decibel level of its live or recorded music; (4) have all future advertisements reviewed for undesirable content; (5) provide adequate parking; (6) clean a 100-foot radius from the building after closing each night; (7) allow no more than two employees to stay past close to clean and close down the building; and (8) provide security with a wide area network, a mobile identification card scanner, an age verifier, and a fake identification scanner.  These unprecedented requirements caused Holmes to incur significant costs to continue operating.

204.    As an example of just one of the so-called "incidents" precipitating the Licensing Committee's investigation into Park 6, on May 20, 2010, a Park 6 security guard was hit in the ankle by a stray bullet shot from down 6th Street at closing time.  Sometime after the shooting, Holmes learned who shot the stray bullet, which he told to 1st District Alderman Jeff Coe, who

50

then contacted Chief Wahlen of the Police Department. Wahlen, however, declined to investigate the matter further. The case remains unsolved to date; yet, Park 6 was blamed for the incident at subsequent due process hearings.

205. Meanwhile, the Racine Journal Times reported on July 21, 2010 that security cameras were placed by the City on the corner of Sixth Street and Park Avenue. Alderman Wisneski publicly stated, "Sixth Street is one of the city's entertainment districts, and the city has seen an increase in the number of police related incidents and complaints about large crowds." However, the cameras, which cost approximately $10,000 and were jointly purchased by the Police Department and the Downtown Racine Corporation, were specifically and exclusively aimed at Park 6—one at the front door and one at the backdoor. No white-owned bars with white clientele had City-owned security cameras monitoring their activity.

206. The Licensing Committee first referred Park 6 to a due process hearing that was held on August 26, 2010. At the hearing, the Licensing Committee suspended Park 6's liquor license for 45 days. Pursuant to yet another side agreement, in addition to the unprecedented requirements imposed on Park 6 in August 2009, Holmes and Park 6 were required to install a roped-off area at the entrance and implement procedures to minimize disorderly incidents at and adjacent to Park 6 following the suspension.

207. Thereafter, on December 8, 2010, Wahlen—as a resident of Racine and not in his capacity as police chief—filed but did not swear to a complaint with the Licensing Committee requesting a due process hearing and ultimate revocation of Park 6's license. Park 6 was ordered to appear before the Licensing Committee on December 20, 2010, for a due process hearing.

208. At the December 20, 2010 due process hearing, Wahlen admitted he did not properly swear to the complaint filed on December 8, 2010 as required by Racine ordinance.

The Licensing Committee nevertheless voted to recommend revocation of Park 6's license to the Common Council. On January 4, 2011, based on the recommendation of the Licensing Committee, the Common Council voted to revoke Park 6's Class B liquor license, effective January 11, 2011.

209. On January 11, 2011, Holmes appealed to the Racine County Circuit Court and sought the entry of a temporary injunction. On March 25, 2011, the Circuit Court judge issued an injunction, enjoining the City from enforcing the revocation. In June 2011, the Circuit Court ruled that the City's revocation was invalid.

210. After the City's first effort to revoke Park 6's license failed, the Licensing Committee held a special meeting on or about June 20, 2011, at which it recommended that Park 6's licenses not be renewed. Holmes' attorney was not available for the "special meeting," so he requested that it be adjourned. Holmes' request was denied and the Common Council approved a motion to adopt the Licensing Committee's recommendation to not renew Park 6's licenses.

211. At around the same time, the City appealed the Circuit Court's ruling invalidating the earlier revocation of Park 6's license, which created additional significant expense to Holmes in order to keep Park 6 operating.

212. In October 2011, Holmes decided he could no longer afford to continue defending the City's repeated efforts to revoke Park 6's license—both in the Court and before the Licensing Committee—and having no other choice, he entered into an Agreement for Surrender of Licenses, which allowed him to continue operating Park 6 from October 18, 2011 to December 15, 2011.

213. On December 15, 2011, Holmes vacated the premises and closed Park 6.

214.     Mayor Dickert, and members of the Licensing Committee—Wisneski, Kaplan, Helding, Mozol, and Maack—and Police Chief Wahlen acting under the Mayor's direction, acting under the color of state law, deprived Holmes of his right to equal protection under the laws and equal privileges and immunities under the laws in that he was discriminated against solely because of his race and the race of his tavern's patrons.

215.     Those Defendants knowingly and deliberately utilized municipal authority and administrative tribunals to invoke customs and policies to unfairly target, harass, and discriminate against Holmes in several ways, including but not limited to:

    a.   Targeted Holmes and Park 6 by increased monitoring and scrutiny soley because of his race and the race of his tavern's patrons while similarly situated white bar owners with bars frequented by whites were exempted from the same scrutiny from July 2008 to December 2011;

    b.   Wahlen, under Dickert's direction, discriminatorily investigated incidents related to Park 6, including by failing to investigate the May 20, 2010 stray bullet shooting of a Park 6 security guard, to provide fodder for the Licensing Committee to discipline Holmes;

    c.   Licensing Committee members – Wisneski, Kaplan, Helding, Mozol, and Maack, – at Dickert's direction, disparately disciplined Holmes for the occurrence of minor incidents at Park 6, by forcing him to expend money and enter side agreements in order to keep his license and ultimately recommending the revocation and non-renewal of Park 6's liquor license, while failing to impose discipline against white-owned bars experiencing similar incidents at the same or even a higher rate;

Case 2:14-cv-00208-JPS   Filed 08/21/14   Page 53 of 119   Document 62

d. As detailed above, the actions by the City, its Mayors, alderpersons, and employees constituted a pattern, practice, policy or custom of the City and deliberate indifference toward Fair's rights.

216. Dickert, Wahlen, and the members of the Licensing Committee conspired to deprive Holmes of his right to equal protection of the laws by discriminatorily targeting him and his tavern as discussed above.

217. Each of those defendants acted in furtherance of the conspiracy in that:

a. Dickert instructed and/or pressured members of the Licensing Committee to extort side agreements from Holmes and ultimately to vote to revoke or to not renew his license;

b. Dickert instructed Wahlen to discriminatorily investigate incidents related to The Park 6;

c. Wahlen discriminatorily investigated incidents related to Park 6; and

d. Wisneski, Kaplan, Helding, Mozol, and Maack extorted side agreements from Holmes; and voted to revoke and to not renew Holmes' license.

218. If not for the overtly discriminatory conduct, Holmes would still own Park 6 and its property today and would have continually operated it from December 2011 to the present.

219. The clearly discriminatory and unconstitutional conduct of Dickert, Wahlen, and other City employees and co-conspirators violated Holmes' constitutional rights and proximately caused him injuries, including but not limited to:

a. the loss of his liquor license for Park 6;

b. his business;

c. his profits from December 2011 to the present; and

54

d.   other damages.

**All Plaintiffs v. City of Racine**
**Pursuant to 42 U.S.C. 1983 (*Monell* Claim)**

220.   Plaintiffs incorporate the allegations of paragraphs 31 to 219 as if fully restated here.

221.   In 2006, the City of Racine adopted a policy of subjecting minority-owned taverns, including Plaintiffs' taverns, to surveillance by its police officers, regulators, and administrative agencies and to the application of municipal ordinances relating to the regulation of taverns in disproportionate fashion as compared with white-owned taverns.   The City implemented the policy to rid downtown Racine of minority-owned businesses.

222.   The City's policy manifested itself in many forms, including but not limited to, disproportionately ordering Plaintiffs to appear before the Licensing Committee for violations otherwise unchecked at white-owned taverns and subjecting minority-owned businesses disproportionately to fines, side agreements, and public censure otherwise unheard of at white-owned taverns.

223.   The City has maintained this policy to the present date and will continue to do so.

224.   Although the City's policy and custom of targeting minority-owned taverns has of course never been written into law, it was and remains so widespread and pervasive as to have the force of law.

225.   Indeed, despite the fact that as of the 2010 census, the City of Racine was comprised of approximately 40% minorities, there is not a single minority-owned tavern in downtown Racine.

226.   The aforementioned policy and custom of the City of Racine caused injury to all Plaintiffs as follows:

a.  The Maldonados, as set forth in paragraphs 147;

b.  Jones, as set forth in paragraphs 165;

c.  Khampane and Nueakeaw; as set forth in paragraphs 182;

d.  Fair, as set forth in paragraphs 199; and

e.  Holmes, as set forth in paragraph 219.

227.    Accordingly, Plaintiffs are entitled to injunctive, monetary, and all other relief recoverable under 42 U.S.C. § 1983 and its jurisprudence for the damages wrought by the pervasive discriminatory targeting of minority-owned businesses in downtown Racine, including Plaintiffs' taverns, as was and is the policy and custom of the City of Racine.

## B. RICO VIOLATIONS

### *Overview*

228.    As detailed above, under former Mayor Becker, Racine began discriminating against minority business owners and their minority customers beginning in 2005.

229.    That pattern and practice of discrimination accelerated with Dickert's election in 2009. As detailed below, the City's continued targeting of minority-owned businesses was based not only a racial animus but was part of a criminal scheme by Dickert and white business people in Racine to control and use the City's government for their own benefit.

### *The Participants*

230.    In an effort to control who owned businesses—particularly taverns—within downtown Racine, Nicholson, LeGath, the Tavern League and unknown tavern owners ("the Financiers") bribed Dickert both during and after his 2009 and 2011 Mayoral campaigns and, on information and belief, they continue to do so.

231.    In exchange for the bribe monies received from the Financiers, Dickert, after his election, used his office to support the Financiers' agenda, particularly by appointing alderpersons to the Licensing Committee who had agreed to protect those businesses' interests or over whom Dickert had influence.  Dickert and the alderpersons ensured that these Financiers were protected from Police Department and Licensing Committee scrutiny.  The Financiers also gained access to the limited number of liquor licenses available in Racine and additional revenue by attracting former customers of the minority-owned bars that were driven out of business.

232.    Dickert wielded his influence over Wahlen, as-yet unidentified Police Officers and Dickert's cronies not officially affiliated with city government, including Jerger, Osterman, Sutherland and Levine ("the Accomplices").  That influence resulted in the Accomplices either assisting in hiding bribe monies or in creating pre-textual reasons for depriving minority bar owners of the means to operate successful businesses and ultimately their liquor licenses.

233.    Either because they feared reprisal from Dickert from failing to do so or because they stood to benefit from doing so, Kaplan, Maack, Mozol, Wisneski, and Helding ("the Aldermen") used their positions on the Licensing Committee to unduly pressure minority-owned businesses into paying trumped-up fines, entering into side agreements, and relinquishing their liquor licenses where the Aldermen did not outright revoke the licenses themselves.

234.    The participants knew of the criminal nature of the scheme and knew that Dickert and the Financiers engaged in the scheme to control and conduct the Racine City government for their own benefit.

### *The Participants' Roles*

235.    The Financiers gave thousands of dollars in bribe monies to Dickert in exchange for official acts, including but not limited to the appointment of alderpersons to the Licensing

Committee who would protect the Financiers' business interests, protection from Police Department and Licensing Committee scrutiny, and access to the limited number of liquor licenses available in Racine. Through the payment of these bribe monies, the Financiers gained significant control of the Racine city government and obtained additional revenue by attracting former customers of the minority-owned bars that were driven out of business.

236. Dickert accepted the bribe monies paid by the Financiers and, in exchange, ran the city of Racine's government in a corrupt fashion which deprived Racine, its residents and its business community at large of his honest services. Specifically, Dickert appointed alderpersons to the Licensing Committee who protected the Financiers' business interests, shielded the Financiers from Police Department and Licensing Committee scrutiny, and ensured they had unrestricted access to the limited number of liquor licenses available in Racine whenever they desired.

237. Dickert, the Financiers, and Jerger, as Dickert's campaign treasurer, knew at all relevant times of all relevant Wisconsin statutes related to campaign finance, including those laws related to financial contribution limits and reporting of same in campaign finance reports.

238. Knowing that the Financiers' bribes were illegal, and in order to keep their amounts and purpose hidden, Dickert and the Financiers devised a method to "wash" the bribes. In particular, Dickert had Jerger report the bribes as campaign contributions in Dickert's 2009 and 2011 campaign finance reports. Further, Dickert and Jerger would attribute the bogus contributions to people other than the Financiers and for amounts different than the Financiers had provided to Dickert.

