# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| THOMAS J. HOLMES d/b/a Park 6 Bar LLC,<br>OTHA KEITH FAIR d/b/a The Place on 6th LLC,<br>JOSE MALDONADO d/b/a The Cruise Inn,<br>MARIA E. MALDONADO d/b/a The Cruise Inn,<br>WILBUR JONES d/b/a Viper's Lounge,<br>PYTHAPHONE KHAMPANE<br>d/b/a Ginger's Lounge, and<br>OMJAI NUEAKEAW d/b/a Ginger's Lounge | Case No. 14-CV-208-JPS |
| Plaintiffs, | |
| v. | |
| CITY OF RACINE,<br>GARY BECKER, JOHN DICKERT,<br>TAVERN LEAGUE OF RACINE CITY,<br>KURT S. WAHLEN, JAMES KAPLAN,<br>GREGORY T. HELDING,<br>DAVID L. MAACK, ARON WISNESKI,<br>ROBERT E. MOZOL, DEVIN P. SUTHERLAND,<br>MARK L. LEVINE, JOSEPH G. LEGATH,<br>DOUGLAS E. NICHOLSON,<br>MONTE G. OSTERMAN, MARY OSTERMAN,<br>and GREGORY S. BACH, | ORDER |
| Defendants. | |

The plaintiffs filed their initial Complaint (the "Complaint," or the "original Complaint") in this action on February 25, 2014. (Docket #1 ("Compl.")). They alleged that the defendants engaged in illegal activities to eliminate minority-owned bars from downtown Racine, Wisconsin, and sued the defendants under the Civil Rights Act ("CRA"), 42 U.S.C. §§ 1983, 1985(3), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(b)–(d). (Compl., ¶¶ 4–5).

The defendants then filed four separate motions to dismiss. (Docket #25, #28, #31, #36). The Court reviewed those motions and determined that the plaintiffs' complaint was, indeed, deficient. (Docket #60). The Court was

particularly concerned with the fact that the complaint was extremely vague. (*E.g.*, Docket #60 at 27–28). In the original Complaint, the plaintiffs had not adequately distinguished which claims it had intended to assert against particular defendants. (*E.g.*, Docket #60 at 27–28). Nonetheless, the Court found that the claims generally had some merit, in spite of the confusing pleadings, and so allowed the plaintiffs to amend their complaint. (*E.g.*, Docket #60 at 3, 27–29).

The plaintiffs amended their complaint, generally clarifying their allegations. (Docket #62 ("Am. Compl.")).[1] Thereafter the defendants again filed four separate motions to dismiss. (Docket #67, #70, #73, #75). Those motions are fully briefed (Docket #82, #84, #86, #88, #89), and the Court now turns to decide them.

1.      BACKGROUND

The Court begins by addressing the background of this case. In doing so, it expects the reader to be familiar with its recitation of the factual background, as appeared in its order dismissing the plaintiffs' original Complaint, and so does not provide as detailed an overview as appeared in that order. (Docket #60 at 3–9). Nonetheless, for ease of reading, the Court will again provide a short discussion of the parties and their general allegations. Thereafter, the Court discusses the plaintiffs' Amended Complaint, the changes made therein, and the specific claims that now remain in this case.  The Court then discusses, generally, the defendants' outstanding motions to dismiss and the arguments that form the basis for those motions. Finally, the Court will discuss, with greater specificity, the

---

[1] The Court will describe the changes to the Amended Complaint in further detail in Section 1.2, *infra*.

plaintiffs' conspiracy- and RICO-related allegations, as the defendants' motions to dismiss are focused primarily on the dismissal of the plaintiffs' RICO claims. After providing that background, the Court will turn to its substantive analysis of the motions to dismiss, in Section 2 of this order.

### 1.1 Parties and Allegations[2]

There are seven plaintiffs remaining in this case.[3] They are all either black, Hispanic, or Thai, and owned several bars located in downtown Racine:

(1)  Thomas Holmes is black and owned and operated the Park 6 Bar from 2008 to 2011 (Am. Compl., ¶ 9);

(2)  Otha Keith Fair is black and owned and operated The Place on 6th, LLC, from 2009 to 2012 (Am. Compl., ¶ 10);

(3-4)  Pythaphone Khampane and Omjai Nueakeaw are Thai-American and Thai, respectively, and together owned and operated Ginger's Lounge from 2008 to 2011 (Am. Compl. ¶¶ 11–12);

(5)  Wilbur Jones is black and owned and operated Viper's Lounge from 1998 to 2008 (Am. Compl. ¶ 13);

(7–8)  Jose Maldonado and Maria Maldonado are Hispanic and together owned and operated The Cruise Inn from 2001 to 2006 (Am. Compl. ¶ 14).

They brought suit against a number of defendants, including the City of Racine and various individuals and groups involved in Racine's local politics. (*See* Compl. ¶¶ 16–35). Those defendants have appeared in several separate groups, as follows:

---

[2]The Court has drawn large portions of this background material from its order dismissing the original Complaint, making alterations where necessary to reflect changes in the Amended Complaint.

[3]Cerafin Davalos was named as a plaintiff in the original Complaint, but no longer is listed as a plaintiff.

(1)    the Municipal Defendants, which includes:

(a)    the City of Racine (hereinafter "Racine" or "the City") (Am. Compl. ¶ 15);

(b)    Gary Becker, Racine's former mayor, who served in that position from April of 2003 until January 20, 2009 (Am. Compl. ¶ 16);

(c)    John Dickert, Racine's current mayor, who has held that position since May of 2009 (Am. Compl. ¶ 18);

(d)    Kurt Wahlen, who served as Racine's police chief from September of 2006 until April of 2011 (with a short additional stint as interim chief between July of 2011 and July of 2012) (Am. Compl. ¶ 19);

(f)    James Kaplan, an alderman sitting on Racine's Common Council from April of 2006 through present, during which time he has served on the City's Board of Health and Licensing Committee (Am. Compl. ¶ 20);

(h)    Gregory Helding, an alderman sitting on Racine's Common Council from April of 2005 through present, during which time he served on the City's Licensing Committee (Am. Compl. ¶ 21);

(i)    David Maack, an alderman sitting on Racine's Common Council from April of 2000 through April of 2010, during which time he served on the City's Licensing Committee (Am. Compl. ¶ 22);

(j)    Aron Wisneski, an alderman sitting on Racine's Common Council from April of 2006 through July of 2012, during which time he served on the City's Licensing Committee (Am. Compl. ¶ 23);

(k)    Robert Mozol, an alderman sitting on Racine's Common Council from April of 2007 through April of 2013, during which time he served on the City's Licensing Committee (Am. Compl. ¶ 24);

(l)      Devin Sutherland, who serves as manager of Racine's Downtown Business Improvement District ("BID #1") and executive director of the Downtown Racine Corporation (the Court will discuss both BID #1 and the Downtown Racine Corporation in further detail, below) (Am. Compl. ¶ 25);

(m)     Mark Levine, who serves as the chairman of BID #1 and also owns property within BID #1 (Am. Compl. ¶ 26);

(n)     Joseph (or "Joey") LeGath, a member of the BID #1 board, who also owns several bars in Racine and serves as the director of the Racine City Tavern League (which the Court will discuss further, below) (Am. Compl. ¶ 27);

(2)     the Political Staff Defendants, a term the Court has used to describe the group that includes:

(a)     Doug Nicholson, a member of the Racine City Tavern League and former campaign worker for current-Mayor Dickert, who owns several bars within BID #1 and also serves on the City's Board of Ethics (Am. Compl. ¶ 28);