239. The size of the bribes became so large at one point that Dickert and Jerger could no longer conceal them through the "washing" method in campaign finance reports.

Case 2:14-cv-00208-JPS   Filed 08/21/14   Page 58 of 119   Document 62

Accordingly, Dickert and Jerger simply stopped reporting the bribes on campaign finance reports altogether.

240.    As such, Dickert's sworn 2009 and 2011 campaign finance reports were works of fiction, written to disguise the bribes given by the Financiers and the purpose for which they were given—to buy influence for their businesses and gain control over the city governmenparat.

241.    After Dickert's election in May 2009, the Aldermen required a number of minority-owned taverns, including several owned or operated by Plaintiffs, to either enter grossly excessive and punitive side agreements by which Dickert's cronies stood to benefit or lose their liquor licenses.

242.    The Aldermen did this to gain and curry favor with Dickert and the Financiers and to ensure they remained on influential committees.

243.    To ensure there was no disruption to the scheme, Dickert threatened to remove any alderman from the Licensing Committee, or any other influential position they held, if they failed to "play ball."   Dickert further threatened to support candidates to run against these aldermen in the next election cycle.

     a.    For example, an alderperson named Eric Marcus was appointed by Dickert to the Licensing Committee in 2010.  After a few months, Marcus raised questions to fellow members of the Licensing Committee regarding its unfair targeting of minority bar owners for fines, side agreements, suspensions, and revocations, and began to vote against imposing same upon minority bar owners.  For example, on July 12, 2010 and November 8, 2010, Marcus voted against disciplining Fair and Place on 6th.  As a result, Dickert refused to re-appoint Marcus to the Licensing Committee once his one-year term ended.   Dickert then recruited Krystyna

Sarrazin to run against Marcus for alderperson and enlisted the support of Nicholson, who held fundraisers for Sarrazin at his bar, Ivanhoe's Pub. Sarrazin beat Marcus in the election and Dickert promptly appointed her to the Licensing Committee, where she has remained since her election.

b. As another example, an alderperson named Henry Perez was appointed by Dickert to the Licensing Committee in 2013. Perez raised questions to fellow members of the Licensing Committee regarding its unfair targeting of minority bar owners for fines, side agreements, suspensions, and revocations, and began to vote against imposing same upon minority bar owners. As a result, Dickert refused to re-appoint Perez to the Licensing Committee once his one-year term ended.

244. After Dickert's election, Wahlen and other as-yet unidentified police officers, Sutherland, Osterman and Levine assisted the scheme in a multitude of ways:

a. Wahlen was directly involved in filing complaints against minority business owners targeted by the Financiers and Dickert.

b. Wahlen instructed his officers to underreport crimes that occurred at the Financiers' businesses.

c. Wahlen stationed his police officers in such a way to attempt to prevent disturbances at the Financiers' businesses.

d. Wahlen stationed his police officers so they would not stop or deter disturbances at minority-owned businesses but so they could document them as they were taking place.

e.   Wahlen instructed his officers to misrepresent the locations of crimes near minority-owned bars, including Plaintiffs', so that it appeared the crimes occurred on their property.

f.   Wahlen instructed his officers to catalogue and exaggerate incidents that occurred at minority-owned taverns, including Plaintiffs', targeted by Dickert and the Financiers.

g.   Osterman approached business community members who previously provided Dickert bribes and demanded that the payments continue or they would face governmental scrutiny and resultant negative consequences to their personal and professional lives.

h.   Osterman extorted business owners and developers into using his granite contracting company on construction projects within Racine by reminding those owners of his influence in City Hall and the negative consequences they would face should they refuse.

i.   Sutherland investigated, recruited and coached witnesses to testify against minority-owned taverns targeted by Dickert and the Financiers, including Plaintiffs' taverns targeted by the scheme.

j.   Levine discounted rental rates for tenants at his properties who complained about the minority-owned businesses that were targeted by the scheme.

### *The Enterprise*

245.   Through the actions of the participants above and the more specific predicate acts detailed below, Dickert and the Financiers took over the Racine city government in 2009 and have and maintained control of that government through continued criminal conduct, including

the predicate acts detailed below. The participants were united in their desire to control Racine's downtown business district and the commercial and personal benefits attendant to such control and, further, to rid downtown Racine of minority owned businesses and their minority patrons, who threatened that control.

246. The participants as detailed above in paragraphs 230 to 234 were aware of the enterprise, its goals and the participation of some, if not all, of the other participants.

247. The participants were each aware that either they or some other member of the scheme would undertake the necessary actions to allow the scheme to succeed and for them to continue to control and use the enterprise for their benefit and that some of the participants, if not all, would undertake at least two of the predicate acts detailed below.

*Pattern of Racketeering Activity*

248. In furtherance of the scheme as detailed above, some if not all of the participants engaged in repeated criminal acts beginning as late as January 2009 and continuing through the present. Specifically, the participants engaged in both the solicitation and payment of bribes, extortion, mail fraud, unlawful gratuity to a public official and other unspecified criminal, illegal and dishonest acts. Specific predicate acts of specific defendants are detailed in the subsequent paragraphs.

249. To allow them to gain control of the Enterprise, the Financiers and Dickert engaged in numerous acts of bribery in violation of WI Stat. 946.10 and 18 U.S.C. § 201(b) or in the alternative, received and/or gave unlawful gratuities, in violation in 18 U.S.C. 201(c), as well as their state law counterparts. Specifically, they undertook the following actions:

a. In early 2009, before the special April 2009 primary election for Mayor of Racine, LeGath entered the campaign office of John Dickert and handed an

envelope containing three or four $100 bills of U.S. currency to Dickert's Finance Director and general strategist, Zachary Williams. LeGath told Williams that the money was for Dickert and that LeGath's name could not be identified on campaign finance reports as having provided the cash. The purpose of the payment was to ensure Dickert's cooperation in carrying out LeGath's interests, as previously identified in paragraph 235.

b. In early 2009, before the special April 2009 primary election for Mayor of Racine, on two other occasions, as-yet unidentified adult males entered the campaign office of Dickert and provided two $100 bills in U.S. currency to Zachary Williams and informed him both that LeGath, as President and/or Director of the Tavern League, had directed that they deliver the money for Dickert to him and that neither LeGath's, the as-yet unidentified white bar owners', nor the Tavern League's names could be publicly linked to the cash. The purpose of the payments was to ensure Dickert's cooperation in carrying out LeGath's, the as-yet unidentified white bar owners', and the Tavern League's interests, as previously identified in paragraph 235.

c. In April or May 2009, soon after Dickert won the April 2009 special primary but prior to the May 2009 special general election for Mayor, LeGath again entered the campaign office of Dickert and handed an envelope containing three or four $100 bills of U.S. currency to Dickert's Finance Director and general strategist, Zachary Williams. LeGath told Williams that the money was for Dickert and that LeGath's name could not be identified on campaign finance reports as having provided the cash. The purpose of the payment was to ensure Dickert's

cooperation in carrying out LeGath's interests, as previously identified in paragraph 235.

d.  In April or May 2009, soon after Dickert won the April 2009 special primary but prior to the May 2009 special general election for Mayor, on three or four other occasions, as-yet unidentified adult white males entered the campaign office of John Dickert and provided one or two $100 bills in U.S. currency to Zachary Williams, on two or three of those occasions, and to Gregory Bach, on one of those occasions, and informed each man, respectively, that LeGath, as President and/or Director of the Tavern League, had directed that they deliver the money for Dickert and that neither LeGath's, the as-yet unidentified white bar owners', nor the Tavern League's names could be publicly linked to the cash. The purpose of the payments was to ensure Dickert's cooperation in carrying out LeGath's, the as-yet unidentified white bar owners', and the Tavern League's interests, as previously identified in paragraph 235.

e.  In Spring 2009, before the special April 2009 primary election for Mayor, Dickert instructed Williams to go to Ivanhoe's pub, owned by Nicholson, to pick up money for Dickert. Upon arrival, Nicholson brought Williams into his office. Nicholson removed ten $100 bills in U.S. currency from his safe in the office with bankwrap still on the notes. Nicholson told Williams that the money was from a fundraiser for Dickert's campaign which was held at Ivanhoe's two days earlier and that he had just put a jar up on the bar for patrons put money into so there was no way to know who had contributed or how much money they had given. Williams, however, had been at the fundraiser and knew that there was no jar

64

placed on the bar. Instead, donations to the campaign had been taken by check at the fundraiser.

f.  Dickert instructed that the $1,000 given to Williams by Nicholson was to be reported as a campaign contribution from various individuals, including Nicholson, Nicholson's wife, Williams, and other unknown individuals.

g.  Soon after the special April 2009 primary election, Dickert again instructed Williams to go to Ivanhoe's pub, owned by Nicholson, to pick up money for Dickert. Upon arrival, Nicholson brought Williams into his office. Nicholson removed $1,000 in U.S. currency from his safe in the office. Nicholson told Williams that the money was from a fundraiser for Dickert's campaign.

h.  Dickert instructed that the additional $1,000 given to Williams by Nicholson was to be reported as a campaign contribution of various unknown amounts from various unknown individuals.

i.  These bribes in April and May 2009 from Nicholson, LeGath, the Tavern League, and as-yet unidentified white bar owners were made with a criminal intent and were intended to influence Dickert's appointments to the Licensing Committee and to ensure that minority-owned taverns were targeted by the City while Nicholson, LeGath, the Tavern League, and as-yet unidentified white bar owners would not have their businesses' interrupted.

j.  Soon after the special April 2009 primary election, Dickert met with a known Racine business owner ("Business Owner") to entice him to "do the same thing" that Nicholson had done. At the time of the election and shortly thereafter,

Business Owner was interested in redeveloping a section of west downtown in Racine, WI.

k. Shortly after Dickert's meeting with Business Owner, Dickert instructed Williams to go to Business Owner's place of business to pick up money. Upon arrival, Business Owner brought Williams into his office. Business Owner pulled a jar with over $1,200 in U.S. currency from a drawer in his office. Business Owner told Williams that Dickert told him to say the money was put in the jar by patrons of Business Owner's business. The money was crisp, in large denominations and did not appear to have been randomly given by patrons. This bribe was intended to influence Dickert for purposes of obtaining his administration's approval of a redevelopment project in west downtown Racine that Business Owner intended to undertake.

l. In May 2009, after he was elected Mayor, Dickert sent Osterman to obtain an additional bribe from Business Owner in exchange for allowing the planned redevelopment project to proceed. Dickert and Osterman solicited this bribe by convincing Business Owner that it would affect the approval of his redevelopment project. When Business Owner refused to furnish additional bribe monies, Brian O'Connell, the City's head of redevelopment who did Dickert's bidding, terminated any support for the project, thereby ending any chance for it would move forward.

m. Prior to the 2011 Mayoral election, at the direction of Dickert, Nicholson and LeGath, the Tavern League and its members were called to a "fundraiser" at Nicholson's bar to give Dickert additional bribe monies. These payments were

intended to influence Dickert's appointments to the Licensing Committee and to ensure that minority-owned taverns were targeted by the City while Nicholson, LeGath and Tavern League members would not have their businesses' interrupted. Further evidencing the illicit intent of these cash payments, none of these payments were recorded at the time of the fundraiser and did not appear on any of Dickert's campaign finance reports for the 2011 election.

n. In addition to the specific incidents detailed above, upon information and belief, Dickert solicited and received bribes from LeGath, Nicholson, the Tavern League and as-yet unidentified white bar owners in downtown Racine beginning in 2009 and continuing to the present in exchange for his continued use of his position and specifically the appointments to the Licensing Committee, continued targeting of minority-owned and/or competitor businesses, and other interests as specified in paragraph 235.