(b)     Monte Osterman ("Osterman"), who assisted Mayor Dickert with his 2009 and 2011 mayoral campaigns, operates Osterman Granite and Marble (a business within the BID #1), and is currently the District #3 Racine County Supervisor (Am. Compl. ¶ 29); and

(c)     Mary Jerger Osterman ("Jerger"), who served as Mayor Dickert's treasurer for his 2009 and 2011 mayoral campaigns, owns Copacetic (a business within the BID #1), and was appointed to the City's Board of Ethics by Dickert (Am. Compl. ¶ 30);

(3)     the Downtown Racine Corporation, through Devin Sutherland,[4] a private, non-profit corporation that works to enhance Downtown Racine's image and functionality and contracts with the City to manage BID #1, the Downtown Racine Corporation is managed by an Executive Director (Sutherland, who is also one of the Municipal Defendants) and governed by a Board of Directors (some of whom are named Municipal Defendants) (*See* Am. Compl. ¶ 25); and

(4)     the Racine City Tavern League (the "Tavern League"), a non-profit corporation that, essentially, serves as a lobbying group for alcohol retailers in Racine, Wisconsin, and currently has "dozens of members, nearly all of whom are white" (Am. Compl. ¶ 17).

Stated as generally as possible, the plaintiffs allege that current-Mayor Dickert conspired with donors (including white business owners), Alderpersons, the Police Department, the BID #1 board members, and the Tavern League. Together, that group discriminated against the plaintiffs by ensuring that the plaintiffs would be subject to a significant number of complaints and reports to police, which in turn required them to appear before the Common Council—which, the theory goes, Dickert essentially controlled—for civil proceedings in which the plaintiffs had to agree to take expensive remediation steps or face loss of their liquor licenses. Meanwhile, through this alleged conspiracy, the white-owned bars in the area had similar or higher number of incidents, but were reported less often or mis-reported

---

[4] Devin Sutherland is represented by Meissner Tierney Fisher & Nichols, S.C., as one of the Municipal Defendants, but has also apparently personally retained Wilson Elser Moskowitz Edelman & Dicker, LLP. As the Court will discuss further in Section 1.2, *infra*, Downtown Racine Corporation is no longer listed as a defendant, and so does not need a motion to dismiss filed on its behalf. Nonetheless, Wilson Elser has filed a brief on Sutherland's behalf seeking dismissal of the claims against him; this brief is in addition to the one Meissner Tierney filed on behalf of the Municipal Defendants, which seeks dismissal of the claims against Sutherland (in addition to the claims against the remaining Municipal Defendants).

by police so that the white owners would not face the same level of scrutiny including civil proceedings and potential license-loss. As a result of these proceedings, the plaintiffs spent large amounts of money on remediation efforts and/or lost or relinquished their liquor licenses. The plaintiffs allege that this activity was a racially-motivated plan to rid downtown Racine of non-white-owned businesses. (*See, e.g.*, Am. Compl. ¶¶ 31–113).

### 1.2 Amended Complaint

Those general allegations formed the basis for two groups of claims in the plaintiffs' original Complaint: the CRA claims (Compl. ¶¶ 139–150) and the RICO claims (Compl. ¶¶ 151–184). The CRA claims were, of course, directed at what the plaintiffs perceive to be racially-motivated discrimination on behalf of the defendants. The RICO claims, on the other hand, were directed more toward the allegedly corrupt conspiratorial activity of the defendants. In any event, the claims were all alleged broadly and seemingly against every defendant by every plaintiff. This lack of specificity in "who, precisely, [was] claiming what against whom" prevented any meaningful notice of claim, and so required dismissal of the original Complaint. (Docket #60 at 3, 27–29).

The Court allowed the plaintiffs to file an amended complaint, and they chose to do so. In their Amended Complaint, the plaintiffs have made three significant changes to the parties:

(1)     Cerafin Davalos is no longer listed as a plaintiff;

(2)     Jeffrey Coe is no longer listed as a defendant;

(3)     Downtown Racine Corporation is no longer listed as a defendant, although the plaintiffs maintain claims against Devin Sutherland, the director of Downtown Racine Corporation (and who is also a Municipal Defendant, but has filed a personal brief) (Am. Compl. ¶ 25).

The plaintiffs having made those changes, the Court will treat those parties as having been effectively dismissed from this case.

Perhaps more importantly, though, the plaintiffs have made substantial efforts to clarify their claims. They, like the Court, group their claims into two broad categories: the CRA claims and the RICO claims.[5] Beyond that, the plaintiffs have provided the Court with specific statements to define what sort of claim each plaintiff brings and who each claim is against.

(1) CRA claims:

  (a) Holmes alleges claims against Wisneski, Kaplan, Helding, Mozol, Maack, and Wahlen, under both 42 U.S.C. §§ 1983 and 1985(3) (Am. Compl. ¶¶ 200–219).

  (b) Fair alleges claims against Wisneski, Kaplan, Helding, Mozol, and Maack, under both 42 U.S.C. §§ 1983 and 1985(3) (Am. Compl. ¶¶ 183–199).

  (c) Khampane and Nueakeaw allege claims against Wisneski, Kaplan, Mozol, Maack, Helding, and Dickert under both 42 U.S.C. §§ 1983 and 1985(3) (Am. Compl. ¶¶ 166–182).

  (d) Jones alleges claims against Becker, Maack, Helding, Kaplan, Mozol, Wisneski, and Wahlen under both 42 U.S.C. §§ 1983 and 1985(3) (Am. Compl. ¶¶ 148–165).

---

[5]The CRA claims, in turn, come in two flavors: standard deprivation of civil rights claims, under 42 U.S.C. § 1983; and conspiracy to deprive claims, under 42 U.S.C. § 1985(3). The RICO claims, meanwhile, are of three separate types: a RICO acquisition claim, under 18 U.S.C. § 1962(b); a RICO conduct claim, under 18 U.S.C. § 1962(c); and a RICO conspiracy claim, under 18 U.S.C. § 1962(d). The plaintiffs allege different permutations of these claims against the defendants, as the Court will describe in further detail.

(e)     the Maldonados allege claims against Becker, Maack, and Helding under 42 U.S.C. §§ 1983 and 1985(3)[6] (Am. Compl. ¶¶ 114–147).

(f)     all of the plaintiffs, jointly, allege 42 U.S.C. § 1983 claims against the City of Racine, pursuant to *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978) (Am. Compl. ¶¶ 220–227).

(2)     RICO claims:

(a)     Holmes asserts

(i)     claims against LeGath under 42 U.S.C. §§ 1962(b) and (d) (Am. Compl. ¶¶ 255–260);

(ii)    claims against Nicholson under 42 U.S.C. §§ 1962(b) and (d) (Am. Compl. ¶¶ 261–266);

(iii)   claims against the Tavern League under 42 U.S.C. §§ 1962(b) and (d) (Am. Compl. ¶¶ 267–272);

(iv)    claims against Dickert under 42 U.S.C. §§ 1962(b), (c), and (d) (Am. Compl. ¶¶ 273–278);

(v)     claims against Kaplan, Helding, Mozol, Wisneski, and Maack, under 42 U.S.C. § 1962 (d) (Am. Compl. ¶¶ 279–286);

(vi)    a claim against Osterman under 42 U.S.C. § 1962(d) (Am. Compl. ¶¶ 287–291);

(vii)   a claim against Jerger under 42 U.S.C. § 1962(d) (Am. Compl. ¶¶ 292–296);

---

[6]It is not entirely clear that the Maldonados wish to maintain a 42 U.S.C. § 1985(3) claim against Becker, Maack, and Helding. The heading of their claim section reads only "Maldonados/The Cruise Inn v. Becker, Maack, Helding Pursuant to 42 U.S.C. 1983," (*see* Am. Compl. at 30) whereas the claims section headers for the other defendants also include reference to "42 U.S.C. 1985" (*see* Am. Compl. at 36 (Jones), 41 (Khampane/Nueakeaw), 45 (Fair), 49 (Holmes)). Nonetheless, as the Court will discuss further, all of the plaintiffs have agreed to dismiss their 42 U.S.C. § 1985(3) claims. Accordingly, this is of little importance.