250. In furtherance of the scheme, Dickert, Kaplan, Helding, Wisneski, Maack, Osterman and Wisneski, and Mozol engaged in numerous acts of extortion in violation of WI Stat. 943.30 and 18 U.S.C. § 1951. Specifically, they undertook the following actions:

a. In June or July 2009, after Dickert's election as Mayor, Monte Osterman, at the direction of Dickert, demanded Business Owner provide him cash for Dickert or Business Owner's plan to develop a gas station on the west side of downtown Racine would not win the necessary approval from the Mayor and city departments. As part of his effort to extort money from Business Owner and to demonstrate the control Dickert held over the alderman and common council, Osterman called an alderman who had been creating problems for Business

Owner's planned development and indicated the Mayor was considering the project. Dickert would have benefitted from the receipt of this elicit money and Osterman would have also benefitted by receipt of money or preferential treatment from Dickert. When Business Owner refused to become Dickert and Osterman's personal ATM machine, his planned development on the west side of downtown Racine was terminated.

b. In June 2009, Osterman on behalf and at the behest of Dickert, approached Caleb Robinson—who was attempting to sell hot dogs on and around Monument Square and was facing resistance—to "shake him down." Dickert would have benefitted from the receipt of this elicit money and Osterman would have also benefitted by receipt of money or preferential treatment from Dickert. Shortly after this visit, Mr. Robinson was granted approval to sell hot dogs from his mobile cart in front of city owned property.

c. Also, in June or July 2009, Osterman on behalf of and at the behest of Dickert, approached a developer who was interested in buying and developing land in Racine and threatened the developer that the project would not proceed unless payment was made to Dickert through Osterman. Dickert would have benefitted from the receipt of this elicit money and Osterman would have also benefitted by receipt of money or preferential treatment from Dickert.

d. On and immediately prior to August 10, 2009, at the direction of Dickert, Kaplan, Wisneski, Maack and Mozol threatened Holmes with revocation of his business' liquor license unless he agreed to a side agreement by which he was required to (1) update, install, and maintain video surveillance and retain the videos for two

68

weeks; (2) close Park 6 at 1:30 a.m. on Thursdays, Fridays, and Saturdays until the end of September 2009; (3) monitor the decibel level of its live or recorded music; (4) have all future advertisements reviewed for undesirable content; (5) provide adequate parking; (6) clean a 100-foot radius from the building after closing each night; (7) allow no more than two employees to stay past close to clean and close down the building; and (8) provide security with a wide area network, a mobile identification card scanner, an age verifier, and a fake identification scanner.  Holmes agreed to this side agreement under the fear of the economic harm that would accompany the revocation of his liquor license.  These unprecedented requirements caused Holmes to incur significant costs to continue operating.  Kaplan, Wisneski, Maack and Mozol directly benefitted from this extortion by appeasing Dickert and thus ensuring they retained their positions on influential city committees and would not face a Dickert-backed challenger in any upcoming elections.

e. On or about September 1, 2009, as-yet unidentified members of the Racine Police Department who were working off-duty at Holmes' business as required by the August 10, 2009 side agreement, demanded to be paid $70.00 per hour or they would "blackball" Holmes.  After Holmes complained to Wahlen about the clear attempt at extortion by his officers, Wahlen took no action and instead Holmes met with Wisneski who demanded that Holmes "not discuss this with anyone." These as-yet unidentified members of the Racine Police Department intended to benefit financially from this extortion.

f.  In and around August and September 2009, Kaplan, Wisneski, Maack and Mozol voted to call Ginger's Lounge and Khampane and Nueakeaw before the Licensing Committee and referred them to a due process hearing as a threat to force Ginger's owners to agree to a side agreement.  On September 29, 2009, against their will, under threat of economic harm and in order to keep their business operating, Ginger's owners signed a side agreement requiring them to hire two security officers on weekend nights, limit capacity to 120 people, install surveillance cameras and maintain the tapes for 30 days, utilize an ID scanner, age verifier and fake ID detection unit, limit hours of operation, clean trash on public sidewalks and post a notice "banning gang clothing."  Kaplan, Wisneski, Maack and Mozol directly benefitted from this extortion by appeasing Dickert and thus ensuring they retained their positions on influential city committees and would not face a Dickert-backed challenger in any upcoming elections.

g.  On and immediately prior to October 26, 2009, Kaplan, Wisneski, Maack and Mozol threatened Holmes with revocation of his business' liquor license unless he agreed to yet another side agreement.  In fear of the economic harm he would suffer by having his license revoked, Holmes entered into another side agreement, under the terms of which he was required to close even earlier, hire additional security and install additional security cameras. These unprecedented requirements caused Holmes to incur significant costs against his will to continue operating.  Kaplan, Wisneski, Maack and Mozol directly benefitted from this extortion by appeasing Dickert and thus ensuring they retained their positions on

influential city committees and would not face a Dickert-backed challenger in any upcoming elections.

h. Between October 26, 2009 and August 26, 2010, Dickert, Levine, Sutherland, Wahlen, Kaplan and Wisneski undertook efforts to create a pretext for a revocation or suspension of the liquor licenses of minority-owned businesses on 6th street, including Park 6 and Place on 6th.  Specifically, these individuals did the following:

    i. Levine and Sutherland specifically requesting Dickert and the City "step-up" efforts on 6th Street;

    ii. Sutherland paying for individuals to film patrons entering and leaving Park 6 and Place on 6th;

    iii. Kaplan and Wahlen targeting Park 6's patrons and others gathered around Park 6 for loitering citations;

    iv. Wahlen and his subordinates coordinating with Wisneski regarding ensuring a uniformed police presence at Park 6's upcoming due process hearing; and

    v. Dickert through the City Attorney's office threatening to hold underage drinking citations over Holmes' head unless he agreed to a suspension.

i. On August 26, 2010, Kaplan, Wisneski, Maack and Mozol, as members of the Licensing Committee, found Park 6 to be "a disorderly, riotous, indecent and improper house" to force Holmes against his will to agree to the suspension of Park 6's liquor license for forty-five days. Kaplan, Wisneski, Maack and Mozol directly benefitted from this extortion by appeasing Dickert and thus ensuring

they retained their positions on influential city committees and would not face a Dickert-backed challenger in any upcoming elections.

j.  In March 2011, Wisneski filed a complaint seeking a due process hearing against Ginger's and its owners in an effort to either revoke its license or force the owners to give up the liquor license voluntarily.  On March 30, 2011, a due process hearing was held and the Licensing Committee received testimony that "hip-hop clubs" require more security and testimony from other witnesses that made clear they had a racial animus in making their complaints.  Despite the clearly prejudicial impetus behind the testimony, Maack, Kaplan and Mozol voted to recommend revoking Ginger's liquor license.  Shortly thereafter, Ginger's relinquished its liquor license in hopes of saving their adjacent restaurant business. Kaplan, Wisneski, Maack and Mozol directly benefitted from this extortion by appeasing Dickert and thus ensuring they retained their positions on influential city committees and would not face a Dickert-backed challenger in any upcoming elections.

k.  On July 11, 2011, Kaplan, Wisneski, Helding and Mozol voted to send Place on 6th and Fair to a due process hearing to revoke or suspend his liquor license in an effort to force Fair to agree to a side agreement against his will.  This effort was successful as on August 1, 2011 when Fair, in fear of the economic harm his business would suffer if his liquor license was revoked, entered into a side agreement which required him to double the number of security cameras, prohibit anyone under the age of 25 from entering into the bar, maintain a list of trouble patrons and agree to suspend the operation of his bar for fifteen days.  Kaplan,

Wisneski, Helding and Mozol directly benefitted from this extortion by appeasing Dickert and thus ensuring they retained their positions on influential city committees and would not face a Dickert-backed challenger in any upcoming elections.

l. In addition to the specific extortionate acts detailed above, upon information and belief, Dickert, the Aldermen, and Accomplices, beginning in 2009 continued to extort minority-owned taverns by threatening them with loss of their right to do business and forcing them to agree to expensive and excessive requirements to operate their businesses over and above those required of the Financiers' businesses. Dickert benefitted from the extortionate acts because he appeased the financiers and received additional bribes. The aldermen and accomplices benefited from these extortionate acts by appeasing Dickert and receiving additional committee appointments, avoiding costly contested elections or by directly benefitting from contracts with the extorted businesses.

251. In furtherance of the scheme, Dickert and Jerger engaged in at least two acts of wire fraud in violation of 18 U.S.C. § 1343, specifically, they undertook the following actions:

a. In and around March, April and July 2009, Dickert and Jerger knowingly submitted campaign finance reports that contained false information regarding moneys received and who provided that money electronically using wires as defined in the statute. Specifically, the reports did not properly attribute bribe monies received by Dickert from Nicholson, LeGath, Business Owner and other as-yet unknown tavern league members. Dickert and Jerger submitted those

reports intending that they be relied upon by Dickert's opponents and other governmental officials.

b.  In and around July 2010, February, March and July 2011, Dickert and Jerger knowingly submitted campaign finance reports that contained false information regarding moneys received and who provided that money electronically using wires as defined in the statute. Specifically, the reports did not properly attribute bribe monies received by Dickert from Nicholson, LeGath, and other as-yet unknown tavern league members.  Dickert and Jerger submitted those reports intending that they be relied upon by Dickert's opponent and other governmental officials.

252.    In furtherance of the scheme, Dickert, Nicholson, and LeGath, engaged in at two or more acts of honest services fraud utilizing the mail or wire in violation of 18 U.S.C. § 1341, 1343 and 1346, specifically, they undertook the following actions:

a.  Dickert, Nicholson and LeGath undertook the actions detailed in paragraphs 249 through 251, which are incorporated as if reasserted herein, with the intention of defraud the residents, businesses and community of Racine of the honest services of their elected officials including Dickert and the Alderman including but not limited to Wisneski, Mozol, Helding, Kaplan and Maack and other city employees.

b.  These actions defrauded the residents, businesses and community of Racine including Plaintiffs Holmes, Fair, Khampane and Nueakeaw of the honest services of Dickert and the Alderman in that they through their official duties acted to protect and enhance LeGath and Nicholson's influence in Racine by (1)

failing to investigate or punish bars, taverns and restaurants owned by LeGath, Nicholson and other Tavern League member for serious and repeated violations of the law, including Racine ordinances; (2) unfairly targeted minority-owned bars, including those of the Plaintiffs for similar or even less serious violations including through the use of the Licensing Committee, due process hearings, side agreements and suspension or revocation of liquor licenses; (3) altered Racine Ordinances to provide LeGath and Nicholson with tens of thousands of dollars in "facade grants" despite an ordinance requiring tavern owners to maintain their businesses in good repair; (4) influenced the elected officials' performance of their job duties and votes on these and other subjects.

c.  In accomplishing this fraud, these Defendants utilized the U.S. Mail and interstate wires in furtherance of the scheme in one or more of the following ways:

    i.  Nicholson, Dickert and LeGath's use of phone lines to discuss the bribes, the times and dates to pick up those bribes;

    ii.  In and around March, April and July 2009 and July 2010, February, March and July 2011, Dickert through Jerger submitting fraudulent campaign finance reports by U.S. Mail and electronically through use of interstate wires;

    iii.  On April 19, 2009, June 1, 2009, March 30, 2010, December 31, 2010, January 31, 2011 and March 30, 2012, Dickert's payments and use of Paypal, a California company, that operates an internet site which Dickert used to solicit and accept campaign contributions the use of which requires the use of interstate wires;

iv. Beginning in February 2011 including August 5, 2011, Dickert made payments to AT&T, an out-of-state company, using either the U.S. Mails or interstate wires for internet and phone services for his campaigns;

v. On March 27, 2009, April 2,24, 29, 2009, February 22, 2011, April 5, 2011, Dickert made payments using the U.S. Mails and/or interstate wires to Mission Control, a Connecticut company for direct-mail materials to be sent to voters;

vi. Dickert and his city government's use of the U.S. Mail to send notices of violations to taverns, their attorneys and other businesses, including the ;

vii. The imposition of fines on minority-owned businesses by Dickert and other City employees or departments under his control required the use of interstate wires and the U.S. mail both in providing notice of the fines and by the business owners payment of those fines;

viii. Dickert, Nicholson and LeGath's use of phone lines and wires to communicate by phone, e-mail and text message to discuss and implement the scheme and which bars to target going forward;

ix. Use of e-mail correspondence between Dickert, the Aldermen, Wahlen and other city officials to discuss upcoming licensing events, including due process hearings;

253. The actions identified in paragraphs 248 through 252, including all their subparagraphs, affected interstate commerce in that they controlled the number of locations eligible to sell liquor and other alcoholic beverages in Wisconsin and thus directly impacted the

amount of liquor and other alcoholic beverages imported to Wisconsin from other states and the revenue derived by alcohol manufacturers from other states.