(viii)   a claim against Wahlen under 42 U.S.C. § 1962(d) (Am. Compl. ¶¶ 297–304);

(ix)   a claim against Levine under 42 U.S.C. § 1962(d) (Am. Compl. ¶¶ 305–308); and

(x)   a claim against Sutherland under 42 U.S.C. § 1962(d) (Am. Compl. ¶¶ 309–315).

(b)   Fair asserts

(i)   claims against LeGath under 42 U.S.C. §§ 1962(b) and (d) (Am. Compl. ¶¶ 316–321);

(ii)   claims against Nicholson under 42 U.S.C. §§ 1962(b) and (d) (Am. Compl. ¶¶ 322–327);

(iii)   claims against the Tavern League under 42 U.S.C. §§ 1962(b) and (d) (Am. Compl. ¶¶ 328–333);

(iv)   claims against Dickert under 42 U.S.C. §§ 1962(b), (c), and (d) (Am. Compl. ¶¶ 334–339);

(v)   claims against Kaplan, Helding, Mozol, Wisneski, and Maack, under 42 U.S.C. § 1962 (d) (Am. Compl. ¶¶ 340–346);

(vi)   a claim against Osterman under 42 U.S.C. § 1962(d) (Am. Compl. ¶¶ 347–351);

(vii)   a claim against Jerger under 42 U.S.C. § 1962(d) (Am. Compl. ¶¶ 352–356);

(viii)   a claim against Wahlen under 42 U.S.C. § 1962(d) (Am. Compl. ¶¶ 357–362); and

(ix)   a claim against Levine under 42 U.S.C. § 1962(d) (Am. Compl. ¶¶ 363–366).

(c)   Khampane and Nueakeaw assert

(i)   claims against LeGath under 42 U.S.C. §§ 1962(b) and (d) (Am. Compl. ¶¶ 367–372);

(ii)   claims against Nicholson under 42 U.S.C. §§ 1962(b) and (d) (Am. Compl. ¶¶ 373–378);

<ol type="i" start="3">
<li>(iii) claims against the Tavern League under 42 U.S.C. §§ 1962(b) and (d) (Am. Compl. ¶¶ 379–384);</li>
</ol>

(iii) claims against the Tavern League under 42 U.S.C. §§ 1962(b) and (d) (Am. Compl. ¶¶ 379–384);

(iv) claims against Dickert under 42 U.S.C. §§ 1962(b), (c), and (d) (Am. Compl. ¶¶ 385–390);

(v) claims against Kaplan, Helding, Mozol, Wisneski, and Maack, under 42 U.S.C. § 1962 (d) (Am. Compl. ¶¶ 391–396);

(vi) a claim against Osterman under 42 U.S.C. § 1962(d) (Am. Compl. ¶¶ 397–401);

(vii) a claim against Jerger under 42 U.S.C. § 1962(d) (Am. Compl. ¶¶ 402–406); and

(viii) a claim against Wahlen under 42 U.S.C. § 1962(d) (Am. Compl. ¶¶ 407–411).

In sum, each plaintiff alleges CRA claims against Municipal Defendants alone.[7] The plaintiffs do not allege any CRA claims against the Political Staff Defendants, the Tavern League, the Downtown Racine Corporation,[8] or certain Municipal Defendants (Sutherland, Levine, and LeGath).

Only Holmes, Fair, Khampane, and Nueakeaw assert any RICO claims, and they do so against a combination of Municipal Defendants, Political Staff Defendants, the Tavern League, and Sutherland. Meanwhile, Jones and the Maldonados do not assert any RICO claims.

---

[7] For any given plaintiff, this is some permutation of Municipal Defendants including Wisneski, Kaplan, Helding, Mozol, Maack, Wahlen, Dickert, and Becker. Additionally, each plaintiff alleges a *Monell* claim against the City of Racine.

[8] Again, it appears that there are no claims remaining against the Downtown Racine Corporation, although Sutherland has filed motions to dismiss the RICO claims against him, personally.

### 1.3 Motions to Dismiss

Having described the currently-pending claims, the Court next turns to briefly describe the nature of the defendants' respective motions to dismiss.

The Municipal Defendants have filed what the Court views as the primary briefs in support of dismissal. (Docket #71, #86). The other defendants have generally adopted the Municipal Defendants' arguments. The Municipal Defendants seek the following relief:

(1) dismissal of Jones' 42 U.S.C. § 1983 claims against Helding and Maack;

(2) dismissal of Khampane and Nueakeaw's 42 U.S.C. § 1983 claims against Helding;[9]

(3) dismissal of the 42 U.S.C. § 1985(3) claims in their entirety;[10] and

(4) dismissal of the RICO claims in their entirety.

(Docket #71 at 44).

If the Court were to grant that request in its entirety, it would leave only 42 U.S.C. § 1983 claims outstanding. And, to be clear, the Municipal Defendants have generally agreed that the 42 U.S.C. § 1983 claims should proceed (except as the Court just described). (*See* Docket #71 at 2 (stating that plaintiffs' claims "undoubtedly sound in civil rights actions pursuant to 42 U.S.C. § 1983, which they have brought, and which the Municipal Defendants concede should proceed—except as described…with respect to certain of the Municipal Defendants who played no role in certain licensing decisions.")).

---

[9] The plaintiffs have agreed to dismiss this claim. (Docket #82 at 1 n.1).

[10] The plaintiffs have also agreed to dismiss this claim. (Docket #82 at 1 n.1).

In the event the Court totally acceded to the Municipal Defendants' request, the Political Staff Defendants, the Tavern League, the Downtown Racine Corporation (to the extent it is not already dismissed), Sutherland, Levine, and LeGath, would be dismissed from the case entirely, because there are only RICO claims currently pending against them. Given that enticing possibility, the Political Staff Defendants, the Tavern League, and Sutherland have all filed their own motions to dismiss and related briefs, adopting and supplementing the Municipal Defendants' RICO-related arguments with the hope of getting all of the RICO claims—and thus themselves—dismissed entirely from this case. (*See* Docket #67, #68, #73, #74, #75, #76, #84, #88, #89).

### 1.4 RICO-Related Factual Allegations

The Court must, of course, address the arguments in those briefs. But, before doing so, the Court will first discuss the plaintiffs' specific RICO-related allegations. While the Court discussed the plaintiffs' discrimination-related allegations in some detail in its order dismissing the original Complaint, (Docket #60 at 3–9), it has not yet provided a detailed overview of the RICO-related allegations. And, seeing as the defendants' motions to dismiss primarily seek the dismissal of the RICO claims,[11] the Court should detail the allegations that specifically relate to those claims before determining whether they should be dismissed.

Generally, the plaintiffs allege—and the Court wishes to make clear that the discussion that follows is based *solely* on allegations at this

---

[11] Because the plaintiffs have agreed to dismiss their 42 U.S.C. § 1985(3) claims, the Court will not go into great detail in analyzing the Municipal Defendants' argument on that topic.

point[12]—that Dickert received money from the Tavern League and other tavern owners and, in exchange, appointed alderpersons who would create issues for minority bar owners in downtown Racine. (*See, e.g.*, Am. Compl. ¶¶ 231–32). After those minority owners lost their licenses, the tavern owners who were bribing Dickert (and who are also, presumably, white) gained access to those licenses. (Am. Compl. ¶ 232).