254.    This pattern of racketeering activity, which began at the latest in 2009, continues to this day as is evidenced by the following:

a.   In April 2014, Nicholson applied for a Class B liquor license for Carriage House Liquor Company.

b.   Nicholson's planned location was an area where minority applicants were previously denied a license based on the fact that the concentration of liquor licenses was too high and due to the "fragility of the neighborhood";

c.   At an April 22, 2014 meeting of the Licensing Committee with LeGath and another former Tavern League president present, Nicholson won approval for this new liquor license;

d.   In February 2013, LeGath recommended to the Redevelopment Authority for the City of Racine to amend a Racine ordinance to allow taverns to participate in the City's "façade grant" program;

e.   Nicholson was a board member of the Redevelopment Authority at the time of LeGath's request;

f.   On February 4, 2013, the Redevelopment Authority recommended the exclusion be lifted and the Common Council agreed and the ordinance was accordingly amended;

g.   On February 7, 2013, Nicholson requested a façade grant in the amount of $20,000;

h.  In June 2013, Nicholson received a $20,000 façade grant based on the newly amended ordinance to upgrade the exterior of the building that eventually housed Carriage House;

i.  On March 29, 2014, less than a month prior to applying for a liquor license for Carriage House, a patron of Envi, one of Nicholson's other bars, was shot to death as he was reentering the tavern. Neither Nicholson nor Envi were ever called before the Licensing Committee or the Common Council.

j.  Immediately prior to and ubsequent to the filing of the complaint in this matter, the frequency of incidents reported at Tavern League bars has decreased, despite incidents continuing to occur at the same rate. Upon information and belief, this decrease is an effort to hide the ongoing protection Dickert and the City provided to Nicholson, LeGath and the Tavern League.

**Holmes v. LeGath**
**Pursuant to 18 U.S.C. § 1962(b) & (d)**

255.    Plaintiff Holmes incorporates the allegations of paragraphs 228 through 249(a)-(d),(i), (m) and (n), 252 and 253 as if fully restated here.

256.    As a result of LeGath's numerous acts of bribery, detailed in paragraph 255, gained control of Dickert and, through Dickert, LeGath gained control of the city government of Racine.

257.    Using that control, LeGath ensured that Holmes' business would be closed.

258.    As Mayor, Dickert appointed the members of the Licensing Committee. That power ensured that the members of said committee did his bidding or faced removal from the committee and fundraising and election opposition if they did not do so.

259.     As evidenced by the actions asserted above and throughout this pleading, LeGath agreed with Dickert, Nicholson, the Tavern League, the Aldermen and the Accomplices to take over and control the government of the city of Racine and to use it for their own benefit. Beginning at the latest in 2009 and continuing to the present, LeGath further agreed to perpetrate this scheme through acts of bribery and knew that others would commit the same or similar acts on numerous occasions during that time period.

260.     LeGath's acts of bribery and his agreement that he and others would perpetrate and effectuate the scheme through a pattern of racketeering activity directly and proximately caused Holmes' injuries, including but not limited to:

 a. Forcing Holmes' to enter extortionate side agreements under fear of economic harm on August 10, 2009 and August 26, 2010 through which he was forced to spend large sums of money to continue operating,

 b. the loss of his liquor license for Park 6 through improper revocation of his liquor license on January 4, 2011 despite the lack of a sworn complaint thus requiring Holmes to file suit and expended tremendous sums of money to fight that improper and rash decision to continue operating;

 c. the June 20 and June 21 attempted second revocation of Park 6's liquor license which ultimately required Holmes to close his business in December 2011 after the unprecedented efforts of Dickert and others under Dickert's influence;

 d. the eventual loss of Holmes' business,

 e. the loss of the right to solicit business during this period, the loss of the business' profits during this period and the total loss of any and all potential profits from December 2011 to the present; and

f. other damages.

**Holmes v. Nicholson**
**Pursuant to 18 U.S.C. § 1962(b) & (d)**

261.    Plaintiff Holmes incorporates the allegations of paragraphs 228 through 249(e)-
(i), (m) and (n), 252 and 253 as if fully restated here.

262.    As a result of Nicholson's numerous acts of bribery, detailed in paragraph 261,
Nicholson gained control of Dickert and, through Dickert, Nicholson gained control of the city
government of Racine.

263.    Using that control, Nicholson ensured that Holmes' business would be closed.

264.    As Mayor, Dickert appointed the members of the Licensing Committee.  That
power ensured that the members of said committee did his bidding or faced removal from the
committee and fundraising and election opposition if they did not do so.

265.    As evidenced by the actions asserted above and throughout this pleading,
Nicholson agreed with Dickert, LeGath, the Tavern League, the Aldermen and the Accomplices
to take over and control the government of the city of Racine and to use it for their own benefit.
Beginning at the latest in 2009 and continuing to the present, Nicholson further agreed to
perpetrate this scheme through acts of bribery and knew that others would commit the same or
similar acts on numerous occasions during that time period.

266.    Nicholson's acts of bribery and his agreement that he and others would perpetrate
and effectuate the scheme through a pattern of racketeering activity directly and proximately
caused Holmes' injuries, including but not limited to:

    a. Forcing Holmes' to enter extortionate side agreements under fear of economic
        harm on August 10, 2009 and August 26, 2010 through which he was forced to
        spend large sums of money to continue operating,

b. the loss of his liquor license for Park 6 through improper revocation of his liquor license on January 4, 2011 despite the lack of a sworn complaint thus requiring Holmes to file suit and expended tremendous sums of money to fight that improper and rash decision to continue operating;

c. the June 20 and June 21 attempted second revocation of Park 6's liquor license which ultimately required Holmes to close his business in December 2011 after the unprecedented efforts of Dickert and others under Dickert's influence;

d. the eventual loss of Holmes' business,

e. the loss of the right to solicit business during this period, the loss of the business' profits during this period and the total loss of any and all potential profits from December 2011 to the present; and

f. other damages.

## Holmes v. Tavern League
### Pursuant to 18 U.S.C. § 1962(b) & (d)

267. Plaintiff Holmes incorporates the allegations of paragraphs 228 through 249(b), (d),(i), (m) and (n), 252 and 253 as if fully restated here.

268. As a result of the Tavern League's numerous acts of bribery, detailed in paragraph 267, the Tavern League gained control of Dickert and, through Dickert, it gained control of the city government of Racine.

269. Using that control, the Tavern League ensured that Holmes' business would be closed.

270. As Mayor, Dickert appointed the members of the Licensing Committee. That power ensured that the members of said committee did his bidding or faced removal from the committee and fundraising and election opposition if they did not do so.

271.     As evidenced by the actions asserted above and throughout this pleading, the Tavern League agreed with Dickert, LeGath, Nicholson, the Aldermen and the Accomplices to take over and control the government of the city of Racine and to use it for their own benefit. Beginning at the latest in 2009 and continuing to the present, the Tavern League further agreed to perpetrate this scheme through acts of bribery and knew that others would commit the same or similar acts on numerous occasions during that time period.

272.     The Tavern League's acts of bribery and its agreement that it and others would perpetrate and effectuate the scheme through a pattern of racketeering activity directly and proximately caused Holmes' injuries, including but not limited to:

   a.  Forcing Holmes' to enter extortionate side agreements under fear of economic harm on August 10, 2009 and August 26, 2010 through which he was forced to spend large sums of money to continue operating,

   b.  the loss of his liquor license for Park 6 through improper revocation of his liquor license on January 4, 2011 despite the lack of a sworn complaint thus requiring Holmes to file suit and expended tremendous sums of money to fight that improper and rash decision to continue operating;

   c.  the June 20 and June 21 attempted second revocation of Park 6's liquor license which ultimately required Holmes to close his business in December 2011 after the unprecedented efforts of Dickert and others under Dickert's influence;

   d.  the eventual loss of Holmes' business,

   e.  the loss of the right to solicit business during this period, the loss of the business' profits during this period and the total loss of any and all potential profits from December 2011 to the present; and

Case 2:14-cv-00208-JPS   Filed 08/21/14   Page 82 of 119   Document 62

a. other damages.

**Holmes v. Dickert**
**Pursuant to 18 U.S.C. § 1962(b), (c) & (d)**

273.    Plaintiff Holmes incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

274.    As a result of Dickert's and his cohorts' numerous acts of soliciting and receiving bribes, extorting, threatening or incentivizing alderpersons to comply with his and the Financiers' desires regarding liquor licenses, extorting businesspeople for additional money, wire fraud to conceal the nature and existence of these payments, Dickert gained control of the government of Racine and used that control to ensure that Holmes' business would be closed.

275.    Specifically, as Mayor, Dickert appointed the members of the Licensing Committee.  That power ensured that the members of said committee did Dickert's and the Financiers' bidding or faced removal from the committee and fundraising and election opposition if they did not do so.

276.    Dickert also controlled the Racine Police Department by his appointment of members of the Police and Fire Committee who appointed and oversaw the Police Department. Thus, he was able to ensure the Police Department through Wahlen unfairly and inappropriately targeted businesses he desired including Holmes' business.

277.    As evidenced by the actions asserted above and throughout this pleading, Dickert agreed with LeGath, Nicholson, the Tavern League, the Aldermen and the Accomplices to take over and control the government of the city of Racine and to use it for their own benefit. Beginning at the latest in 2009 and continuing to the present, Dickert further agreed to perpetrate this scheme through acts of bribery, extortion, wire fraud and honest services fraud and knew

that others would commit the same or similar acts on numerous occasions during that time period.

278.    The bribes accepted and solicited by Dickert and his acts of extortion, wire fraud and honest services fraud, as well as his agreement that he and others would perpetrate and effectuate the scheme through a pattern of racketeering activity, directly and proximately caused Holmes' injuries, including but not limited to:

    a.   Forcing Holmes' to enter extortionate side agreements under fear of economic harm on August 10, 2009 and August 26, 2010 through which he was forced to spend large sums of money to continue operating,

    b.   the loss of his liquor license for Park 6 through improper revocation of his liquor license on January 4, 2011 despite the lack of a sworn complaint thus requiring Holmes to file suit and expended tremendous sums of money to fight that improper and rash decision to continue operating;

    c.   the June 20 and June 21 attempted second revocation of Park 6's liquor license which ultimately required Holmes to close his business in December 2011 after the unprecedented efforts of Dickert and others under Dickert's influence;

    d.   the eventual loss of Holmes' business,

    e.   the loss of the right to solicit business during this period, the loss of the business' profits during this period and the total loss of any and all potential profits from December 2011 to the present; and

    f.   other damages.

**Holmes v. Kaplan, Helding, Mozol, Wisneski, and Maack**
**Pursuant to 18 U.S.C. § 1962(d)**

279.     Plaintiff Holmes incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

280.     Kaplan, Helding, Mozol, Wisneski and Maack all played an important role in allowing Dickert and the Financiers to maintain control over the government of the city of Racine.  With knowledge of the bribe monies paid by the Financiers to Dickert and under threat of an opposition candidate financially and publicly supported by the Financiers and Dickert during their respective aldermanic re-election campaigns, Kaplan, Helding, Mozol, Wisneski and Maack agreed to use their positions on the Licensing Committee to unduly pressure Holmes into paying trumped-up fines, entering into side agreements, and relinquishing his liquor license where the Licensing Committee lacked sufficient justification to recommend that the Common Council revoke his license.  Kaplan, Helding, Mozol, Wisneski and Maack directly benefitted from Dickert and the Financiers' continued control of the Racine city government by receiving their public support in upcoming elections and retaining their positions on influential city committees.

281.     At the direction of Dickert and the Financiers, Kaplan, Mozol, Wisneski, Maack and other members of the Licensing Committee required Holmes to appear before them on August 10, 2009, at which time the License Committed held a vote to determine whether, rather than revoking Holmes' liquor license for Park 6, Holmes would be required to enter into a side agreement with the City.   Kaplan, Mozol, Wisneski and Maack voted in favor of the side agreement.