More specifically, the plaintiffs assert that Dickert accepted thousands of dollars from "the Financiers"—Nicholson, LeGath, the Tavern League, and other unidentified tavern owners—during and after his 2009 and 2011 mayoral campaigns. (Am. Compl. ¶¶ 230, 235).

The first incidents of bribery occurred prior to the April 2009 mayoral primary election. (Am. Compl. ¶ 249(a)). At that time, LeGath provided Dickert's finance director with $300.00 to $400.00 in cash, informing him that the money was for Dickert's campaign, but that LeGath could not be identified in the campaign finance report. (Am. Compl. ¶ 249(a)). LeGath then sent two additional unidentified individuals to carry out similar transactions prior to the primary election, each time providing $200.00 to Dickert's campaign coffers with instructions not to identify the source of the cash in finance reports. (Am. Compl. ¶ 249(b)).

Also prior to the primary, Nicholson paid $1,000.00 to the Dickert campaign. (Am. Compl. ¶ 249(e)). He provided that payment to Dickert's finance director in the form of ten bankwrapped $100.00 bills. (Am. Compl. ¶ 249(e)). In doing so, Nicholson explained that the money had come from

---

[12]The Court must accept those allegations as true, at this stage of the proceedings. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (complaint must "contain sufficient factual matter, *accepted as true*, to 'state a claim to relief that is plausible on its face.'") (emphasis added; quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007))

a fundraiser at his bar at which he had set out a jar for donations. (Am. Compl. ¶ 249(e)). Dickert's finance director, however, had been present at the fundraiser and did not remember seeing a donation jar. (Am. Compl. ¶ 249(e)). This precise sequence of events occurred again shortly thereafter. (Am. Compl. ¶ 249(g)). In total, the Dickert campaign received $2,000.00 from Nicholson prior to the primary election. (Am. Compl. ¶¶ (e, g)). Dickert instructed his finance director to mis-report those funds as having come from Nicholson, Nicholson's wife, the finance director, and other unknown individuals. (Am. Compl. ¶¶ 249(f, h)).

Dickert won the primary election, and thereafter the course of bribery continued. LeGath again personally provided $300.00 to $400.00 and had unidentified accomplices provide $200.00 to Dickert's finance director with instructions that the finance reports not reflect those amounts. (Am. Compl. ¶¶ 249(c–d)).

Dickert arranged a meeting with another business owner (who is known, but unnamed in the Amended Complaint) and enticed him to "do the same thing" as Nicholson—namely provide bribes. (Am. Compl. ¶ 249(j)). That business owner complied, providing Dickert's finance director with $1,200.00 in large bills that he said he had received from a donation jar. (Am. Compl. ¶ 249(k)). The business owner apparently made this statement and took this action entirely at Dickert's bidding, in an attempt to secure favor to redevelop a section of downtown Racine. (Am. Compl. ¶ 249(k)). That support lasted only so long as the bribes: when the business owner refused to pay any additional money, Dickert's administration terminated his support for the redevelopment project. (Am. Compl. ¶ 249(l)).

Then, before Dickert's 2011 re-election, the Tavern League, Nicholson, and LeGath, held an additional fundraiser at which Tavern League members were called upon to provide bribes to Dickert.

Throughout this time, knowing that this system of bribes was illegal, Dickert, together with the Financiers and his allies, developed a system to "wash" the bribes. (Am. Compl. ¶¶ 237–238). Specifically, Dickert encouraged Jerger, his campaign treasurer, to report the bribes as campaign contributions and attribute them to people other than the Financiers. (Am. Compl. ¶¶ 238, 240). Jerger allegedly complied and reported the contributions as having come from unrelated individuals for varying amounts. (Am. Compl. ¶¶ 238, 240). This method worked until the bribes became so large that Dickert could no longer include them on his finance reports without causing alarm. (Am. Compl. ¶ 239). So Dickert and Jerger simply stopped reporting the bribes entirely. (Am. Compl. ¶ 239). The re-election bribes from 2011 simply were not reported on Dickert's campaign finance reports. (Am. Compl. ¶ 249(m)). Dickert and Jerger then filed these false finance reports. (Am. Compl. ¶¶ 251).[13]

Having received those bribes, Dickert took action in the Financiers' favor, appointing alderpersons who would focus undue negative attention on Racine's minority bars and encouraging the Police Department to harass those bars. (Am. Compl. ¶¶ 236, 241). The alderpersons, through their appointed positions on the Licensing Committee, demanded that the plaintiffs pay exorbitant fines or comply with expensive security directives ("side agreements"); they also recommended revocation of certain liquor

---

[13]They also allegedly used out-of-state companies, the U.S. mail, and phone lines and other wire services to solicit donations. (*See, e.g.*, Am. Compl. ¶¶ 252(c)(i–ix)).

licenses. (*See, e.g.*, Am. Compl. ¶¶ 250(d, f–l). As to any licenses that were not revoked, the Licensing Committee hoped that the burdensome fines and side agreements would cause the plaintiffs to choose to relinquish their licenses; thereafter, the Financiers and other preferred white individuals would be able to access those licenses for their own benefit. (Am. Compl. ¶ 236).

In order to maintain control over the alderpersons so that they would continue to take the actions he desired, Dickert engaged in a system of intimidation. (*See* Am. Compl. ¶ 243). The plaintiffs allege various instances of such intimidation. (*See* Am. Compl. ¶ 243). For example, Dickert appointed alderperson Eric Marcus to the Licensing Committee in 2010. (Am. Compl. ¶ 243(a)). Marcus shortly thereafter began to voice concerns about unfair treatment of minority bar owners and voted against taking disciplinary action against some of the plaintiffs in this case. (Am. Compl. ¶ 243(a)). Thereafter, Dickert declined to re-appoint Marcus to the Licensing Committee and went so far as to actively campaign in favor of Marcus' opponent in the next election. (Am. Compl. ¶ 243(a)). Marcus lost that election and Dickert promptly promoted the victorious opponent to the Licensing Committee. (Am. Compl. ¶ 243(a)). Another similar incident occurred in 2013, when Dickert appointed Henry Perez to the Licensing Committee. (Am. Compl. ¶ 243(b)). Perez also voiced concerns about unfair treatment of minority bar owners, whereafter Dickert refused to re-appoint him to the Licensing Committee. (Am. Compl. ¶ 243(b)).

Meanwhile, the Police Department was playing a significant role in channeling primarily minority-owned establishments to the Licensing Committee for hearings. (*See* Am. Compl. ¶ 244). Wahlen, himself, filed complaints against minority-owned businesses. (Am. Compl. ¶ 244(a)). He also told his officers to target those businesses while turning a blind eye to

troubles occurring at Financier-owned (read: white-owned) establishments. (Am. Compl. ¶¶ 244(b–f)). Specifically, he told his officers to prevent and underreport crimes at Financier-owned establishments; meanwhile, he placed them in areas where they would be able to observe disturbances at minority-owned establishments, but would be unlikely to deter or stop such occurrences, and thereafter would report those disturbances. (Am. Compl. ¶¶ 244(b–d)). He also instructed his officers to report disturbances that occurred in the vicinity of a minority-owned bar as having actually occurred at that bar and to exaggerate any incidents at those locations; conversely, white-owned bars received the benefit of having disturbances at their locations mis-reported. (Am. Compl. ¶¶ 244(b, e–f)).