282.     Kaplan, Mozol, Wisneski and Maack played an active role in negotiating the terms of this side agreement, which required Holmes to (1) update, install, and maintain video surveillance and retain the videos for two weeks; (2) close Park 6 at 1:30 am on Thursdays,

Fridays, and Saturdays until October 1, 2009; (3) monitor the decibel level of its live or recorded music; (4) have all future advertisements reviewed for violent or unlawful content; (5) provide adequate parking; (6) clean a 100-foot radius from the building after closing each night; (7) allow no more than two employees to stay past close to clean and close down the building; and (8) provide security with a wide area network, a mobile identification card scanner, an age verifier, and a fake identification scanner. These unprecedented requirements caused Holmes to incur significant costs to continue operating, interfered with his right to do business, and ultimately forced him to close his business. Wisneski executed this side agreement on behalf of the City.

283. Holmes was again called before the Licensing Committee for a due process hearing on August 26, 2010. Kaplan, Mozol, Wisneski and Maack voted in favor of suspending Park 6's liquor license for 45 days. Not only was Holmes' license suspended, but he was also required to enter into yet another side agreement. Kaplan, Mozol, Wisneski and Maack were instrumental in requesting the imposition of this side agreement and establishing its terms, which required Holmes to install a roped-off area at the entrance of Park 6 and implement procedures to minimize disorderly incidents at and adjacent to Park 6 following the end of the suspension. Again, Wisneski executed the side agreement on behalf of the city.

284. Holmes was called before the Licensing Committee for a third due process hearing on December 20, 2010. Kaplan, Helding, Mozol and Wisneski voted in favor of the Licensing Committee's decision to recommend the revocation of Holmes' liquor license, despite the lack of a sworn complaint.

285. Following Holmes' appeal to the Racine County Circuit Court and that court's entry of an order determining that the City's revocation was invalid, Wisneski called a special

meeting of the Licensing Committee and, even in the absence of a sworn complaint against Holmes, again recommended that the Common Council revoke Holmes' liquor license. Kaplan, Helding and Mozol voted in favor of revocation, with Wisneski abstaining. In the face of repeated attacks by the Licensing Committee on his business and property, Holmes ultimately forfeited his liquor license and shuttered his business.

286.    In sum, Kaplan, Helding, Mozol, Wisneski and Maack's decision to carry out Dickert's goal of making Park 6 and other minority-owned bars the target of the Licensing Committee's ire and excepting bars owned by Financiers from the same level of scrutiny evidences their agreement to perpetuate the scheme. Absent their participation in the scheme, the bribes paid by the Financiers and others to Dickert would have no effect and the conspiracy would come apart at the seams.

**Holmes v. Osterman**
**Pursuant to 18 U.S.C. § 1962(d)**

287.    Plaintiff Holmes incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

288.    Osterman acted on behalf of Dickert when, as detailed in paragraphs 257 and 258, he approached Business Owner, Robinson and others to demand that they pay money to Dickert, which would be delivered to him by Osterman, in exchange for Dickert undertaking official acts that directly affected their prospective business ventures. Also at the direction of Dickert, Osterman threatened those individuals who declined to pay bribe monies to Dickert. Specifically, Osterman warned that Dickert would take official action against Business Owner, Robinson or any other individual who refused to pay him money "under the table," and that the official action would negatively affect their business interests.

289.     Osterman's actions evidence his agreement to participate in the scheme perpetrated by Dickert and the Financiers to control the city of Racine's government and the commercial and personal benefits attendant to such control.   Osterman benefitted from his participation in that he was able to use Dickert's control over the Racine city government to his advantage.  Specifically, Dickert allowed Osterman to position himself as the go-to granite company for construction projects in Racine.  Osterman threatened those developers who refused to give him business by reminding them of his close relationship with, and influence over, Dickert.

290.     Osterman's numerous overt acts involving Business Owner, Robinson and others were undertaken for the express purpose of, and were instrumental in, facilitating the continued payment of bribe monies to Dickert in exchange for official acts.   In performing these acts, Osterman knowingly agreed that Dickert and others would commit multiple acts of bribery and receiving or giving unlawful gratuities.

291.     Osterman's actions cultivated an environment which, through the payment of monies to Dickert in exchange for official acts, gave both Dickert and those paying the bribe monies significant control over the government of the city of Racine.   Many of these bribes, specifically those paid to Dickert by the Financiers, were given with the express purpose of forcing minority bar owners, including Holmes, out of downtown Racine.  The actions taken by the Licensing Committee against Holmes were ordered and/or influenced by Dickert at the behest of the Financiers and would not have been possible absent the overt acts committed by Osterman in furtherance of the conspiracy.

**Holmes v. Jerger**
**Pursuant to 18 U.S.C. § 1962(d)**

292.    Plaintiff Holmes incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

293.    Jerger played an active role in perpetuating the scheme by Dickert and the Financiers to gain control of Racine's government and to effectuate, among other plans, the removal of minority-owned bars with minority patrons from downtown Racine.  In particular, Jerger conspired with Dickert to "wash" bribe monies paid to Dickert by Nicholson, LeGath, Business Owner and other as-yet unknown Tavern League members in exchange for official acts.

294.    With knowledge of the fact that donations made to Dickert by the Financiers were, in fact, bribe monies paid in exchange for official acts, Jerger knowingly submitted campaign finance reports that did not properly attribute these payments to the individuals who actually made them.  Instead, Jerger attributed the sham contributions to individuals other than the Financiers and for amounts different than the Financiers had provided to Dickert.  When the amount of these bribes became too large, Jerger ceased reported them as campaign contributions altogether.

295.    By attributing these bribe monies to individuals who made no such payments on campaign finance reports, Jerger hid the true nature of these payments by disguising them as legitimate campaign contributions.

296.    Jerger's willingness and ability to successfully conceal the source and amount of these payments as lawful campaign contributions made by residents of Racine and not the Financiers or other as-yet unknown members of the Tavern League directly facilitated the continued payment of bribe monies to Dickert by the Financiers in exchange for official acts. The Financiers and Dickert would not have been able to effectuate their scheme to gain control of Racine's government without the concealment of these bribes by Jerger, and without this

control, they would not have been able to direct the Licensing Committee to unfairly target and ultimately injure Park 6 and other minority-owned bars with minority patrons.

## Holmes v. Wahlen
## Pursuant to 18 U.S.C. § 1962(d)

297.    Plaintiff Holmes incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

298.    Wahlen, as well as certain unidentified police officers, agreed to assist Dickert in the targeting of Park 6 and other minority-owned bars.  To do so, Wahlen and these officers created pre-textual reasons for the Licensing Committee to require Holmes to enter into side agreements in exchange for being permitted to keep his liquor license.  These side agreements forced Holmes to incur significant costs to continue operating Park 6, interfered with his right to do business, and ultimately forced him to close his business.

299.    Wahlen was ordered by Dickert to create sufficient evidence for other members of the conspiracy to target and ultimately eradicate minority-owned bars from downtown Racine through seemingly lawful channels.  At the same time, he was ordered by Dickert to shield bars owned by Nicholson, LeGath and other as-yet unidentified Tavern League members from scrutiny.  He had knowledge that this arrangement was part of an agreement between Dickert and his Financiers.

300.    Wahlen instructed his officers to keep their distance from, yet maintain visual contact of, minority-owned bars for the express purpose of not deterring unlawful activity in front of those establishments.  While the officers were not close enough to act as a passive deterrent to unlawful activity at and/or in front of these bars, they were still close enough to see and subsequently report disturbances and make arrests when laws were broken.

301.     To shield the Financiers' bars from scrutiny by the Licensing Committee and Common Council, Wahlen also ordered his officers to station themselves immediately outside bars owned by Nicholson, LeGath and other as-yet unidentified Tavern League members for the express purpose of deterring any unlawful activity that may take place at and/or in in front of these establishments.

302.     Wahlen also instructed his officers to misrepresent the locations of crimes that occurred at minority-owned bars that were targeted by Dickert and the Financiers when those crime did not, in fact, occur at those bars.  For example, Wahlen refused to investigate the circumstances surrounding the May 20, 2010 shooting of a Park 6 security guard with a bullet that was not fired within the immediate vicinity of Park 6.  Although Holmes learned the name of the shooter soon after the incident, which was timely provided to Wahlen, Wahlen refused to investigate the matter further.  Not unsurprisingly, Park 6 was blamed for the incident at subsequent due process hearings.

303.     Wahlen even went so far as to file a complaint against Park 6 with the Licensing Committee.  Notably, he did so as a resident of Racine and not in his capacity as chief of police.  In the complaint, Wahlen requested a due process hearing and the ultimate revocation of Holmes' liquor license.

304.     All of Wahlen's acts were undertaken for the express purpose of providing the Licensing Committee with sufficient "evidence" to force Holmes to enter into burdensome and oppressive side agreements, while at the same time protecting the Financiers from similar scrutiny.  His participation in the conspiracy was instrumental to its continued operation.  The bribe monies paid by the Financiers to Dickert would have no effect if Dickert, acting through

Wahlen, could not guarantee that the bars owned by the Financiers would be excepted from scrutiny by the Racine Police Department and the Licensing Committee.

## Holmes v. Levine
### Pursuant to 18 U.S.C. § 1962(d)

305.  Plaintiff Holmes incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

306.  At the direction of Dickert and the Financiers, Levine created pre-textual reasons for the Licensing Committee to require Holmes to enter into side agreements in exchange for being permitted to keep his liquor license.  These side agreements forced Holmes to incur significant costs to continue operating Park 6, interfered with his right to do business, and ultimately forced him to voluntarily surrender his liquor license and close Park 6.

307.  In 2011, Levine posted a Craigslist advertisement for an apartment for rent at 507 6th Street, next door to The Place On 6th and across the street from Park 6.  The ad stated "special discount available – discuss after showing."  In August 2011, Georgia Davis and Linda Davis met with Levine to discuss renting his advertised apartment.  Levine told the Davises that the discount was contingent on the Davises agreeing to complain about Park 6 and The Place On 6th.

308.  Levine's acts were undertaken for the express purpose of providing the Licensing Committee with sufficient "evidence" to force Holmes to enter into burdensome and oppressive side agreements.  His participation in the conspiracy was instrumental to its continued operation.  The bribe monies paid by the Financiers to Dickert would have no effect if Dickert, acting in concert with Levine, could not control which businesses were allowed to continue operating in downtown Racine.

## Holmes v. Sutherland
## Pursuant to 18 U.S.C. § 1962(d)

309.    Plaintiff Holmes incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

310.    Sutherland played a key role in effectuating Dickert's and the Financiers' scheme to control and use the City's government for their own benefit.  As discussed above, this scheme includes Dickert and the Financiers' goal of eliminating minority-owned bars with minority patrons from downtown Racine and promoting white-owned establishments, which, in turn, financially supports the Financiers.

311.    Dickert and the Financiers requested that Sutherland utilize his role as Executive Director of the Downtown Racine Corporation to build a case against Park 6 for the express purpose of forcing Holmes out of business in downtown Racine, either by bringing about the revocation of his liquor license or by causing him to voluntarily shutter his business in the face of repeated, burdensome side agreements.

312.    With knowledge of this information, Sutherland undertook actions that evince his desire to participate in the affairs of Dickert's and the Financiers' scheme.  In his capacity as Executive Director, Sutherland approved the Downtown Racine Corporation's hiring of a private investigator to videotape Park 6 and Thomas Holmes, both at street level and from rooftops of adjacent buildings.  Sutherland also approved the Downtown Racine Corporation's decision to jointly purchase two security cameras which were aimed at the front and back doors of Park 6. He approved no such measures against any of the Financiers' bars.

313.    Sutherland even sought to ensure that the Licensing Committee recommended revocation of Park 6's liquor license.  When Park 6 was brought before the Licensing Committee

for a due process hearing, Sutherland contacted various downtown residents, including Justin Balkcom, asking that they come to the Licensing Committee's hearing to testify against Park 6.

314.    The Licensing Committee used the evidence collected by the private investigator and from the security cameras to justify requiring Holmes to appear at multiple due process hearings and forcing him to enter into numerous side agreements, which caused Holmes to incur significant costs to continue operating, interfered with his right to do business, and ultimately forced him to close his business.

315.    Sutherland's actions gave effect to the acts of bribery and extortion discussed above and demonstrate his agreement that these acts would continue to occur in the future.