Osterman, Sutherland, and Levine also assisted in this scheme. Osterman threatened Racine business owners with similar harassment by the police and Licensing Committee if they did not pay bribes to Dickert (or use Osterman's own granite contracting company). (Am. Compl. ¶¶ 244(g–h), 250(a–c)). Sutherland recruited witnesses to testify against the minority business owners, and Levine even provided discounts to tenants in his properties who would complain about the minority-owned businesses. (Am. Compl. ¶¶ 244(i–j)).

2.      DISCUSSION

The Court will begin by discussing the claims that the plaintiffs have agreed to dismiss from their amended complaint. Thereafter, it will examine the substance of the defendants' arguments in favor of dismissal of the remaining claims.

2.1      Plaintiffs' Agreements to Dismiss

The plaintiffs have agreed to dismiss their 42 U.S.C. §§ 1985(3) civil rights conspiracy claims in their entirety. (Docket #82 at 1 n.1). They have

also agreed to dismiss Khampane and Nueakeaw's 42 U.S.C. § 1983 claim against Helding. (Docket #82 at 1 n.1). The Court will dismiss those claims in accordance with the plaintiffs' request.

2.2     Remaining Claims

This leaves only two groups of claims that remain subject to the defendants' motions to dismiss: (1) the RICO claims in their entirety; and (2) Jones' 42 U.S.C. § 1983 claims against Helding and Maack. The Court will address each in turn.

In doing so, the Court must accept all of the plaintiffs' well-pleaded factual allegations as true to determine whether the complaint states "'a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 663 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This plausibility requirement helps "to protect defendants from having to undergo costly discovery unless a substantial case is brought against them." *United States v. Vaughn*, 722 F.3d 918, 926 (7th Cir. 2013).

2.2.1   RICO Claims

Holmes, Fair, Khampane, and Nueakeaw assert combinations of RICO claims against a variety of Municipal Defendants, Political Staff Defendants, the Tavern League, and Sutherland. In the Court's prior order, it described the RICO claims as falling into three separate groups:

(1)     RICO acquisition claims, pursuant to 18 U.S.C. § 1962(b), under which the plaintiffs allege that certain defendants targeted them and obtained power or control over their businesses through a scheme of corrupt and illegal activities.

(2)  RICO conduct claims, pursuant to 18 U.S.C. § 1962(c), under which the plaintiffs allege that the defendants conducted corrupt and illegal activities through their businesses or the Racine municipal government.

(3)  RICO conspiracy claims, pursuant to 18 U.S.C. § 1962(d), under which the plaintiffs allege that the defendants conspired in carrying out the corrupt and illegal activities.

To help the Court and the parties keep straight which plaintiffs are suing which defendants and under which theories, the Court has prepared several tables to list the various claims:

| HOLMES CLAIMS | |
|---|---|
| TYPE OF CLAIM | DEFENDANTS |
| 18 U.S.C. § 1962(b) acquisition | LeGath, Nicholson, Tavern League, Dickert |
| 18 U.S.C. § 1962(c) conduct | Dickert |
| 18 U.S.C. § 1962(d) conspiracy | LeGath, Nicholson, Tavern League, Dickert, Kaplan, Helding, Mozol, Wisneski, Maack, Osterman, Jerger, Wahlen, Levine, Sutherland |

| FAIR CLAIMS | |
|---|---|
| TYPE OF CLAIM | DEFENDANTS |
| 18 U.S.C. § 1962(b) acquisition | LeGath, Nicholson, Tavern League, Dickert |
| 18 U.S.C. § 1962(c) conduct | Dickert |
| 18 U.S.C. § 1962(d) conspiracy | LeGath, Nicholson, Tavern League, Dickert, Kaplan, Helding, Mozol, Wisneski, Maack, Osterman, Jerger, Wahlen, Levine |

| KHAMPANE/NUEAKEAW CLAIMS | |
|---|---|
| TYPE OF CLAIM | DEFENDANTS |
| 18 U.S.C. § 1962(b) acquisition | LeGath, Nicholson, Tavern League, Dickert |
| 18 U.S.C. § 1962(c) conduct | Dickert |
| 18 U.S.C. § 1962(d) conspiracy | LeGath, Nicholson, Tavern League, Dickert, Kaplan, Helding, Mozol, Wisneski, Maack, Osterman, Jerger, Wahlen |

The defendants argue that all of these claims should be dismissed. The Court will address each group of defendants' arguments, beginning with the Municipal Defendants'.

### 2.2.1.1 Municipal Defendants

As already noted, the Municipal Defendants' motion to dismiss is the primary motion before the Court. Though there are multiple RICO provisions at issue—18 U.S.C. §§ 1962(b), 1962(c), 1962(d)—the Municipal Defendants attack the plaintiffs' claims under each provision in related ways.

To begin with, the Court notes that the plaintiffs' 18 U.S.C. § 1962(d) claims rest entirely on the existence of their 18 U.S.C. §§ 1962(b) and 1962(c) claims. That is because the Court cannot find a violation of 18 U.S.C. § 1962(d) without a separate violation of 18 U.S.C. §§ 1962(b) or 1962(c). So, the Municipal Defendants focus primarily on undermining the plaintiffs' 18 U.S.C. §§ 1962(b) and 1962(c) claims. Their efforts in that regard are threefold.

### 2.2.1.1.1 Causation

First, they attack the plaintiffs' amended complaint for not adequately alleging causation. (Docket #71 at 13–26; Docket #86 at 3–10). To state a RICO claim, a "plaintiff must allege that 'an injury to [his] business or property resulte[ed] from the underlying acts of racketeering.'" *Empress Casino v. Joliet Corp. v. Johnston*, 763 F.3d 723, 728–29 (7th Cir. 2014) (alterations in original) (quoting *Haroco, Inc. v. Amer. Nat'l B & T Co. of Chi.*, 747 F.2d 384, 398 (7th Cir. 1984); citing 18 U.S.C. § 1964(c)). "Under RICO, the plaintiff 'can only recover to the extent that [ ]he has been injured in his business or property by the conduct constituting the violation.'" *Empress Casino*, 763 F.3d at 729 (alterations in original) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)). This causation requirement—essentially proximate cause—is

the same for both RICO and antitrust cases, and focuses "'on the directness of the relationship between the defendant's alleged conduct and the harm.'" *Empress Casino*, 763 F.3d at 729 (quoting *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 12 (2010); citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("[T]he central question [to] ask is whether the alleged violation led directly to the plaintiff's injuries."); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267–68 (1992) (RICO requires "some direct relation between the injury asserted and the injurious conduct alleged").

The Seventh Circuit recently decided *Empress Casino*, which dealt directly with the issue of proximate cause at the summary judgment stage of RICO proceedings. *See Empress Casino*, 763 F.3d at 727–730. The *Empress Casino* court considered two separate pieces of legislation—the '06 Act and the '08 Act—to determine whether RICO activities by Illinois' former governor caused those pieces of legislation to pass and, hence, proximately caused the *Empress Casino* plaintiffs' damages.