## Fair v. LeGath
### Pursuant to 18 U.S.C. § 1962(b) & (d)

316.    Plaintiff Fair incorporates the allegations of paragraphs 228 through 249(a)-(d),(i), (m) and (n), 252 and 253 as if fully restated here.

317.    As a result of LeGath's numerous acts of bribery, detailed in paragraph 316, gained control of Dickert and, through Dickert, LeGath gained control of the city government of Racine.

318.    Using that control, LeGath ensure that Fair's business would be closed.

319.    As Mayor, Dickert appointed the members of the Licensing Committee.  That power ensured that the members of said committee did his bidding or faced removal from the committee and fundraising and election opposition if they did not do so.

320.    As evidenced by the actions asserted above and throughout this pleading, LeGath agreed with Dickert, Nicholson, the Tavern League, the Aldermen and the Accomplices to take over and control the government of the city of Racine and to use it for their own benefit. Beginning at the latest in 2009 and continuing to the present, LeGath further agreed to perpetrate

this scheme through acts of bribery and knew that others would commit the same or similar acts on numerous occasions during that time period.

321.    LeGath's acts of bribery and his agreement that he and others would perpetrate and effectuate the scheme through a pattern of racketeering activity directly and proximately caused Fair's injuries, including but not limited to:

  a. Influencing Dickert to appoint friendly aldermen to the licensing committee which ultimately resulted in Fair being forced to enter a "side agreement" against his will on or around August 1, 2011 through which he was forced to spend large sums of money to continue operating including on the installation of new security cameras, limiting the number of patrons and the age of patrons and closing for fifteen days;

  b. the loss of Fair's liquor license for Place on 6th in October 2012 after the efforts of Dickert, the Alderman and others under Dickert's influence;

  c. the loss of Fair's business;

  d. the loss of any and all potential profits from October 2012 to the present; and

  e. other damages.

### Fair v. Nicholson
### Pursuant to 18 U.S.C. § 1962(b) & (d)

322.    Plaintiff Fair incorporates the allegations of paragraphs 228 through 249(e)-(i), (m) and (n), 252 and 253 as if fully restated here.

323.    As a result of Nicholson's numerous acts of bribery, detailed in paragraph 322, Nicholson gained control of Dickert and, through Dickert, Nicholson gained control of the city government of Racine.

324.    Using that control, Nicholson ensured that Fair's business would be closed.

325.     As Mayor, Dickert appointed the members of the Licensing Committee.  That power ensured that the members of said committee did his bidding or faced removal from the committee and fundraising and election opposition if they did not do so.

326.     As evidenced by the actions asserted above and throughout this pleading, Nicholson agreed with Dickert, LeGath, the Tavern League, the Aldermen and the Accomplices to take over and control the government of the city of Racine and to use it for their own benefit. Beginning at the latest in 2009 and continuing to the present, Nicholson further agreed to perpetrate this scheme through acts of bribery and knew that others would commit the same or similar acts on numerous occasions during that time period.

327.     Nicholson's acts of bribery and his agreement that he and others would perpetrate and effectuate the scheme through a pattern of racketeering activity directly and proximately caused Fair's injuries, including but not limited to:

     a.  Influencing Dickert to appoint friendly aldermen to the licensing committee which ultimately resulted in Fair being forced to enter a "side agreement" against his will on or around August 1, 2011 through which he was forced to spend large sums of money to continue operating including on the installation of new security cameras, limiting the number of patrons and the age of patrons and closing for fifteen days;

     b.  the loss of Fair's liquor license for Place on 6th in October 2012 after the efforts of Dickert, the Alderman and others under Dickert's influence;

     c.  the loss of Fair's business;

     d.  the loss of any and all potential profits from October 2012 to the present; and

     e.  other damages.

**Fair v. Tavern League**
**Pursuant to 18 U.S.C. § 1962(b) & (d)**

328.    Plaintiff Fair incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

329.    As a result of the Tavern League's numerous acts of bribery, detailed in paragraph 328, the Tavern League gained control of Dickert and, through Dickert, the Tavern League gained control of the city government of Racine.

330.    Using that control, the Tavern League ensured that Fair's business would be closed.

331.    As Mayor, Dickert appointed the members of the Licensing Committee.  That power ensured that the members of said committee did his bidding or faced removal from the committee and fundraising and election opposition if they did not do so.

332.    As evidenced by the actions asserted above and throughout this pleading, the Tavern League agreed with Dickert, LeGath, Nicholson, the Aldermen and the Accomplices to take over and control the government of the city of Racine and to use it for their own benefit. Beginning at the latest in 2009 and continuing to the present, the Tavern League further agreed to perpetrate this scheme through acts of bribery and knew that others would commit the same or similar acts on numerous occasions during that time period.

333.    The Tavern League's acts of bribery and its agreement that it and others would perpetrate and effectuate the scheme through a pattern of racketeering activity directly and proximately caused Fair's injuries, including but not limited to:

      a.    Influencing Dickert to appoint friendly aldermen to the licensing committee which ultimately resulted in Fair being forced to enter a "side agreement" against his will on or around August 1, 2011 through which he was forced to spend large

sums of money to continue operating including on the installation of new security cameras, limiting the number of patrons and the age of patrons and closing for fifteen days;

b.  the loss of Fair's liquor license for Place on 6th in October 2012 after the efforts of Dickert, the Alderman and others under Dickert's influence;

c.  the loss of Fair's business;

d.  the loss of any and all potential profits from October 2012 to the present; and

e.  other damages.

## Fair v. Dickert
### Pursuant to 18 U.S.C. § 1962(b), (c) & (d)

334.    Plaintiff Fair incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

335.    As a result of Dickert's and his cohorts' numerous acts of soliciting and receiving bribes, extorting, threatening or incentivizing alderpersons to comply with his and the Financiers' desires regarding liquor licenses, extorting businesspeople for additional money, wire fraud to conceal the nature and existence of these payments, Dickert gained control of the government of Racine and used that control to ensure that Fair's business would be closed.

336.    Specifically, as Mayor, Dickert appointed the members of the Licensing Committee.  That power ensured that the members of said committee did Dickert's and the Financiers' bidding or faced removal from the committee and fundraising and election opposition if they did not do so.

337.    Dickert also controlled the Racine Police Department by his appointment of members of the Police and Fire Committee who appointed and oversaw the Police Department.

Thus, he was able to ensure the Police Department through Wahlen unfairly and inappropriately targeted businesses he desired including Fair's business.

338.    As evidenced by the actions asserted above and throughout this pleading, Dickert agreed with LeGath, Nicholson, the Tavern League, the Aldermen and the Accomplices to take over and control the government of the city of Racine and to use it for their own benefit. Beginning at the latest in 2009 and continuing to the present, Dickert further agreed to perpetrate this scheme through acts of bribery, extortion, wire fraud and honest services fraud and knew that others would commit the same or similar acts on numerous occasions during that time period.

339.    The bribes accepted and solicited by Dickert and his acts of extortion, wire fraud and honest services fraud, as well as his agreement that he and others would perpetrate and effectuate the scheme through a pattern of racketeering activity, directly and proximately caused Fair's injuries, including but not limited to:

a.    Influencing Dickert to appoint friendly aldermen to the licensing committee which ultimately resulted in Fair being forced to enter a "side agreement" against his will on or around August 1, 2011 through which he was forced to spend large sums of money to continue operating including on the installation of new security cameras, limiting the number of patrons and the age of patrons and closing for fifteen days;

b.    the loss of Fair's liquor license for Place on 6th in October 2012 after the efforts of Dickert, the Alderman and others under Dickert's influence;

c.    the loss of Fair's business;

d.    the loss of any and all potential profits from October 2012 to the present; and

e.   other damages.

## Fair v. Kaplan, Helding, Mozol, Wisneski, and Maack
## Pursuant to 18 U.S.C. § 1962(d)

340.   Plaintiff Fair incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

341.   Kaplan, Helding, Mozol, Wisneski and Maack all played an important role in allowing Dickert and the Financiers to maintain control over the government of the city of Racine.  With knowledge of the bribe monies paid by the Financiers to Dickert and under threat of an opposition candidate financially and publicly supported by the Financiers and Dickert during their respective aldermanic re-election campaigns, Kaplan, Helding, Mozol, Wisneski and Maack agreed to use their positions on the Licensing Committee to unduly pressure Fair into paying trumped-up fines and entering into side agreements.  Kaplan, Helding, Mozol, Wisneski and Maack directly benefitted from Dickert and the Financiers' continued control of the Racine city government by receiving their public support in upcoming elections and retaining their positions on influential city committees.

342.   Under the instruction of Dickert and the Financiers, Kaplan, Mozol, Wisneski, Maack and other members of the Licensing Committee required Fair to appear before them on July 12, 2010 to discuss a possible side agreement.  Mozol was instrumental in the decision to require Fair to enter into a side agreement which required him to hire off-duty Racine police officers for security, imposed a restrictive capacity limit and controlled the type of music played and dress code required for Place on 6th's patrons.  Kaplan, Mozol and Maack all voted in favor of the side agreement.

343.   Kaplan, Mozol, Wisneski, and Helding again targeted Place on 6th on June 21, 2011.  That day, Helding made a motion for nonrenewal of Fair's liquor license and for a due

process hearing. While Wisneski did not vote, Kaplan, Mozol and Helding all voted in favor of Helding's motion. To avoid having his license revoked, Fair entered into yet another side agreement on August 3, 2011. Under the terms of this agreement, Fair was required to install four additional security cameras at a cost of approximately $2,000, bringing the total number of security cameras at Place on 6th to eight. Fair was also prohibited from allowing anyone under the age of 25 to enter the bar and ordered to close the bar for a 15-day period of time following the Licensing Committee's adoption of the side agreement. Wisneski moved to adopt this agreement; Mozol voted in favor of adoption, Kaplan was excused from voting and Helding voted against its adoption, but only because he was in favor of revoking Fair's liquor license.

344. On September 16, 2011, the Licensing Committee submitted a recommendation to the Common Council that Fair's liquor license be revoked. Not unsurprisingly, Mozol, Wisneski, and Helding all voted in favor of revocation.

345. These unprecedented requirements caused Fair to incur significant costs to continue operating and interfered with his right to do business.

346. In sum, Kaplan, Helding, Mozol, Wisneski and Maack's decision to carry out Dickert's goal of making Place on 6th and other minority-owned bars the target of the Licensing Committee's ire and excepting bars owned by Financiers from the same level of scrutiny evidences their agreement to perpetuate the scheme. Absent their participation in the scheme, the bribes paid by the Financiers and others to Dickert would have no effect and the conspiracy would come apart at the seams.

## Fair v. Osterman
## Pursuant to 18 U.S.C. § 1962(d)

347. Plaintiff Fair incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

348.   Osterman acted on behalf of Dickert when, as detailed in paragraphs 257 and 258, he approached Business Owner, Robinson and others to demand that they pay money to Dickert, which would be delivered to him by Osterman, in exchange for Dickert undertaking official acts that directly affected their prospective business ventures.   Also at the direction of Dickert, Osterman threatened those individuals who declined to pay bribe monies to Dickert. Specifically, Osterman warned that Dickert would take official action against Business Owner, Robinson or any other individual who refused to pay him money "under the table," and that the official action would negatively affect their business interests.

349.   Osterman's actions evidence his agreement to participate in the scheme perpetrated by Dickert and the Financiers to control the city of Racine's government and the commercial and personal benefits attendant to such control.   Osterman benefitted from his participation in that he was able to use Dickert's control over the Racine city government to his advantage. Specifically, Dickert allowed Osterman to position himself as the go-to granite company for construction projects in Racine.   Osterman threatened those developers who refused to give him business by reminding them of his close relationship with, and influence over, Dickert.

350.   Osterman's numerous overt acts involving Business Owner, Robinson and others were undertaken for the express purpose of, and were instrumental in, facilitating the continued payment of bribe monies to Dickert in exchange for official acts.   In performing these acts, Osterman knowingly agreed that Dickert and others would commit multiple acts of bribery and receiving or giving unlawful gratuities.