In examining the '06 Act, the *Empress Casino* court determined that the plaintiffs had "not pointed to evidence that would allow a factfinder to conclude that the [defendants'] alleged bribery scheme cause the legislature to pass," a piece of legislation that negatively affected the plaintiffs. *Id.* at 729. Likewise, the plaintiffs had not shown "evidence that the [allegedly corrupt] governor agreed to exert improper influence over state legislators in order to win their support," of the legislation. *Id.* (citing *McCutcheon v. Fed. Election Comm'n*, --- U.S. ----, 134 S.Ct. 1434, 1450 (2014) ("[W]hile preventing corruption or its appearance is a legitimate objective, Congress may target only a specific type of corruption—'*quid pro quo*' corruption."). Meanwhile, a finding of causation was not supported by the admissible evidence—which fell somewhere on the spectrum between corrupt threats to induce votes and

"simple logrolling." *Empress Casino*, 763 F.3d at 730 (certain inadmissible evidence may have gone to corruption, but the Seventh Circuit brushed it aside with little discussion). The Seventh Circuit accepted that "in an appropriate case, a 'finding that bribery of a [government official] proximately caused a plaintiff's injury can [ ] rest on evidence of that individual's influence over the proceedings.'" *Id.* at 730 (quoting *Bieter Co. v. Blomquist*, 987 F.2d 1319, 1327 (8th Cir. 1993)). But, at least as to the '06 Act, there was no evidence of bribery or of the legislators voting as a bloc at the governor's behest, and so RICO causation was not present. 763 F.3d at 730.

The '08 Act was an entirely different story. In that instance, there was clear evidence that the defendants had agreed to provide $100,000.00 to the governor in exchange for his support of the '08 Act. *Id.* at 731. In turn, the governor's "signature on the bill caused the '08 Act to become law." *Id.* at 732.

> Unlike the allegation that the [defendants] bribed the governor to persuade the 150-member legislature to enact the bill, the '08 Act became law as a direct result of the alleged agreement to trade money for one person's action—the governor's signature. A jury could find that the causal chain between the [defendants'] bribe and the governor's signing of the bill was not broken by any intervening acts of third parties.

*Id.* The *Empress Casino* court surveyed Supreme Court case law on the topic and concluded that the plaintiffs' evidence was sufficient to escape summary judgment. *Id.* at 732–34 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, --- U.S. ----, 134 S. Ct. 1377, 1387 (2014); *Holmes*, 503 U.S. at 266; *Hemi Grp.*, 559 U.S. at 4, 10, 11; *Anza*, 547 U.S. at 454–55, 58; *S. Pac. Co. v. Darnell Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918)). The plaintiffs "suffered the only injury resulting from" the alleged RICO activity. *Empress Casino*, 763 F.3d

at734.[14] Accordingly, there was evidence of proximate cause between the alleged RICO activity and the plaintiffs' injury.

To be sure, *Empress Casino* differs slightly from this case in its posture: *Empress Casino* was decided at summary judgment and on the basis of lack of evidence, *see* 763 F.3d at 729–730; this case, on the other hand, comes before the Court on motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and without any real evidence before the Court. Nonetheless, *Empress Casino* is instructive as to the components of RICO causation: "'a direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* at 735 (quoting *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 654–55 (2008)). From the Seventh Circuit's differentiation between the '06 Act and the '08 Act, it is also clear that the Court cannot find proximate cause where the RICO activity could not have brought about the injury in question. *See Empress Casino*, 763 F.3d at 729–735 (where evidence did not support any influence over '06 Act by governor, there was not proximate causation; where evidence established some influence over '08 Act, there was proximate causation). As to the difference in posture between *Empress Casino* and this case, the Court must simply be sure that it is applying the *Twombly/Iqbal* plausibility standard, instead of looking for evidence, as the *Empress Casino* court was required to do at the summary judgment stage.

So, the question before the Court on causation is whether the plaintiffs' Amended Complaint alleges facts that plausibly establish causation. It clearly does. The plaintiffs' alleged injuries—fines, side

---

[14]The Seventh Circuit also discussed the fact that the *Empress Casino* plaintiffs had not sued as taxpayers; nor do the plaintiffs in the immediate case, so that analysis is not relevant.

agreements, license revocations, and voluntary license revocations resulting from the burdensome fines and side agreements—are directly related to the RICO predicate acts.[15] The plaintiffs have alleged a general scheme in which Dickert accepted bribes from defendants and others; he thereafter: (1) made appointments to the Licensing Committee that would bow to his interests (and removed unfriendly appointees); and (2) exerted control over the Police Department to target the plaintiffs' businesses. In control of both the Licensing Committee and police, Dickert and his Financiers (LeGath, Nicholson, and the Tavern League) ensured that the plaintiffs' businesses were targeted and suffered financial burdens, resulting in revocation. Just as the governor in *Empress Casino* did not have total control over passage of the '08 Act, Dickert and his Financiers did not have total control[16] here; but the allegations, if proved, would still be sufficient to establish RICO causation, because there is a direct relation between the activity and the injury and the injury is the one resulting from the alleged RICO activity. *See Empress Casino,*

---

[15]The Court will discuss the sufficiency of the allegations relating to the RICO predicate acts, but assumes *arguendo* for this portion of the discussion that they are sufficiently pled.

[16]And, as to 18 U.S.C. § 1962(b), control under that statute need not rise to the level of formal control; all that is necessary is that "Plaintiffs must allege that Defendants agreed to manipulate Plaintiffs' activities through predicate acts which would cause Plaintiffs to make decisions it would not have otherwise made." *Titan Intern., Inc. v. Becker*, 189 F. Supp. 2d 817, 830 (C.D. Ill. 2001) (citing *Sutliff, Inc v. Donovan Cos., Inc.*, 727 F.2d 648, 653 (7th Cir. 1984); *Ikuno v. Yip*, 912 F.2d 306, 310 (9th Cir. 1990)). There, of course, remain additional questions about this form of liability (including whether the defendants could have obtained an "interest" under 18 U.S.C. § 1962(b)), and it is quite possible that these claims will be dismissed at some point for lack of "interest." But, because the Court ultimately determines that this matter must proceed to discovery, and 18 U.S.C. § 1962(b) discovery and defendants will be co-extensive with the other RICO discovery, the Court will not dismiss the 18 U.S.C. § 1962(b) claims at this juncture.

763 F.3d at 731–34 (detailing the governor's lack of total control over passage of legislation but ultimately finding proximate cause). Indeed, according to the plaintiffs' theory, this was the precise object of the scheme.

Accordingly, the Court finds that the plaintiffs have adequately pleaded RICO causation.

#### 2.2.1.1.2 Predicate Acts

Second, the Municipal Defendants argue that the plaintiffs have not adequately alleged predicate acts. While 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d) each have distinct elements, they all require the existence of a "pattern of racketeering activity." *See* 18 U.S.C. §§ 1962(b–d) (the terms of subsection (d) may not specifically mention a pattern requirement, but in requiring a violation of subsection (a), (b) or (c), it effectively imports those sections' pattern requirement). A pattern of racketeering activity requires at least two "predicate acts" of racketeering activity. 18 U.S.C. § 1961(5). This means that the plaintiffs have to have pleaded at least two "act[s] or threat[s] involving…" racketeering activity, as enumerated in 18 U.S.C. § 1961(1), in order to state a claim under 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d). *See, e.g.*, 18 U.S.C. §§ 1961(1, 5), 1962(b–d); *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011).

The plaintiffs have attempted to comply with this requirement by alleging violations of various Wisconsin and United States statutes that they assert would qualify as racketeering activity under 18 U.S.C. § 1961(1). The Municipal Defendants disagree.

The first area of disagreement comes with the plaintiffs' assertion that the RICO defendants' activities violated Wis. Stat. § 946.10 and/or 18 U.S.C. §§ 201(b–c). (Docket #71 at 27–31). A violation of Wis. Stat. § 946.10, which prohibits bribery, would certainly qualify as a RICO predicate act, *see* 18

U.S.C. § 1961(1)(A)("'racketeering activity' means…any act or threat… involving…bribery…which is chargeable under State law and punishable by imprisonment for more than one year), as would a violation of 18 U.S.C. § 201, seeing as that latter statute is explicitly listed as racketeering activity. So, if the plaintiffs have adequately pled violations of either of those statutes, then they have sufficiently pleaded predicate acts.