351.   Osterman's actions cultivated an environment which, through the payment of monies to Dickert in exchange for official acts, gave both Dickert and those paying the bribe

monies significant control over the government of the city of Racine.  Many of these bribes, specifically those paid to Dickert by the Financiers, were given with the express purpose of forcing minority bar owners, including Fair, out of downtown Racine.  The actions taken by the Licensing Committee against Fair were ordered and/or influenced by Dickert at the behest of the Financiers and would not have been possible absent the overt acts committed by Osterman in furtherance of the conspiracy.

### Fair v. Jerger
### Pursuant to 18 U.S.C. § 1962(d)

352.    Plaintiff Fair incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

353.    Jerger played an active role in perpetuating the scheme by Dickert and the Financiers to gain control of Racine's government and to effectuate, among other plans, the removal of Place on 6th and other minority-owned bars with minority patrons from downtown Racine.  In particular, Jerger conspired with Dickert to "wash" bribe monies paid to Dickert by Nicholson, LeGath, Business Owner and other as-yet unknown Tavern League members in exchange for official acts.

354.    With knowledge of the fact that donations made to Dickert by the Financiers were, in fact, bribe monies paid in exchange for official acts, Jerger knowingly submitted campaign finance reports that did not properly attribute these payments to the individuals who actually made them.  Instead, Jerger attributed the sham contributions to individuals other than the Financiers and for amounts different than the Financiers had provided to Dickert.  When the amount of these bribes became too large, Jerger ceased reported them as campaign contributions altogether.

Case 2:14-cv-00208-JPS   Filed 08/21/14   Page 103 of 119   Document 62

355.    By attributing these bribe monies to individuals who made no such payments on campaign finance reports, Jerger hid the true nature of these payments by disguising them as legitimate campaign contributions.

356.    Jerger's willingness and ability to successfully conceal the source and amount of these payments as lawful campaign contributions made by residents of Racine and not the Financiers or other as-yet unknown members of the Tavern League directly facilitated the continued payment of bribe monies to Dickert by the Financiers in exchange for official acts. The Financiers and Dickert would not have been able to effectuate their scheme to gain control of Racine's government without the concealment of these bribes by Jerger, and without this control, they would not have been able to direct the Licensing Committee to unfairly target and ultimately injure Place on 6th and other minority-owned bars with minority patrons.

### Fair v. Wahlen
### Pursuant to 18 U.S.C. § 1962(d)

357.    Plaintiff Fair incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

358.    Wahlen, as well as certain unidentified police officers, agreed to assist Dickert in the targeting of Place on 6th and other minority-owned bars.  To do so, Wahlen and these officers created pre-textual reasons for the Licensing Committee to require Fair to enter into side agreements in exchange for being permitted to keep his liquor license.  These side agreements forced Fair to incur significant costs to continue operating Place on 6th and interfered with his right to do business.

359.    Wahlen was ordered by Dickert to create sufficient evidence for other members of the conspiracy to target and ultimately eradicate minority-owned bars from downtown Racine through seemingly lawful channels.  At the same time, he was ordered by Dickert to shield bars

owned by Nicholson, LeGath and other as-yet unidentified Tavern League members from scrutiny. He had knowledge that this arrangement was part of an agreement between Dickert and his Financiers.

360.    Wahlen instructed his officers to keep their distance from, yet maintain visual contact of, minority-owned bars for the express purpose of not deterring unlawful activity in front of those establishments. While the officers were not close enough to act as a passive deterrent to unlawful activity at and/or in front of these bars, they were still close enough to see and subsequently report disturbances and make arrests when laws were broken.

361.    To shield the Financiers' bars from scrutiny by the Licensing Committee and Common Council, Wahlen also ordered his officers to station themselves immediately outside bars owned by Nicholson, LeGath and other as-yet unidentified Tavern League members for the express purpose of deterring any unlawful activity that may take place at and/or in in front of these establishments.

362.    All of Wahlen's acts were undertaken for the express purpose of providing the Licensing Committee with sufficient "evidence" to force Fair to enter into burdensome and oppressive side agreements, while at the same time protecting the Financiers from similar scrutiny. His participation in the conspiracy was instrumental to its continued operation. The bribe monies paid by the Financiers to Dickert would have no effect if Dickert, acting through Wahlen, could not guarantee that the bars owned by the Financiers would be excepted from scrutiny by the Racine Police Department and the Licensing Committee.

**Fair v. Levine**
**Pursuant to 18 U.S.C. § 1962(d)**

363.    Plaintiff Fair incorporates the allegations of paragraphs 228 through 254 as if fully restated here.

364.    At the direction of Dickert and the Financiers, Levine created pre-textual reasons for the Licensing Committee to require Fair to enter into side agreements in exchange for being permitted to keep his liquor license.  These side agreements forced Fair to incur significant costs to continue operating Place on 6th and interfered with his right to do business.

365.    In 2011, Levine posted a Craigslist advertisement for an apartment for rent at 507 6th Street, next door to The Place On 6th and across the street from Park 6.  The ad stated "special discount available – discuss after showing."  In August 2011, Georgia Davis and Linda Davis met with Levine to discuss renting his advertised apartment.  Levine told the Davises that the discount was contingent on the Davises agreeing to complain about Park 6 and The Place On 6th.

366.    Levine's acts were undertaken for the express purpose of providing the Licensing Committee with sufficient "evidence" to force Fair to enter into burdensome and oppressive side agreements.  His participation in the conspiracy was instrumental to its continued operation.  The bribe monies paid by the Financiers to Dickert would have no effect if Dickert, acting in concert with Levine, could not control which businesses were allowed to continue operating in downtown Racine.

### Khampane & Neuakeaw v. LeGath
### Pursuant to 18 U.S.C. § 1962(b) & (d)

367.    Plaintiffs Khampane and Neuakeaw incorporate the allegations of paragraphs 228 through 249(a)-(d),(i), (m) and (n), 252 and 253 as if fully restated here.

368.    As a result of LeGath's numerous acts of bribery, detailed in paragraph 367, gained control of Dickert and, through, Dickert LeGath gained control of the city government of Racine.

369. Using that control, LeGath ensured that Khampane and Neuakeaw's tavern business named "Ginger's" would be disrupted and eventually closed.

370. As Mayor, Dickert appointed the members of the Licensing Committee. That power ensured that the members of said committee did his bidding or faced removal from the committee and fundraising and election opposition if they did not do so.

371. As evidenced by the actions asserted above and throughout this pleading, LeGath agreed with Dickert, Nicholson, the Tavern League, the Aldermen and the Accomplices to take over and control the government of the city of Racine and to use it for their own benefit. Beginning at the latest in 2009 and continuing to the present, LeGath further agreed to perpetrate this scheme through acts of bribery and knew that others would commit the same or similar acts on numerous occasions during that time period.

372. LeGath's acts of bribery and his agreement that he and others would perpetrate and effectuate the scheme through a pattern of racketeering activity directly and proximately caused Khampane and Neuakeaw's injuries, including but not limited to:

    a. Influencing Dickert to appoint friendly aldermen to the licensing committee which ultimately resulted in Khampane and Neuakeaw being forced to enter a "side agreement" against their will in or around September 2009 through which they were forced to spend large sums of money to continue operating the tavern business including requiring that Ginger's employ additional security guards, limit capacity, purchase surveillance cameras, maintain surveillance tapes, procure identification scanners, limit operation times, and post notices concerning "gang clothing";

b.  the loss of Khampane and Neuakeaw's liquor license for Ginger's in March 2011 after the efforts of Dickert, the Alderman and others under Dickert's influence forced them to give up the liquor license against their will;

c.  the loss of Khampane and Neuakeaw's tavern business;

d.  the loss of any and all potential profits from Ginger's from March 2011 to the present; and

e.  other damages.

### Khampane & Neuakeaw v. Nicholson
### Pursuant to 18 U.S.C. § 1962(b) & (d)

373.  Plaintiffs Khampane and Neuakeaw incorporate the allegations of paragraphs 228 through 249(e)-(i), (m) and (n), 252 and 253 as if fully restated here.

374.  As a result of Nicholson's numerous acts of bribery, detailed in paragraph 373, Nicholson gained control of Dickert and, through Dickert, Nicholson gained control of the city government of Racine.

375.  Using that control, Nicholson ensured that Khampane and Neuakeaw's tavern business named Ginger's would be closed.

376.  As Mayor, Dickert appointed the members of the Licensing Committee. That power ensured that the members of said committee did his bidding or faced removal from the committee and fundraising and election opposition if they did not do so.

377.  As evidenced by the actions asserted above and throughout this pleading, Nicholson agreed with Dickert, LeGath, the Tavern League, the Aldermen and the Accomplices to take over and control the government of the city of Racine and to use it for their own benefit. Beginning at the latest in 2009 and continuing to the present, Nicholson further agreed to

perpetrate this scheme through acts of bribery and knew that others would commit the same or similar acts on numerous occasions during that time period.

378.    Nicholson's acts of bribery and his agreement that he and others would perpetrate and effectuate the scheme through a pattern of racketeering activity directly and proximately caused Khampane and Neuakeaw's injuries, including but not limited to:

      a.    Influencing Dickert to appoint friendly aldermen to the licensing committee which ultimately resulted in Khampane and Neuakeaw being forced to enter a "side agreement" against their will in or around September 2009 through which they were forced to spend large sums of money to continue operating the tavern business including requiring that Ginger's employ additional security guards, limit capacity, purchase surveillance cameras, maintain surveillance tapes, procure identification scanners, limit operation times, and post notices concerning "gang clothing";

      b.    the loss of Khampane and Neuakeaw's liquor license for Ginger's in March 2011 after the efforts of Dickert, the Alderman and others under Dickert's influence forced them to give up the liquor license against their will;

      c.    the loss of Khampane and Neuakeaw's tavern business;

      d.    the loss of any and all potential profits from Ginger's from March 2011 to the present; and

      e.    other damages.

### Khampane & Neuakeaw v. Tavern League
### Pursuant to 18 U.S.C. § 1962(b) & (d)

379.    Khampane and Neuakeaw incorporate the allegations of paragraphs 238 through 257(e)-(i), (m) and (n), 260 and 261 as if fully restated here.

380.     As a result of the Tavern League's numerous acts of bribery, detailed in paragraph 269, the Tavern League gained control of Dickert and, through Dickert, the Tavern League gained control of the city government of Racine.

381.     Using that control, the Tavern League ensured that Khampane and Neuakeaw's tavern business named Ginger's would be closed.

382.     As Mayor, Dickert appointed the members of the Licensing Committee. That power ensured that the members of said committee did his bidding or faced removal from the committee and fundraising and election opposition if they did not do so.

383.     As evidenced by the actions asserted above and throughout this pleading, the Tavern League agreed with Dickert, LeGath, Nicholson, the Aldermen and the Accomplices to take over and control the government of the city of Racine and to use it for their own benefit. Beginning at the latest in 2009 and continuing to the present, the Tavern League further agreed to perpetrate this scheme through acts of bribery and knew that others would commit the same or similar acts on numerous occasions during that time period.

384.     The Tavern League's acts of bribery and its agreement that it and others would perpetrate and effectuate the scheme through a pattern of racketeering activity directly and proximately caused Khampane and Neuakeaw's injuries, including but not limited to:

    a.  Influencing Dickert to appoint friendly aldermen to the licensing committee which ultimately resulted in Khampane and Neuakeaw being forced to enter a "side agreement" against their will in or around September 2009 through which they were forced to spend large sums of money to continue operating the tavern business including requiring that Ginger's employ additional security guards, limit capacity, purchase surveillance cameras, maintain surveillance tapes,

procure identification scanners, limit operation times, and post notices concerning "gang clothing";

b. the loss of Khampane and Neuakeaw's liquor license for Ginger's in March 2011 after the efforts of Dickert, the Alderman and others under Dickert's influence forced them to give up the liquor license against their will;

c. the loss of Khampane and Neuakeaw's tavern business;

d. the loss of any and all potential profits from Ginger's from March 2011 to the present; and

e. other damages.

## Khampane & Neuakeaw v. Dickert
### Pursuant to 18 U.S.C. § 1962(b), (c) & (d)

385.    Plaintiffs Khampane and Neuakeaw incorporate the allegations of paragraphs 228 through 254 as if fully restated here.