Unfortunately for the plaintiffs, 18 U.S.C. § 201 does not cover the situation in this case, because no one in this case "occupie[d] a position of public trust with official federal responsibilities," and nothing involved federal duties. *E.g., Dixson v. United States*, 465 U.S. 482, 496 (1984); 18 U.S.C. § 201(a)(1).

The plaintiffs have adequately alleged Wis. Stat. § 946.10 violations, though. The Municipal Defendants argue that the plaintiffs fail to plead sufficient bribery allegations. They are simply incorrect: the plaintiffs allege that various individuals, including Nicholson and LeGath, on behalf of the Tavern League, made payments to Dickert for the express purpose of ensuring that minority bar owners would be targeted. (*E.g.*, Am. Compl. ¶¶ 235, 249). Dickert, in turn, appointed (or re-appointed) Licensing Committee members who would participate in this scheme, discouraging any dissent. (*E.g.*, Am. Compl. ¶¶ 243, 250). These allegations plausibly state a

violation of Wis. Stat. § 946.10, and so constitute RICO predicate acts, which is enough to allow the RICO claims to proceed.[17]

### 2.2.1.1.3 Continuity

Third, the Municipal Defendants argue that the alleged predicate acts do not satisfy RICO's continuity requirement. "[T]he continuity requirement exists to give effect to Congress' clear intention that RICO target long-term criminal behavior…, as opposed to more discrete acts of fraud." *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 473 (7th Cir. 2007) (citing *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242 (1989)). Continuity can be closed- or open-ended. *DeGuelle*, 664 F.3d at 199 (citing *H.J., Inc.*, 492 U.S. at 241). "Closed-ended continuity refers to criminal behavior that has ended but "the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future." *DeGuelle*, 664 F.3d at 199 (citing *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007)).

---

[17]The parties engage in substantial discussion of the plaintiffs' allegations of "honest services" fraud and wire fraud; those would also constitute appropriate allegations of RICO predicate acts, given the allegations concerning bribery and use of the mail, telephones, and other wire services. *See, e.g., Huff v. First Energy Corp.*, 972 F. Supp. 2d 1018, 1034 (N.D. Ohio 2013) ("claim of honest-services fraud must allege the fraudulent deprivation of honest services through a bribery…scheme"; bribery scheme is present here). (*See, e.g.*, Am. Compl. ¶ 252).

On the other hand, the alleged extortion of other business people, purportedly executed by Osterman (Am. Compl. ¶¶ 250(a–c)), is not predicate to the plaintiffs' RICO claims. Those acts were not "related" to the alleged RICO scheme against the plaintiff—they involved other victims, who it is not clear were white, and in one case did not result in the closure of a business; moreover, the acts were committed by Osterman who has little other role in the alleged scheme and involved direct demands for bribes, which is not alleged to have happened to the plaintiffs. (*See, e.g.*, Am. Compl. ¶¶ 250(a–c)). Thus, there would seem to be different purposes, results, victims, perpetrators, and methods of commission, meaning the extortion acts are not "related" and cannot be treated as predicate acts. *See H.J., Inc.*, 492 U.S. at 237–38.

Open-ended continuity involves "a course of criminal activity which lacks the duration and repetition to establish continuity," but "by its nature projects into the future with a threat of repetition." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992) (citing *H.J., Inc.*, 492 U.S. at 242).

At the very least, there is open-ended continuity, here. Dickert remains mayor, and many of the other actors continue to be involved in Racine politics. Moreover, the alleged scheme is allegedly continuing to produce fruit: in recent months, Nicholson received a liquor license that had previously been denied to minority applicants, has received various grants from the City, and has not been called in front of the Licensing Committee despite incidents at his bars. (*See* Am. Compl. ¶ 254). Dickert and the other actors allegedly engaged in racketeering activity over the course of two mayoral terms, and the scheme allegedly continues to this day. This comes within the ambit of Congress' intent to prevent long-term criminal behavior, and so the Court is obliged to find that open-ended continuity is adequately pled.

### 2.2.1.1.4 Conclusion on Municipal Defendants' RICO Arguments

Having disagreed with each of the Municipal Defendants' arguments in favor of dismissal of the RICO claims, the Court is obliged to deny the Municipal Defendants' motion in that regard.

### 2.2.1.2 Political Staff Defendants

Together, the Political Staff Defendants—Osterman, Jerger, and Nicholson—argue that the 18 U.S.C. § 1962(d) claims against them should be dismissed. To state a claim under 18 U.S.C. § 1962(d), the plaintiffs must allege "that (1) the defendant[s] agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a

pattern of racketeering activity, and (2) the defendant[s] further agreed that someone would commit at least two predicate acts to accomplish these goals." *DeGuelle*, 664 F.3d at 204. "[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998). "A conspiracy to violate RICO may be shown by proof that the defendant, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes." *Roger Whitmore's Auto Servs., Inc. v. Lake Cty., Ill.*, 424 F.3d 659, 674 (7th Cir. 2005). Under *DeGuelle*, the Court notes that it can "infer[ ] from the facts of the complaint…that [defendants'] actions…were part of the original conspirators' agreement." 664 F.3d at 206.

The Court agrees with the Political Staff Defendants that the plaintiffs have not sufficiently pled those two elements as to Osterman and Jerger. As to Osterman, there are only conclusory allegations that he agreed to join the enterprise, but those allegations seem to be based entirely on his alleged participation in activities that the Court found were not RICO predicate acts in footnote 17, *supra*. *(See, e.g.*, Am. Compl. ¶¶ 250(a–c), 289, 290, 349, 350, 399, 400). The Court, therefore, finds that it would be inappropriate to infer an agreement against him. The allegations of an agreement against Jerger are even weaker. Her only involvement was as Dickert's treasurer, allegedly filing campaign finance statements *that were reported to her by another individual.* (Am. Compl. ¶¶ 249(f, h), 296, 356, 406). She had a duty to file those statements and there is no indication or allegation that she had any

idea that anything included in those reports was incorrect. So, the Court also cannot infer an agreement as against her.[18]

Nicholson, on the other hand, is alleged to have paid bribes to Dickert in exchange for favorable action. That is a direct part of the alleged RICO scheme, and so the Court can infer that he agreed to participate therein. As such, the Court cannot dismiss the 18 U.S.C. § 1962(d) claim against him.

Likewise, the Court cannot dismiss the 18 U.S.C. § 1962(b) claim against him. In discussing the Municipal Defendants' arguments, *supra*, the Court largely addressed his arguments in favor of dismissing that claim (predicate acts, causation). Those arguments do not form the basis for dismissal.

Accordingly, the Court will grant in part the Political Staff Defendants' motion to dismiss, insofar as it seeks dismissal of Osterman and Jerger, and deny it in part, insofar as it seeks dismissal of Nicholson.

### 2.2.1.3 Sutherland

The Court begins by pointing out that Sutherland is separately represented as a Municipal Defendant. Moreover, Downtown Racine Corporation, which Sutherland directed, is no longer a defendant in this case. Therefore, it was not necessary for Sutherland to file an extra motion and corresponding set of briefs. Nonetheless, the Court accepts those documents and has reviewed them.