386.    As a result of Dickert's and his cohorts' numerous acts of soliciting and receiving bribes, extorting, threatening or incentivizing alderpersons to comply with his and the Financiers' desires regarding liquor licenses, extorting businesspeople for additional money, wire fraud to conceal the nature and existence of these payments, Dickert gained control of the government of Racine and used that control to ensure that Holmes' business would be closed.

387.    Specifically, as Mayor, Dickert appointed the members of the Licensing Committee.  That power ensured that the members of said committee did Dickert's and the Financiers' bidding or faced removal from the committee and fundraising and election opposition if they did not do so.

388.    Dickert also controlled the Racine Police Department by his appointment of members of the Police and Fire Committee who appointed and oversaw the Police Department.

Thus, he was able to ensure the Police Department through Wahlen unfairly and inappropriately targeted businesses he desired including Khampane and Neuakeaw's business.

389. As evidenced by the actions asserted above and throughout this pleading, Dickert agreed with LeGath, Nicholson, the Tavern League, the Aldermen and the Accomplices to take over and control the government of the city of Racine and to use it for their own benefit. Beginning at the latest in 2009 and continuing to the present, Dickert further agreed to perpetrate this scheme through acts of bribery, extortion, wire fraud and honest services fraud and knew that others would commit the same or similar acts on numerous occasions during that time period.

390. The bribes accepted and solicited by Dickert and his acts of extortion, wire fraud and honest services fraud, as well as his agreement that he and others would perpetrate and effectuate the scheme through a pattern of racketeering activity, directly and proximately caused Khampane and Neuakeaw's injuries, including but not limited to:

    a. Influencing Dickert to appoint friendly aldermen to the licensing committee which ultimately resulted in Khampane and Neuakeaw being forced to enter a "side agreement" against their will in or around September 2009 through which they were forced to spend large sums of money to continue operating the tavern business including requiring that Ginger's employ additional security guards, limit capacity, purchase surveillance cameras, maintain surveillance tapes, procure identification scanners, limit operation times, and post notices concerning "gang clothing";

b.  the loss of Khampane and Neuakeaw's liquor license for Ginger's in March 2011 after the efforts of Dickert, the Alderman and others under Dickert's influence forced them to give up the liquor license against their will;

c.  the loss of Khampane and Neuakeaw's tavern business;

d.  the loss of any and all potential profits from Ginger's from March 2011 to the present; and

e.  other damages.

**Khampane & Neuakeaw v. Kaplan, Helding, Mozol, Wisneski and Maack**
**Pursuant to 18 U.S.C. § 1962(d)**

391.  Plaintiffs Khampane and Neuakeaw incorporate the allegations of paragraphs 228 through 254 as if fully restated here.

392.  Kaplan, Helding, Mozol, Wisneski and Maack all played an important role in allowing Dickert and the Financiers to maintain control over the government of the city of Racine.  With knowledge of the bribe monies paid by the Financiers to Dickert and under threat of an opposition candidate financially and publicly supported by the Financiers and Dickert during their respective aldermanic re-election campaigns, Kaplan, Helding, Mozol, Wisneski and Maack agreed to use their positions on the Licensing Committee to unduly pressure Khampane and Neuakeaw into paying trumped-up fines, entering into a side agreement, and ultimately forcing them to surrender their liquor license.  Kaplan, Helding, Mozol, Wisneski and Maack directly benefitted from Dickert and the Financiers' continued control of the Racine city government by receiving their public support in upcoming elections and retaining their positions on influential city committees.

113

393.    In September 2009, Khampane and Neuakeaw were called before the Licensing Committee and, under the threat of license revocation, entered into a side agreement. Khampane and Neuakeaw spent over $10,000 to comply with the terms of this side agreement.

394.    On August 9, 2010, Mack made a motion, which was seconded by Kaplan, to have Khampane and Neuakeaw work out an additional side agreement with the city. Maack and Kaplan voted in favor of the side agreement. Wisneski opposed the motion, but only because he wanted to require Ginger's to undergo due process hearing. Mozol did vote as he was excused from doing so. When this motion failed to pass, Wisneski joined in a motion to call Khampane and Neuakeaw before the Licensing Committee for a due process hearing. That hearing was held on March 30, 2011.

395.    Immediately preceding the hearing, Khampane and Neuakeaw and their attorney held a private meeting with Alderman Wisneski and the City's attorneys. They were told that if Ginger's ceased playing "hip-hop" music and changed the bar's patrons, they could maintain their liquor license. Rather than acquiesce to these demands, Khampane attempted to explain to the Licensing Committee during the hearing the steps he had taken to curb violent and disruptive behavior at Ginger's and other measures undertaken to appease their collective minds. The Licensing Committee nevertheless recommended that the Common Council revoke Ginger's liquor license. Khampane and Neuakeaw chose, instead, to surrender their license to the Licensing Committee.

396.    In sum, Kaplan, Helding, Mozol, Wisneski and Maack's decision to carry out Dickert's goal of making Gingers' and other minority-owned bars the target of the Licensing Committee's ire and excepting bars owned by Financiers from the same level of scrutiny evidences their agreement to perpetuate the scheme. Absent their participation in the scheme,

Case 2:14-cv-00208-JPS   Filed 08/21/14   Page 114 of 119   Document 62

the bribes paid by the Financiers and others to Dickert would have no effect and the conspiracy would come apart at the seams.

### Khampane & Neuakeaw v. Osterman
### Pursuant to 18 U.S.C. § 1962(d)

397.    Plaintiffs Khampane and Neuakeaw incorporate the allegations of paragraphs 228 through 254 as if fully restated here.

398.    Osterman acted on behalf of Dickert when, as detailed in paragraphs 257 and 258, he approached Business Owner, Robinson and others to demand that they pay money to Dickert, which would be delivered to him by Osterman, in exchange for Dickert undertaking official acts that directly affected their prospective business ventures.   Also at the direction of Dickert, Osterman threatened those individuals who declined to pay bribe monies to Dickert. Specifically, Osterman warned that Dickert would take official action against Business Owner, Robinson or any other individual who refused to pay him money "under the table," and that the official action would negatively affect their business interests.

399.    Osterman's actions evidence his agreement to participate in the scheme perpetrated by Dickert and the Financiers to control the city of Racine's government and the commercial and personal benefits attendant to such control.   Osterman benefitted from his participation in that he was able to use Dickert's control over the Racine city government to his advantage. Specifically, Dickert allowed Osterman to position himself as the go-to granite company for construction projects in Racine.   Osterman threatened those developers who refused to give him business by reminding them of his close relationship with, and influence over, Dickert.

400.    Osterman's numerous overt acts involving Business Owner, Robinson and others were undertaken for the express purpose of, and were instrumental in, facilitating the continued

115

payment of bribe monies to Dickert in exchange for official acts. In performing these acts, Osterman knowingly agreed that Dickert and others would commit multiple acts of bribery and receiving or giving unlawful gratuities.

401.    Osterman's actions cultivated an environment which, through the payment of monies to Dickert in exchange for official acts, gave both Dickert and those paying the bribe monies significant control over the government of the city of Racine. Many of these bribes, specifically those paid to Dickert by the Financiers, were given with the express purpose of forcing minority bar owners, including Fair, out of downtown Racine. The actions taken by the Licensing Committee against Khampane and Neuakeaw were ordered and/or influenced by Dickert at the behest of the Financiers and would not have been possible absent the overt acts committed by Osterman in furtherance of the conspiracy.

### Khampane & Neuakeaw v. Jerger
### Pursuant to 18 U.S.C. § 1962(d)

402.    Plaintiffs Khampane and Neuakeaw incorporate the allegations of paragraphs 228 through 254 as if fully restated here.

403.    Jerger played an active role in perpetuating the scheme by Dickert and the Financiers to gain control of Racine's government and to effectuate, among other plans, the removal of Ginger's and other minority-owned bars with minority patrons from downtown Racine. In particular, Jerger conspired with Dickert to "wash" bribe monies paid to Dickert by Nicholson, LeGath, Business Owner and other as-yet unknown Tavern League members in exchange for official acts.

404.    With knowledge of the fact that donations made to Dickert by the Financiers were, in fact, bribe monies paid in exchange for official acts, Jerger knowingly submitted campaign finance reports that did not properly attribute these payments to the individuals who

actually made them. Instead, Jerger attributed the sham contributions to individuals other than the Financiers and for amounts different than the Financiers had provided to Dickert. When the amount of these bribes became too large, Jerger ceased reported them as campaign contributions altogether.

405.   By attributing these bribe monies to individuals who made no such payments on campaign finance reports, Jerger hid the true nature of these payments by disguising them as legitimate campaign contributions.

406.   Jerger's willingness and ability to successfully conceal the source and amount of these payments as lawful campaign contributions made by residents of Racine and not the Financiers or other as-yet unknown members of the Tavern League directly facilitated the continued payment of bribe monies to Dickert by the Financiers in exchange for official acts. The Financiers and Dickert would not have been able to effectuate their scheme to gain control of Racine's government without the concealment of these bribes by Jerger, and without this control, they would not have been able to direct the Licensing Committee to unfairly target and ultimately injure Ginger's and other minority-owned bars with minority patrons.

### Khampane & Neuakeaw v. Wahlen
### Pursuant to 18 U.S.C. § 1962(d)

407.   Plaintiffs Khampane and Neuakeaw incorporate the allegations of paragraphs 228 through 254 as if fully restated here.

408.   Wahlen, as well as certain unidentified police officers, agreed to assist Dickert in the targeting of Ginger's and other minority-owned bars. To do so, Wahlen and these officers created pre-textual reasons for the Licensing Committee to require Khampane and Neuakeaw to enter into a side agreement in exchange for being permitted to keep his liquor license. This side agreements forced Khampane and Neuakeaw to incur significant costs to continue operating

Ginger's, interfered with their right to do business, and ultimately forced them to surrender their license and close their business.

409. Wahlen was ordered by Dickert to create sufficient evidence for other members of the conspiracy to target and ultimately eradicate minority-owned bars from downtown Racine through seemingly lawful channels. At the same time, he was ordered by Dickert to shield bars owned by Nicholson, LeGath and other as-yet unidentified Tavern League members from scrutiny. He had knowledge that this arrangement was part of an agreement between Dickert and his Financiers.

410. Wahlen instructed his officers to keep their distance from, yet maintain visual contact of, minority-owned bars for the express purpose of not deterring unlawful activity in front of those establishments. While the officers were not close enough to act as a passive deterrent to unlawful activity at and/or in front of these bars, they were still close enough to see and subsequently report disturbances and make arrests when laws were broken.

411. To shield the Financiers' bars from scrutiny by the Licensing Committee and Common Council, Wahlen also ordered his officers to station themselves immediately outside bars owned by Nicholson, LeGath and other as-yet unidentified Tavern League members for the express purpose of deterring any unlawful activity that may take place at and/or in in front of these establishments. All of Wahlen's acts were undertaken for the express purpose of providing the Licensing Committee with sufficient "evidence" to force Khampane and Neuakeaw to enter into burdensome and oppressive side agreements, while at the same time protecting the Financiers from similar scrutiny. His participation in the conspiracy was instrumental to its continued operation. The bribe monies paid by the Financiers to Dickert would have no effect if

Case 2:14-cv-00208-JPS   Filed 08/21/14   Page 118 of 119   Document 62

Dickert, acting through Wahlen, could not guarantee that the bars owned by the Financiers would be excepted from scrutiny by the Racine Police Department and the Licensing Committee.

## V.  PRAYER FOR RELIEF

The Plaintiffs hereby demand the following:

      A.  Unspecified compensatory damages;

      B.  Declaratory and injunctive relief;

      C.  Reasonable attorney fees and costs; and

      D.  Such other relief that the Court may deem just and proper.

## VI. JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), the Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.


Dated August 21, 2014                    Respectfully submitted,

KOHLER & HART, S.C.

/s/  Marty Kohler_____, Esq.
Marty Kohler
State Bar No. 1016725
Attorney for the Plaintiff
735 N. Water Street, Suite 1212
Milwaukee, Wisconsin  53202
(414) 271-9595


Segal McCambridge Singer & Mahoney, Ltd.

/s/  Steven A. Hart_____, Esq.
Steven A. Hart
IL State Bar No. 6211008
233 S. Wacker Ave., Suite 5500
Chicago, Illinois 60606
(312) 645-7800