There is only one claim remaining against Sutherland: an 18 U.S.C. § 1962(d) claim asserted against him by Holmes. There is absolutely nothing alleged in the Amended Complaint that would establish that Sutherland

---

[18]If discovery proves differently, the Court will reconsider this decision upon motion and submission of evidence by the plaintiffs.

participated in any of the predicate acts. (*See, e.g.*, Am. Compl. ¶¶ 244, 250(h), 309–315). Nor is there any indication that he agreed to participate in the conspiracy. (*See, e.g.*, Am. Compl. ¶¶ 244, 250(h), 309–315). At most, he approved surveillance of Holmes' bar and secured the participation of community members in a hearing against Holmes' bar. (*See, e.g.*, Am. Compl. ¶¶ 244, 250(h), 309–315). But there is no indication that he performed these activities as part of the alleged RICO scheme. (*See, e.g.*, Am. Compl. ¶¶ 244, 250(h), 309–315). Simply put, there is no basis to find or infer an agreement on Sutherland's behalf.[19]

Accordingly, the Court will grant Sutherland's separate motion to dismiss, and dismiss the plaintiffs' complaints against Sutherland.

#### 2.2.1.4   Tavern League

The Tavern League argues that the Court must dismiss the claims against it, because the plaintiffs have not alleged that the Tavern League, *itself*, participated in any RICO activity.

The Tavern League is correct. To find a corporation liable, the Court must find that the Tavern League, *itself*, took some action. *See, e.g.*, *SK Hand Tool Corp. v. Dresser Indus. Inc.*, 852 F.2d 936, 941 (7th Cir. 1988) (corporation "cannot be held vicariously liable under RICO for the independent acts of its employees."); *see also Kovian v. Fulton Cty. Nat. Bank & Trust Co.*, 100 F. Supp. 2d 129, 133 (N.D.N.Y. 2000) ("As courts have noted, plaintiffs face a substantial burden, as 'vicarious liability has been held to be at odds with Congressional intent in enacting RICO [because] the statute was designed to protect corporations from criminal infiltration rather than hold them liable.'")

---

[19]Again, if discovery proves differently, the Court will reconsider this decision upon motion and submission of evidence by the plaintiffs.

(quoting *Qatar Nat'l. Navigation & Transp. Co. Ltd. v. Citibank, N.A.*, No. 89-CV-464, 1992 WL 276565, at *7 (S.D.N.Y. Sep. 29, 1992) (citations omitted); citing *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 351 (S.D.N.Y. 1998)). That is, "[i]t is clear that liability under RICO is limited to persons who have 'personally committed' at least two predicate acts of racketeering." *Emery v. American General Finance, Inc.*, 938 F. Supp. 495, 499 (N.D. Ill. 1996) (citing *Dudley Enterprises, Inc. v. Palmer Corp.*, 822 F. Supp. 496, 502 (N.D. Ill. 1993)).

Thus, the Court looks to find some alleged activity by the Tavern League. Here, there is none. Indeed, there is no allegation that LeGath was acting as the Tavern League's agent or that his activities had been authorized by the Tavern League. The unnamed individuals who paid small bribes to Dickert's finance director all attributed the bribes to LeGath "as President and/or Director of the Tavern League." Aside from it being extremely unlikely that those individuals would have been so specific about LeGath's capacity when providing the bribes, these allegations simply do not show any activity by the Tavern League. The Tavern League's organizational structure is not pled, so the Court cannot know—even if LeGath had directed the bribes as president of the organization—whether he was actually acting on the organization's behalf or whether his activity was *ultra vires*. None of the allegations plausibly allege that the Tavern League took any action, itself, through LeGath or any other individuals. There is no reason to find that the Tavern League "personally committed" any racketeering activities or agreed to participate in a RICO scheme.[20]

---

[20]Again, if discovery proves differently, the Court will reconsider this decision upon motion and submission of evidence by the plaintiffs.

For these reasons, the Court is obliged to grant the Tavern League's motion to dismiss, and dismiss the plaintiffs' claims against the Tavern League.

### 2.2.2   Jones' 42 U.S.C. § 1983 Claims

The Municipal defendants also argue that Jones' 42 U.S.C. § 1983 claims against Helding and Maack must be dismissed. In support, they argue that Jones was not subject to any activity beyond general calls before the Licensing Committee during Helding's and Maack's tenure. (*See* Docket #86 at 26). Thus, Jones was treated in the same way as the other white individuals who were called before the Licensing Committee. (*See* Docket #86 at 26).

This may ultimately prove to be the case, but the Court will not dismiss Jones' claims at this stage. He alleges that he was called before the Licensing Committee on ten separate occasions; perhaps this number was far above the number of times any white individuals were called before the Licensing Committee, and was intended to harass Mr. Jones. This could plausibly state a claim for relief, and so the Court declines to dismiss the claims.

For that reason, the Court will deny the Municipal Defendants' motion to dismiss Jones' 42 U.S.C. § 1983 claims against Helding and Maack.

### 3.    CONCLUSION

In sum, the Court will dismiss the plaintiffs' 42 U.S.C. § 1985(3) claims, because the plaintiffs have agreed to their dismissal. Likewise, the Court will dismiss Khampane and Nueakeaw's 42 U.S.C. § 1983 claim against Helding, pursuant to the plaintiffs' agreement.

The Court will deny the Municipal Defendants' motion to dismiss the RICO claims. While those claims may not be strong, they should proceed to discovery. If the evidence does not establish support those claims, then the

Court will certainly be prepared to dismiss them upon motion from the parties. The Court will also deny the Municipal Defendants' motion to dismiss Jones' 42 U.S.C. § 1983 claims against Helding and Maack.

The Court will grant in part and deny in part the Political Staff Defendants' motion to dismiss, dismissing the claims against Osterman and Jerger but not the claims against Nicholson. The Court also grants Sutherland's and the Tavern League's respective motions to dismiss.

This results in the Tavern League, Sutherland, Osterman, and Jerger being dismissed from the action. The Court will also direct the Clerk of Court to terminate Downtown Racine Corporation, Jeffrey Coe, and Cerafin Davalos, given that the plaintiffs have not named those individuals in their Amended Complaint.

This leaves only the Municipal Defendants (with the exception of Sutherland) and Nicholson as defendants.

Accordingly,

IT IS ORDERED that, pursuant to the agreement of the plaintiffs (Docket #82 at 1 n.1), the plaintiffs' 42 U.S.C. § 1985(3) claims be and the same are DISMISSED in their entirety, and Khampane's and Nueakeaw's 42 U.S.C. § 1983 claim against Helding be and the same is hereby DISMISSED;

IT IS FURTHER ORDERED that the Municipal Defendants' motion to dismiss the amended complaint (Docket #70) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the Political Staff Defendants' motion to dismiss the amended complaint (Docket #67) be and the same is hereby GRANTED in part, insofar as the plaintiffs' claims against Osterman and Jerger are hereby DISMISSED, and DENIED in part, insofar as the Court will allow the plaintiffs to proceed on their claims against Nicholson;

IT IS FURTHER ORDERED that Sutherland's motion to dismiss the amended complaint (Docket #73) be and the same is hereby GRANTED and the plaintiffs' claims against Sutherland are hereby DISMISSED;

IT IS FURTHER ORDERED that the Tavern League's motion to dismiss the amended complaint (Docket #75) be and the same is hereby GRANTED and the plaintiffs' claims against the Tavern League are hereby DISMISSED; and

IT IS FURTHER ORDERED that the Clerk of Court shall terminate Downtown Racine Corporation, Jeffrey Coe, and Cerafin Davalos, as parties in this action.

Dated at Milwaukee, Wisconsin, this 31st day of October, 2014.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge